**Therese SCRIBNER and Resource Recruiters, Inc.**

v.

**WAFFLE HOUSE, INC.**

No.  3:91–CV–2667–R.

United States District Court,
N.D. Texas,
Dallas Division.

March 7, 1997.

442

Michael P. Metcalf, Law Office of Michael T. Metcalf, Dallas, TX, for Plaintiffs.

William Patrick Finegan, Haynes & Boone, Dallas, TX, Michael W. Fox, Haynes & Boone, San Antonio, TX, for Defendant.

Windle Turley, Law Office of Windle Turley, Dallas, TX, for Movant.

### MEMORANDUM OPINION

BUCHMEYER, Chief Judge.

This case involves the severe and pervasive sexual harassment of the plaintiff, Therese Scribner, by some of the top officers and executives of the defendant, Waffle House, Inc.[1] It also involves the blatant lies, an egregious attempt to suborn perjury, and the reward of witnesses who gave false deposition and trial testimony, by the Waffle House officers, executives, supervisors and other witnesses discussed below.[2]

Therese Scribner was employed by Waffle House for three and one-half years as a personnel recruiter. Because Scribner was a woman, during this entire period she was paid less than males who had the same duties and responsibilities that she did for Waffle House. In addition, Therese Scribner was sexually harassed by three male supervisors—who, contrary to their perjured testimony during depositions and at trial—subjected Scribner to continued, abusive, and severe sexual harassment by conduct such as this:

> ... asking her, *"have you ever been eaten by a man with ice in his mouth?"* and *"do you want to sit on my face?"*

> ... telling her, *"if you ever fucked me, you would never be happy with another man"* and *"I'd like to eat the lining out of your pussy."*

> ... calling her *"little Ms. Big Tits"* and *"our Dolly Parton, the girl with the big ... smile."*

> ... telling recruits being interviewed for jobs with Waffle House, *"Your signing bonus will be a weekend in a hotel with Therese ... in a bikini."*

---

**1.** Including the first sexual harasser, Steve Wright, who is currently a Senior Vice–President of Waffle House; another, Steve Oswald, who was a Regional Manager and Assistant Vice–President at the time of the sexual harassment; and a third, Tim Mercer, who was formerly a Waffle House Regional Manager, but who was rewarded for his perjury in this case with an ownership interest in a Waffle House "franchise restaurant" in Colorado.

**2.** These harsh comments are not directed at the two law firms who represented Waffle House at different times during this litigation.

... grabbing her blouse, pulling it out, and leering, "*It was driving me crazy to see what those were.*"

... sticking a Polaroid camera between her legs, and under her dress, and *taking a picture of her crotch.*

... telling other Waffle House employees that "*Therese got so hot and wet that you could throw her panties against the wall and they would stick.*"

... et cetera.[3]

Although other Waffle House executives and officers [4] actually witnessed some of the perverse sexual harassment of Therese Scribner by these three male executives and supervisors, they never reprimanded the harassers or sanctioned them for their egregious misconduct. Instead, one of them, Area Manager *Steve Wright*, was later promoted to become a Senior Vice–President of Waffle House; and the other two harassers, Regional Manager *Steve Oswald* and Division Manager *Tim Mercer*, also received promotions or other rewards from Waffle House.

With the backdrop of this corporate environment, it was not too surprising that other Waffle House executives and supervisors joined in the sexual harassment of Therese Scribner. For example, when Division Manager *Tim Mercer* stuck the Polaroid between Therese's legs, and snapped a picture under her dress, Area Vice–President *Larry Cannon* was present; although he witnessed this reprehensible conduct, Cannon did not take any action against Mercer.[5]

Therese Scribner repeatedly pleaded with Steve Wright, Steve Oswald, and Tim Mercer to stop their repugnant conduct—because, despite it, Therese was doing a very good job, and she wanted and needed to continue her employment at Waffle House. Scribner threatened to report Wright and Oswald if they did not stop the sexual harassment, but it continued. Then, Scribner complained to other Waffle House executives [6] about the sexual harassment, but "nothing ever happened." Finally, Scribner was driven to complain to Donald "Skip" Nau, the new Waffle House "Vice–President of People," shortly after Nau had become her supervisor.

Skip Nau documented *some* of Therese Scribner's complaints of sexual harassment, and he reported them directly to Joe Rogers, Jr., the President, CEO and 78% owner of Waffle House. At the next Executive Committee meeting (held shortly after Joe Rogers received Nau's report), Rogers asked Steve Wright about Scribner's complaints; however, Wright flatly denied that he had ever engaged in any improper conduct towards Therese Scribner—and the Waffle House President, CEO and major stockholder did nothing about Nau's report or the plaintiff's complaints of sexual harassment.[7] Then, *as the direct result of her sexual harassment complaints, Therese Scribner was promptly terminated*—less than four months after she had first complained to Skip Nau.

Supposedly, Waffle House terminated the plaintiff because she had been a "poor employee" and a poor recruiter—a preposterous

---

**3.** These are but a few examples. The many acts of unrelenting and pervasive sexual harassment of Therese Scribner, which are detailed below, make the sexual harassment in *Farpella–Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), seem to pale by comparison.

**4.** As discussed below, the Waffle House executives who witnessed one or more acts of sexual harassment of Therese Scribner by Steve Wright or Steve Oswald included the following: *Joe Rogers, Jr.*, President, CEO and owner of 78% of the stock of Waffle House; *Lib Julian*, Senior Executive Vice–President, Operations; *Skip Nau*, Vice–President, People Department; and *Larry Cannon*, Area Vice–President.

**5.** At trial, Larry Cannon denied that he observed Mercer's "crotch shot," and claimed that Mercer "only" put his hand on the plaintiff's leg. *This*

*was a lie!* Even Tim Mercer, himself, *finally* admitted he was "joking around" with the Polaroid and the plaintiff's legs.

**6.** These executives included *Lib Julian*, Senior Executive Vice–President, Operations; *John Robertson*, Vice–President, Operations; and *Larry Cannon*, Area Vice–President.

**7.** *No member of the Executive Committee (or anyone else at Waffle House) contacted Therese Scribner, either to discuss her complaints of sexual harassment or to give her an opportunity to respond to Steve Wright's denials.* Nor did anyone investigate and talk to the numerous other people who had witnessed the plaintiff's harassment by Wright, Oswald and Mercer.

claim, particularly since Scribner had never received a single complaint, warning or reprimand about her performance; since she had received regular pay increases during her entire three and one-half years at Waffle House; and since—about one year before her termination—Scribner had been persuaded not to quit her job at Waffle House by Steve Wright and by John Robertson, a Waffle House Vice–President.

After she filed this sexual harassment-retaliatory discharge suit against Waffle House, Therese Scribner started her own personnel recruiting company, the plaintiff *Resource Recruiters, Inc.* Two years later, Waffle House maliciously and tortiously interfered with a significant recruiting contract that Resource Recruiters had with Grandy's, Inc. In doing so, Waffle House executives defamed Scribner and Resource Recruiters, Inc. by lying about why Scribner had been terminated by Waffle House.

These are Therese Scribner's legal claims against Waffle House: sexual harassment and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and Tex.Rev.Civ. Stat. Ann. art. 5221k, § 5.01; unequal pay in violation of Title VII and the Equal Pay Act, 29 U.S.C. §§ 206 d(1) and 215; and common law claims of breach of contract, defamation, intentional infliction of emotional distress, and tortious interference with the Resource Recruiters—Grandy's contract. With the exception of the alleged breach of contract, all of Scribner's claims are meritorious, and she is entitled to recover the actual and punitive damages that are discussed below. The Resource Recruiters common law claims against Waffle House are these: tortious interference with the Grandy's recruiting contract, defamation, and intentional infliction of emotional distress; these claims are also valid, and Resource is entitled to the recovery of the actual and punitive damages discussed below.

This opinion will first discuss the applicable law concerning a sexual harassment "hostile work environment" claim.[8] Next, it will state this Court's findings regarding the credibility of the witnesses who testified at the non-jury trial. Then, it will discuss the facts established by the credible testimony and exhibits—including (i) the severe and pervasive sexual harassment that was committed by some Waffle House officers, executives and supervisors (and ignored by others), (ii) the unsuccessful attempt by a Waffle House executive to suborn perjury, and (iii) the successful attempt by other executives to bribe two trial witnesses. Finally, the opinion will discuss the law and the credible evidence supporting the award of actual damages and punitive damages on each of the claims of Therese Scribner and Resource Recruiters.

Because of the length of this opinion—due primarily to the number of valid legal claims made by the plaintiffs and to the incredible extent of the severe, unrelenting sexual harassment and the Waffle House lies in this case[9]—it will begin, for convenience, with an outline of the various matters to be covered.

Page

I.   The Law Applicable To Sexual Harassment Claims   445

II.  The Credibility Of The Witnesses   448

III. The Facts   449
     A.   The Plaintiff's Employment At Waffle House   449
     B.   The Plaintiff's Performance   453
     C.   The Severe, Pervasive Sexual Harassment Of The Plaintiff   455
     D.   Waffle House Does Not Want The Plaintiff To Quit   468
     E.   The Plaintiff Again Complains About The Sexual Harassment—And,
          As The Result, She Is Terminated   470

**8.** This is to lay the predicate for a detailed description of the sexual harassment that took place in this case.

**9.** As well as to the necessity of detailing the egregious conduct of Waffle House that warrants a large award of punitive damages.

F.   The Fabricated "Reasons" Concocted To "Justify" The Plaintiff's Termination ................................................................. 475
     1.   Lie Number One: Waffle House Terminated The Plaintiff Because Of Her Poor Performance ............................................. 475
     2.   Lie Number Two: That's Why The Lady Is A Tramp .......... 478
     3.   Lie Number Three: No One Has Ever Violated the Waffle Houses Sexual Harassment Policy ......................................... 479
G.   After The Plaintiff's Termination ......................................... 481
     1.   The Higher Paid Male Replacement ................................. 481
     2.   The Plaintiff's Complaints To The TCHR [10] Result In More Lies By Waffle House ............................................................. 481
     3.   The Plaintiff Starts Her Own Recruiting Business ............ 483
     4.   The Fictitious "Raid" Upon Waffle House ........................ 484
     5.   Waffle House Threats Cause Grandy's To Terminate Its Contract With Resource Recruiters ......................................... 485
H.   The Attempt To Suborn Perjury ............................................. 487

IV.  Liability And Actual Damages .................................................... 488
A.   Willful Discrimination In Pay ................................................ 489
B.   Sexual Harassment ................................................................. 492
C.   Intentional Interference With The Resource Recruiters Contract With Grandy's .......................................................................... 496
D.   Defamation ............................................................................. 497
E.   Intentional Infliction Of Emotional Distress ......................... 499
F.   Breach Of Contract ................................................................. 500
G.   Summary Of Actual Damages ................................................. 500

V.   Punitive Damage ........................................................................ 500
A.   The Applicable Law ................................................................ 500
B.   Punitive Damages: Sexual Harassment .................................. 504
C.   Punitive Damages: Defamation And Tortious Interference ..... 508

VI.  Summary Of Actual And Punitive Damages ............................... 510

VII. Conclusion .................................................................................. 510

## I. THE LAW APPLICABLE TO SEXUAL HARASSMENT CLAIMS

The recent Fifth Circuit decision in *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803 (5th Cir. October 21, 1996) (*Higginbotham, Wiener and Benavides*)[11] contains an excellent, succinct analysis of the law applicable to the Title VII sexual harassment claims of Therese Scribner. In that case, the plaintiff Farpella–Crosby began work at a Horizon Health Care nursing home in June 1993. In February 1994, Jose Blanco, Horizon's director of nursing, began to sexually harass the plaintiff; his harassing conduct included:

... frequent comments attributing Farpella–Crosby's large number of children to *her proclivity to engage in sexual activity;*

... repeated comments that "*he knew what she liked to do*" because she had seven children and that she "must not have a television";

... "joked" before a group at the nursing home that "Farpella–Crosby *doesn't know how to use condoms*";

... inquired frequently about Farpella–Crosby's *sexual activity;* and

... often questioned Farpella–Crosby and a female co-worker about "*where they had been on the night before (while off duty), whether they had taken men home, and whether they 'got any.'*"

In addition, on one occasion, after Farpella–Crosby had lunch in her office with a boyfriend, Blanco said, "*when you open the door [to the office], the smell of fish just hits you*

---

**10.** Texas Commission On Human Rights.

**11.** The *Farpella–Crosby* opinion is by Circuit Judge Benavides.

*in the face. You shouldn't be doing that kind of thing at work."* Another employee heard "Blanco making this comment and told him that he should stop." [12]

The plaintiff and the female co-worker both testified that Jose Blanco "made similar comments two or three times a week"—and the plaintiff added that Blanco's sexual comments "were so frequent that she could not possibly remember each instance." *Blanco also "threatened Farpella–Crosby with her job on numerous occasions when she asked him to stop making these 'sexual comments.'"* [13]

In his testimony, Blanco "essentially admitted that he did ask Farpella–Crosby about her personal life," but claimed that he did so *"because he believed the lack of sleep resulting from sexual activity could affect her work performance."* [14] With respect to the *"the smell of fish just hits you in the face"* remark, Blanco did not actually deny making this comment, but claimed "that he did not recall it." [15]

The *Farpella–Crosby* opinion holds that, in order to establish a "hostile work environment" sexual harassment claim, a plaintiff must prove that:

> ... (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a term, condition, or privilege of employment (*i.e.*, that the sexual harassment was so pervasive or severe as to alter her conditions of employment and create an abusive working environment); and (5) the employer knew or should have known of the harass-

ment and failed to take prompt remedial action ...[16] To be actionable, the challenged conduct must create an environment that a reasonable person would find hostile or abusive ...[17]

### (i) severe and pervasive harassment

*Farpella–Crosby* then discusses (i) the elements of liability in a sexual harassment case based on verbal conduct, and (ii) the requirements for the imposition of liability *against the employer* for "the employee's offensive conduct." To be actionable under Title VII, the sexual harassment must be:

> ... sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment. *Sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive as to alter the conditions of the victim's employment* and create an abusive working environment that violates Title VII.... But the mere utterance of an ... epithet which engenders offensive feelings in an employee is not alone sufficient to support Title VII liability.[18]

The Fifth Circuit held that Farpella–Crosby's evidence did support the jury's finding that the sexual harassment by her supervisor (Jose Blanco) had been so pervasive or severe that it affected a term, condition, or privilege of her employment. The Court noted the:

> ... substantial evidence from which the jury could have concluded that Blanco's comments and questions were sufficiently severe and pervasive as to alter the conditions of her employment and create an abusive working environment. Both Far-

---

**12.** 97 F.3d at 805.

**13.** *Id.*

**14.** None of the Waffle House witnesses in this case offered this rather imaginative "belief" as an excuse for their sexual harassment of Therese Scribner.

**15.** *Id.*

**16.** *Id.* at 806, citing *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

**17.** *Id.* Whether an environment is "hostile or abusive" depends on "the totality of circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995).

**18.** *Id.* (emphasis added) citing *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir.1996).

pella–Crosby and her co-worker testified that Blanco inquired about Farpella–Crosby's sexual activity or made comments similarly offensive two or three times a week. *The record reflects that Blanco made many egregious comments to Farpella–Crosby, some in front of co-workers, that in combination with his frequent inquisition about her sexual activity were sufficiently severe and pervasive to create a hostile work environment.*[19]

### (ii) *the employer knew or should have known of the sexual harassment*

Of course, an "employer is liable for the discriminatory acts of an employee only if it knew or should have known of the employee's offensive conduct and failed to take steps to repudiate that conduct and eliminate the hostile environment."[20] Although it felt this was "undoubtedly a close question" in *Farpella–Crosby*, the Fifth Circuit held that the plaintiff had met her burden of proving that Horizon Health Care "know or should have known" that she was being subjected to a hostile work environment—primarily with evidence of Farpella–Crosby's complaints to two of the company's "human resource directors," Belinda Callejo and Gigi Hopper.[21]

Specifically, Farpella–Crosby testified that she frequently talked to Belinda Callejo about "her problems" with Jose Blanco, telling the human resource director:

> [T]hat Jose Blanco 'was making comments into [her] personal life' and that he made 'personal comments' that she did not like ... *Although she testified that she did not give Callejo any specific examples,* she

did tell Callejo that she found Blanco's comments to be offensive. *Callejo* agreed that Farpella–Crosby had told her of job-related problems, but *denied that Farpella–Crosby had ever mentioned sexual harassment. Callejo also testified,* however, *that an employee need not say explicitly 'I am being sexually harassed'* before Callejo would take action as human resources director. Callejo said that she would consider it sufficient notice if Farpella–Crosby had said that *'things are being said to me.'*[22]

Farpella–Crosby also testified that, after Callejo was replaced as human resource director by Gigi Hopper, she had also complained to Hopper "that Blanco was 'making comments into [her] personal life' and that she considered the comments to be 'offensive or unwelcome.'" And, Farpella–Crosby testified that she "intentionally failed to report" specific instances of sexual harassment in a statement she gave to Hopper "because she 'had told Belinda [Callejo]' and thought 'somebody would do something about what I had told Belinda.'"[23]

In addition, the *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803 (5th Cir.1996) opinion discusses another factor "relevant to whether [the employer] knew or should have known of [the sexual harassment]": *whether the conduct "took place in public, under the eye of co-workers or supervisors."*[24] With respect to Farpella–Crosby, "on several occasions, Blanco made offensive comments in the presence of [the plaintiff's] co-worker Robert Martinez and Humberto Arriola, as-

---

**19.** *Id.* at 806 (emphasis added). In a footnote, the Fifth Circuit explained: "This case is distinguishable from *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996), in which this Court held that *a single joke told by a supervisor involving condoms* was insufficient to create an hostile work environment. Blanco's joke about Farpella–Crosby's knowledge of condoms was directed specifically toward Farpella–Crosby and her seven children and was not an isolated incident."

**20.** *Id.* at 807, citing *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 404 (5th Cir.1993) (citing *Jones,* 793 F.2d at 720) ("As this Court noted in *Waltman v. International Paper Co.,* the type and extent of notice necessary to impose liability on

an employer under Title VII are the subject of some uncertainty. 875 F.2d 468, 478 (5th Cir. 1989) (concluding that *three separate complaints to higher management constituted sufficient notice* ).")

**21.** 97 F.3d at 807 (Callejo, the human resources director when Farpella–Crosby began her employment in June 1993, was replaced by Hopper on May 1, 1994).

**22.** *Id.* (emphasis added).

**23.** *Id.*

**24.** *Id.* at 807 n. 5. (emphasis added).

sistant director of nursing."[25]

### (iii) the employer's failure to take prompt remedial action

Finally, in *Farpella–Crosby*, the Fifth Circuit rejected the claim that Horizon's "remedial action" had been taken promptly or that it was adequate.

> Substantial evidence also supports a finding that Horizon failed to take prompt remedial action. *Callejo's uniform response to Farpella–Crosby's complaints was 'Hang in there. Something's got to be done.' Nothing, however, was done.* Viewing the evidence in the light most favorable to Farpella–Crosby, *she endured nearly six months of Blanco's abusive behavior before Horizon took any action.* There is no evidence that Callejo performed any investigation of Farpella–Crosby's complaints *or that she took any steps to remedy the situation.* This was not prompt remedial action.[26]

This summary of the law applicable to sexual harassment claims, as explained by the Fifth Circuit in *Farpella–Crosby*, sets the framework for the following discussion of the facts concerning the severe, pervasive and disgusting sexual harassment of Therese Scribner.

## II. THE CREDIBILITY OF THE WITNESSES

These are the Court's credibility determinations concerning the witnesses who testified at the non-jury trial in this case.[27]

1. *The plaintiff:* THERESE SCRIBNER was a very, very credible witness. Indeed, during her three days of testimony, Therese was one of the most truthful persons who has ever testified before this Court.

2. *The sexual harassers:* STEVE WRIGHT and STEVE OSWALD, the first two Waffle House executives who sexually harassed Therese Scribner, *are both liars*—indeed, OSWALD is one of the two worst liars that has ever testified before this Court.[28] Both WRIGHT and OSWALD knowingly gave false testimony during their depositions; they reluctantly admitted some of these lies at trial, but they told new falsehoods and repeated some of their deposition lies. TIM MERCER, who also sexually harassed Therese Scribner, was the second of the two worst liars who have ever appeared before this Court (along with OSWALD). Indeed, as discussed below, MERCER was "rewarded"—with the bribe of a Waffle House franchise restaurant in Colorado—for his perjured deposition testimony. TIM MERCER's testimony, and that of his wife, SHERRY MERCER, are discredited almost entirely by this Court.[29]

3. *The attempt to suborn perjury:* As discussed below, two Waffle House executives—DAVE THEOBOLD and LARRY CANNON—attempted to suborn perjury by intimidating DAVID SMITH, a former Waffle House employee, shortly before the trial

---

**25.** *Id.* (emphasis added).

**26.** 97 F.3d at 808–809 (emphasis added).

**27.** In determining the credibility of witnesses, this Court considered all of the circumstances surrounding the testimony; for example: Did the witness have any personal interest in the outcome of the case or any reason not to tell the truth? What were the witness's connections with the plaintiffs or with Waffle House? Did the witness have a good memory and answer the questions directly? Did the witness have any particular reason not to tell the truth? Was the witness impeached either in deposition or trial testimony (or both)? Was the witness's testimony supported, or contradicted, by other credible evidence?

**28.** During non-jury trials, this Court takes summary notes of the testimony of each witness.

The contemporaneous trial notes made during Steve Wright's testimony contain these remarks by the Court: *"LIE"* and *"Lied About"* (numerous notations), *"Also lied about ...,"* "very evasive," and "NOT CREDIBLE—to say the Very Least." The contemporaneous trial notes regarding Steve Oswald include numerous remarks like these: "LIE" and "LIED ABOUT ..." (many such notations, even more than for Steve Wright) and "LIED TO COURT" (five different notations made immediately after the Court completed its questions to Oswald); *et cetera.*

**29.** The Court's contemporaneous trial notes concerning Tim Mercer contain these editorial comments: "LIE" and "LIED ABOUT" (many, many times), "5 LIES to defense attny" (these were about the "Polaroid crotch shot"), "WARNING BY JB" and "GIVE ME A BREAK!" And, the contemporaneous notes on Sherry Mercer's testimony contain several different "LIE" notations.

in this case. The Court discredits the testimony and the repeated lies of THEOBOLD and CANNON.[30] It credits the entire testimony given by DAVID SMITH, a very credible witness.

4. *The Waffle House executives who witnessed acts of sexual harassment:* Other Waffle House officers and supervisors witnessed some of the sexual harassment of THERESE SCRIBNER by STEVE WRIGHT, STEVE OSWALD, TIM MERCER and others. These include LARRY CANNON, LIB JULIAN, SKIP NAU, JOHN ROBERTSON and DAVE THEOBOLD.[31] The Court discounts either all or major portions of their testimony, as specifically noted in this opinion.

5. *The witnesses for the plaintiff:* The witnesses who testified on behalf of THERESE SCRIBNER included GLENDA ADAMS, MATTHEW BULLOCK, LISA CHAMBLESS, DAVID COLEMAN, FRAN DUBUISSON, MARGARET DAILEY, TONY FISH, DAN GAY, RODNEY LeBRAUN, MICHAEL ROBARE, JOE THOMAS, BOB WESSON and STEVE WILLIAMS. The Court credits their testimony because it was true.[32]

6. *The other Waffle House witnesses:* The Waffle House witnesses also included DAVID ADAMS, OLENE MAE BROWNING, RICK BROWNING, TONY FISH, LISA MERCER (Tim Mercer's first wife), DELINDA PEREZ and others. Some of these witnesses lied, and some were mistaken; the Court credits their testimony only to the extent specified in this opinion.

7. *The Waffle House President:* As discussed below, JOE ROGERS, JR., the President, CEO and majority (78%) stockholder of

Waffle House, was present when one of STEVE WRIGHT's first acts of sexual harassment took place. Despite this, ROGERS took no action against WRIGHT, and he later promoted WRIGHT, who became one of the top Waffle House executives at the company headquarters in Atlanta. ROGERS also gave false testimony about several matters.[33] The Court, therefore, discounts the testimony of JOE ROGERS, JR. insofar as it conflicts with the findings of fact in this opinion.

## III. THE FACTS

Based upon the evidence presented at trial and upon the credibility determinations just made, these are the Court's findings of fact, as required by Fed.R.Civ.P. 52.

### A. The Plaintiff's Employment At Waffle House

#### 1. The Plaintiff

Therese Scribner was 42 at the time of trial. Married since 1974, Therese and her husband have two children.

After she attended junior college in Mississippi, Scribner worked for several different employers, first in Mississippi and then in Dallas, usually as a secretary or an administrative assistant. Among her employers was McDonald's, where she worked for about one and one-half years in the personnel department.

In 1983, Scribner became a personnel recruiter for Diversified Human Resources Group ("Diversified") in Dallas, and she remained there for about three and one-half years. Scribner was very successful in personnel recruiting for Diversified. She re-

---

**30.** The Court's contemporaneous trial notes for Theobold and Cannon include these comments: "LIE" (numerous times), "IMPEACHED" and "NOT CREDIBLE" (numerous times).

**31.** The Court's contemporaneous trial notes for these Waffle House witnesses contain these notations: "LIE" (many times), "NOT CREDIBLE" (many times), "EVASIVE" and "IMPEACHED/NOT CREDIBLE."

**32.** The Court's contemporaneous trial notes concerning these witnesses include numerous notations of "CREDIBLE" and "VERY CREDIBLE!"

**33.** For example, Joe Rogers claimed that the plaintiff's responsibilities as a recruiter were not as great as those of her predecessor, that the plaintiff's performance as a recruiter was not satisfactory, that he was not responsible for her termination, that he conducted an investigation of her harassment claims, and that neither the "Dolly Parton" nor the "weekend with Therese in a bikini" comments violated the Waffle House sexual harassment policy. These claims are false, as were the other parts of his testimony discussed below.

ceived a number of awards and recognitions, including "Rookie of the Year"; she was the top biller at Diversified for two years; and she was earning over $60,000 a year. Scribner was certified by the National Association of Personnel Consultants, and she received numerous production-based awards from that Association and from the Texas Association of Personnel Consultants.

Despite her success, Scribner decided to leave Diversified in April of 1986. She was "burned out" and felt the job was taking too much time away from her family. For the next few months, Scribner did not work.

### 2. *The Defendant Waffle House*

Waffle House, Inc. was started in 1955 by two men, Joe Rogers, Sr. and Ton Forkner. Waffle House is a chain of short order restaurants that are open 24 hours a day, 365 days a year. Its corporate offices are located in Atlanta, Georgia. In 1973, *Joe Rogers, Jr.*—the son of one of the founders—became President and CEO of Waffle House (two years after he had obtained a Masters Degree at Harvard Business School). Then, in 1978, *Joe Rogers, Jr.*[34] became the controlling stockholder when he acquired 78% of Waffle House stock.[35]

At the time of trial, Waffle House owned and operated some 465 restaurants in five marketing areas: Metro East (eastern Georgia), Metro West (western Georgia), the Eastern Area (North and South Carolina), the Gulf Coast Area (some of the states bordering the Gulf of Mexico), and the Western Area (*Texas*, Oklahoma, Colorado, Arizona and parts of Louisiana). In addition to

its own restaurants, Waffle House also had about 470 "franchise restaurants" in its five marketing areas and elsewhere.[36]

These are the "management positions" at Waffle House and the number of restaurants—also called "*units*" and "*stores*" in trial testimony—for which each level of "management" is responsible:

| | |
|---|---|
| Unit Manager [37] | 1 restaurant |
| District Manager | 2–4 restaurants |
| Division Manager | 12–15 restaurants |
| Regional Manager [38] | 25–30 restaurants |
| Area Manager & Assistant Vice-President | up to 120 restaurants |

Each Area Manager–Assistant Vice–President reports to the Vice–President of Operations in Atlanta, who in turn reports to the President & CEO of Waffle House, Joe Rogers. As the top executive and 78% owner of Waffle House, Rogers personally approves every hiring, firing and compensation decision involving his company.[39]

From its beginning, Waffle House has been directed exclusively by white males. Corporate management has never included any females, African–Americans, Hispanics, or other minorities. The testimony at trial established that:

(i) *perhaps* 12–15 of Waffle House's 140 District Managers and two of its 45 Division Managers were females, but that none of its 20 Regional Managers, or its Area Managers or its officers in Atlanta were female; and

(ii) that perhaps 17–18 of Waffle House's 140 District Managers and two of its 45 Division Managers were black, but that none of its Regional Managers, Area

---

**34.** All further references to *Joe Rogers* in this opinion mean *Joe Rogers, Jr.*, not his father.

**35.** The remaining stock, according to Joe Rogers, was held "by just over 3,000 shareholders."

**36.** These "franchise restaurants", located in 20 states, are owned by individuals, but Waffle House receives income from them in the form of payments for the franchise and for the supplies, etc. sold to the owners-operators. Joe Rogers and Lib Julian gave slightly different testimony concerning the number of "franchise" and "company-owned" restaurants.

**37.** A Unit manager is responsible for the day-to-day management and 24–hour operations of each

Waffle House restaurant. Positions above the Unit Manager are generally referred to as "multi-unit managers."

**38.** During trial testimony, there were some different figures given for the number of restaurants for which the District, Division and Regional managers are responsible. These differences are not relevant to any issue in this case.

**39.** See Exh. 256, a November 9, 1990 memorandum of Waffle House Vice–President/Secretary and General Counsel, J. Michael Upton, stating: "Rogers personally approved every hiring and compensation decision, with the exception of Paul Smith" (the male recruiter hired to replace Therese Scribner).

Managers or its Atlanta officers were black.[40]

### 3. *The Plaintiff's Hiring By Waffle House*

Therese Scribner and her family lived in Grapevine, a suburb north of Dallas. One of her friends and neighbors was Mary Wright. After Mary learned that Therese had left her personnel recruiting job with Diversified, she mentioned that her husband, Steve Wright,—who was the Western Area Manager and Assistant Vice–President of Waffle House—was looking for a recruiter in Dallas.

Shortly after this, the Wrights invited the Scribners to have dinner with them and another couple.[41] That evening (in May or June of 1986), Steve Wright told Therese that Waffle House did have an opening for a recruiter, and they discussed her experience and Waffle House's recruiting needs. Therese gave Steve Wright a copy of her resume[42] and Wright told her that the recruiting job would pay from "$30,000 to $40,000 or $50,000 a year."[43]

Following this dinner, Therese Scribner had two meetings at Waffle House with Joe Renfro, a Waffle House executive (Assistant Vice–President, Training) in the Western Area office in Dallas. Renfro told Therese about the company's history, it's structure and their training program. Later, Steve Wright asked Therese Scribner to come to his home for another meeting. There, Steve Wright offered Therese the vacant recruiting job, at a salary of $28,000 per year, with a potential bonus of $8,000 (with this bonus being based on three factors: whether she met hiring quotas, what number of her recruiting hires were "retained," and her "communication skills").

In response to this offer by Wright, Therese Scribner said: "You told me the salary was a lot higher" (i.e., from $30,000 to $40,000 or $50,000 a year). Steve Wright replied to Therese with these two blatant lies:

(i) *that she had misunderstood him, and that the starting salary was only $28,000, but that "she could be making as much as $40–$50,000 within six months"; and*

(ii) *that she would be receiving the same compensation as Rick Seal, the Waffle House recruiter that Scribner was replacing.*

After Wright told Therese that her compensation would be "the same as Rick Seal's," he then said that this offer was "non-negotiable".[44] Therese Scribner accepted Wright's offer. Wright gave Therese "a couple of boxes of Rick Seal's files" for her to review. And, on July 29, 1986, the plaintiff started work for Waffle House, at a base salary of $28,000 per year, with a maximum yearly bonus of $8,000.

Within a month or so, Therese Scribner learned from documents in Rick Seal's files "that Seal had actually been receiving a base salary of $38,000, with a potential bonus of $10,000"—i.e., $12,000 more in potential compensation (salary plus bonus) than the $36,-

---

**40.** Lib Julian, who gave these figures concerning the number of females, blacks and hispanics in the Waffle House management, also testified that the company started a "minority recruiting program" in *May 1994* (four years after the plaintiff's termination), headed by an African–American. Joe Rogers also testified that there was now one female Vice–President of "some sort" in Atlanta.

**41.** After this dinner, Steve Wright sometimes played golf with the plaintiff's husband. The Wright and the Scribner children were friends, sometimes spending the night together.

**42.** Waffle House's claim that Scribner's resume contained false information about her education and employment history was ludicrous. It did not.

**43.** Therese Scribner told the truth about this meeting. *Steve and Mary Wright told several lies about it, including their testimony that Therese Scribner wore "short-shorts" and a "revealing halter top" to this dinner meeting.* When the Court questioned Steve Wright during trial, Wright could not explain why he *would make this job offer to someone who (according to their lies) wore revealing and tasteless clothes in public on the evening he first met her and discussed her possible interest in working for Waffle House.*

**44.** Steve Wright did not tell Therese Scribner that she could only be terminated for cause—that is, for "violating the employee conduct policy." *This Court discounts Scribner's contrary testimony, which were the only non-believable statements she made during her testimony.*

000 maximum that the plaintiff could receive. Therese was so angry that she immediately confronted Steve Wright and asked: *"Why am I making less than Rick Seal? Why did you hire me?"* Steve Wright grinned and replied:

> "I hired you because I saw you in a halter top and shorts. *You're making less because you're not a bread winner. You don't need to make as much as a man. Your's is second income."* [45]

Although Therese Scribner was very upset, she thought she would like the recruiting job with Waffle House—so, despite these first lies and the first inappropriate sexual comments by Steve Wright, Therese decided to continue to work at Waffle House.

### 4. *The Plaintiff's Supervisors*

For the rest of 1986, Therese Scribner reported directly to Steve Wright, the Western Area Manager and Assistant Vice–President. From January 1987 through September or early October of 1989, Scribner's supervision was divided between Steve Wright and John Robertson,[46] the Vice–President, Operations Control, in the Atlanta home office. During this period, Robertson was in charge of "administrative issues" concerning Therese Scribner (such as compensation), while Steve Wright set her performance quotas and was responsible for her day-to-day supervision.

In September (or early October) of 1989, Steve Wright was promoted to the Waffle House headquarters in Atlanta.[47] For the next several weeks, the Area Vice–President, Larry Cannon was Scribner's supervisor. Then, on October 1, 1989, Donald "Skip" Nau, a Vice–President in Atlanta, became head of the newly-created "People Department" of Waffle House. All recruiting functions were transferred to this new department, and Skip Nau was Therese Scribner's supervisor until March 1, 1990, when she was abruptly and unjustly terminated.

### 5. *The Plaintiff's Responsibilities*

Therese Scribner's primary duty was to recruit new trainees for the Unit Manager positions (one restaurant) in the Dallas–Fort Worth area and, to a lesser degree, in other parts of the Waffle House Western Area.[48] Her other responsibilities included an Hourly Employee Training Coordinator program, the preparation and completion of forms concerning the initial interviews of recruits and exit interviews for departing employees, and planning and running special Western Area functions, such as the Top Operator *"Top Ops"* Awards Banquet and the Santa's Sleigh holiday program.[49]

Scribner received her initial training from Steve Wright. There was no structured training program; instead, after Scribner had reviewed the "Rick Seal files," Wright took her to a few Waffle House restaurants to meet the Unit Managers and to learn the manner in which Waffle House wanted its employees to operate. Next, Wright took Scribner to some competitive restaurants— e.g., Hardy's, Taco Bell, Grandy's, etc.—to teach her "how to try to find people who might be interested in working" for Waffle House as Unit Managers, and to leave business cards with any interested prospects. Wright also instructed Scribner on the use of "word of mouth"—i.e., references from Waffle House employees or others—to find Unit Manager recruits.

**45.** Wright lied about this incident at trial, claiming that the plaintiff never complained to him about "the issue of the pay difference between her and Rick Seal."

**46.** Both Steve Wright and John Robertson reported to Lib Julian, the Senior Vice–President, Operations.

**47.** Wright commuted from Dallas to Atlanta until mid–December 1989, when he moved his family to Atlanta.

**48.** For example, in her duties Scribner traveled to Tulsa, Shreveport, Phoenix and Denver, and did some recruiting for Waffle House restaurants in the other states in the Western Area (besides Texas).

**49.** Steve Wright also had Scribner prepare his expense accounts—although this was not part of her responsibilities as a recruiter. After Scribner complained about this to Lib Julian in late 1988, she did not have to do Wright's expense accounts any more. Wright, in one of his many falsehoods, testified that "it didn't bother me that Therese went to Lib Julian about doing my expense statements."

Steve Wright was specific about the "targets" that Therese Scribner should try to find for Waffle House: *young men* in the late 20's, who were ex-football players or "other athletes," and who would be "movers and shakers" as Unit Managers. *Wright also told the plaintiff that he "pretty much wanted white males."* [50] Wright said that he wanted Scribner to try to "upgrade the quality of their Unit Managers and above," and he told her that Waffle House "needed promotable employees *as well as some who would be content with the lower jobs*" (i.e., Unit Managers).

Wright also instructed Scribner about how she was to conduct the interviews and the initial screening of the applicants. Steve Wright specifically told Therese Scribner— and he repeated these instructions several times—*that she had no authority to hire anyone,* and that the hiring would be done *only* by the District, Division and Regional Managers and by Wright, the Western Area Manager and Assistant Vice–President.

In summary, the credible trial evidence clearly established: (i) that Therese Scribner was given specific instructions by Steve Wright with respect to how, and when, and whom she could recruit; (ii) that there were no differences between Scribner's authority and responsibilities and those of her predecessor, Rick Seal; and (iii) that Therese Scribner had no authority to hire new employees or to affect the operations of the Waffle House restaurants in any way.

#### B. *The Plaintiff's Performance*

Therese Scribner was an *outstanding* employee for Waffle House! She was intelligent, organized, innovative and very personable. In addition to doing an excellent job as a recruiter, Scribner also rapidly assumed other responsibilities, including:

(i) *Proper Records*—Therese established procedures and developed new forms for hiring new employees (e.g., reference checks, credit checks, rating sheets, a recruiting log, employment contracts, exit interviews, etc.);

(ii) *Training*—Therese instituted a training program for hourly employees at the restaurants (using a "training coordinator" to assist the Unit Manager), which was designed to reduce turnover; [51]

(iii) *Monthly Newsletter*—Therese started a monthly newsletter for the Waffle House restaurants to help improve the morale of the unit employees. [52]

As mentioned above, Scribner's responsibilities also included (iv) *Santa's Sleigh,* a Christmas project in which toys were delivered by supervisors to several hundred children of the hourly employees of the Waffle House restaurants in the Dallas–Fort Worth Area; and (v) the *"Top Op"* Awards, a dinner-dance at which the "Top Operator Awards" were given to the most outstanding Waffle House employees.

*Therese Scribner learned,* very soon after her initial training by Steve Wright, *just how incredibly demanding, confining, and exhausting the working conditions were for the Unit Managers.* From the trial testimony of Scribner and other credible witnesses, this is a fair summary of the job of a Waffle House Unit Manager (1 restaurant):

The Unit Manager at each Waffle House restaurant is responsible *for everything.* From 7:00 a.m. to 2:00 p.m. (the *First Shift*), he [53] cooks all the meals. Then, he

---

**50.** There was similar testimony at trial concerning the attitude of Waffle House supervisors towards black employees. Steve Williams, a former Waffle House employee, testified that Regional Manager Tim Mercer—while interviewing applicants for jobs at a new Waffle House restaurant in a small town (Corsicana)— marked the applicants either "W" (for whites) and "H" (for blacks or *"Honkeys"*). Area Vice–President Larry Cannon told another witness, a former District Manager, that a black Unit Manager could not transfer to another restaurant in a white area because "he was black."

**51.** Steve Wright approved this training program; even though it was successful, after several months Wright told Therese to drop the program.

**52.** According to Therese Scribner, the newsletter was "well received" by the Unit Managers and their staff, who "were delighted to have someone show them some attention."

**53.** The word "he" is used advisedly, since only a very few of the Waffle House Unit Managers were female.

does office work on the *Second Shift,* and usually leaves the restaurant between 3:00 to 5:00 p.m. *unless his replacement, the assistant cook, has not shown up for work.* Once the replacement cook arrives, the Unit Manager gets some time off, but he must return during the *Third Shift* to lock up the money and leave supplies and some cash for the night shift. However, if the assistant cook does not show up, then the Unit Manager has to "work around the clock" unless his District Manager "agrees to cover for him."

Because of these harsh working conditions, morale at the Unit Manager level is extremely poor (*to say the very least*). As Therese Scribner soon learned, the long hours and the demanding conditions were incredibly difficult on family and personal life; and, understandably, they result in a *very high turnover at the Unit Manager level.* Scribner began documenting these and other problems—i.e., lack of management support, inconsistent treatment of Unit Managers by their supervisors, etc.—in her exit interviews of Unit Managers who quit.[54] Therese was well liked by the unit employees, but she had no authority to change either the demanding working conditions of the Unit Managers or the other things that were causing the high employee turnover at the Waffle House restaurants.

In her interviews with prospective Unit Managers, Therese Scribner "tried to cover both *the pros and the cons*" of this entry level management position at Waffle House. The advantages included a fast advancement track, with excellent compensation and much better working conditions "as one rose up the management ladder," from Unit Manager to District and Division Manager. The disadvantages included the long hours, sometimes 60 to 70 to 80 hours a week; work on every holiday; and, as Therese told her recruits, "the hardest job you will ever have." Steve Wright, after observing one of Therese's interviews, told her it was "an effective interview," and said *"Great. Just great."*

After her initial interviews, Scribner brought *any* person "she felt was qualified" to the attention of the District, Division and Regional Managers—who then conducted second interviews of the recruits, and who made all hiring decisions. As discussed above, and as was made very clear to her by Steve Wright, *Therese Scribner did not have the authority to hire anyone or to offer any recruit a job with Waffle House.*[55]

Therese Scribner worked 40–50 hours each week. Although the number of interviews she conducted each month with new recruits varied, she probably averaged around 30 per month. Therese tried other methods of recruiting besides the "cold calls" to other restaurant chains and "networking" (referrals from current employees). These included "job fairs"; an "All Star Recruiting Team" composed of all of the District Managers and Scribner;[56] contacts with personnel agencies (Wright was opposed to this);[57] and advertisements in newspapers (Wright didn't like these either).[58] The Court specifically credits the testimony of Therese Scribner that her recruiting efforts were "easily 85%" in the "cold-calling" a rival restaurants and "networking" with Waffle House employees—and that, at most, 15% of her recruiting was done by personnel agencies and newspa-

---

54. For example, her September 26, 1988 exit interview with District Manager *Mike Robare,* included these: "lack of guidance and leadership," "no communication from upper management," "tired of being lied to by Larry Cannon and Steve Wright," "not happy with upper management in DFW," "unprofessional management in DFW," "not making enough money for the amount of time and energy putting in," etc. Many of the other exit interview forms contain the same type of comments by departing Waffle House employees.

55. *See, e.g.,* Exh. 28 (*"Recruiters do not hire— operators do"*) (Skip Nau memo of December 6, 1989).

56. Steve Wright first suggested this, but later withdrew support for his own idea.

57. The first time that Steve Wright ever let Scribner use an employment agency was in 1988.

58. Scribner only ran about 6–8 newspaper advertisements in the Dallas–Fort Worth area. Steve Wright approved each one of these ads.

per advertisements.[59]

*No one ever told Therese Scribner that there were any problems with her interviewing style.* To the contrary, Steve Wright said "it was excellent"; and, Larry Cannon, her supervisor for a two-month period in 1989, gave Therese "high marks" for her interviewing methods.[60]

*Nor did anyone*—not Steve Wright, not Skip Nau, and not a single other supervisor—*ever tell Therese Scribner that she was not doing a good job as a recruiter.* Therese received only one written performance evaluation, the one by Larry Cannon on January 26, 1988, and it was a very positive one.[61] Therese normally met, or came close to meeting, all hiring quotas set by her supervisors. And, of course, she received consistent, periodic increases in her pay.

Therese was recognized by Waffle House for her outstanding work in creating the training program for unit hourly employees. In October 1988, she was presented an "award of excellence" for her work in recruiting and training. And, in early 1989, when they learned that Therese was considering quitting her job, both Steve Wright and John Robertson encouraged Scribner and persuaded her to stay with Waffle House. Not one supervisor ever told Therese Scribner, "You are doing a poor job."[62]

However, the fact that Therese performed her recruiting and other responsibilities in an exceptional, dedicated and loyal manner is quite remarkable, indeed—*because during this entire period, she was being subjected to pervasive, demeaning and severe sexual harassment, first by Steve Wright, next by Steve Oswald, and then by Tim Mercer.*

## C. The Severe, Pervasive Sexual Harassment Of The Plaintiff

Therese Scribner was subjected to unrelenting and unwelcome sexual harassment by Waffle House officers, executives and supervisors. This sexual harassment was pervasive, it was severe. The sex-based comments made *to her*—and *about her*—were gross, lecherous and disgusting. This sexual harassment of the plaintiff was, without question, so severe and pervasive that it altered "the conditions of her employment" and created "an abusive working environment."[63]

The first person who sexually harassed Therese Scribner was *Steve Wright,* the Western Area Manager and Assistant Vice–President (who, despite his conduct, was later promoted to the position of Senior Vice–President of Waffle House). The next harassing supervisor, whose misconduct was even more egregious than Wright's, was *Steve Oswald.* Oswald was Scribner's Regional Manager (who, despite his repugnant behavior, was promoted to the position of Assistant Vice–President and Area Manager, Western Region). On cross-examination and in questioning by the Court, both Steve Wright and Steve Oswald admitted that they had made various sexual comments to Therese Scribner—and *Wright also admitted that this conduct was in violation of the Waffle House sexual harassment policy.*

The next supervisor who sexually harassed the plaintiff was *Tim Mercer.* Mercer was first a District Manager, then a Division Manager, and then a District Manager again after demotion,[64] all in the Western Area. His sexual harassment of Therese Scribner was even more demeaning and severe than that of Steve Oswald. And, finally, the other Waffle House officers, executives and super-

---

**59.** The Court discredits the contrary testimony by several Waffle House witnesses, including Steve Wright.

**60.** Exh. 17.

**61.** *Id.,* stating "People Skills—*Good, Good* Communication," "Follow–Up—*O.K.,*" "Recruiting . . . Style—*Effective, Good Approach,*" "Interviewing Styles—*Excellent—To The Point.*"

**62.** To the contrary, a memo to Lib Julian in August 1987 (Exh. 16) reported that "she's doing a good job for us."

**63.** *Farpella–Crosby v. Horizon Health Care,* 97 F.3d at 806.

**64.** Steve Wright lied about this demotion, claiming that Tim Mercer was not demoted because he was incompetent, but because "we had someone else who could do a better job."

visors who are discussed below either witnessed—or participated in—some of the acts of sexual harassment of the plaintiff.

Therese Scribner recorded some (but not all) of these acts of sexual harassment in *her 1987 day-timer* and in *her office calender*. Although these records are not a complete account (her day-timers for other years were lost) or a comprehensive list (she noted only *some* of the harassment), they are very credible records that illustrate the nature of the sex-based comments and conduct to which the plaintiff was subjected. Several months after her termination, Scribner prepared *a chronology* of some more (but still not all) of the acts of sexual harassment; this chronology *(Exhibit 166 )*—which lists the date and substance of, and the persons involved in, the various acts of sexual harassment—is also very accurate.[65] Then, about three years after her termination by Waffle House, Scribner drafted *a list of the acts of sexual harassment by Steve Oswald* (Exhibit 167); this chronology, which was verified by the testimony of Scribner and other witnesses, is also very credible evidence, too.[66]

1. *The Beginning: Sexual Harassment Of The Plaintiff By Steve Wright*

Within two or three months after Therese Scribner was hired by Steve Wright, Therese learned that she was being paid $12,000 a year less than the male recruiter she had replaced (Rick Seal) She angrily confronted Steve Wright about this; and, he replied:

> *"I hired you because I saw you in a halter top and shorts. You're making less because you're not a bread winner. You don't need to make as much as a man. Your's is second income."* [67]

This sexist remark by Steve Wright in the fall of 1986 was followed by an increasing level of sexual harassment by Wright. This pattern of sexual harassment, which quickly became much more severe and pervasive, was clearly established at trial by the very credible testimony of Therese Scribner and the other honest witnesses discussed below. It was confirmed by the repeated impeachment of Steve Wright. In addition, some of Therese's sexual harassment by Wright was actually witnessed by other Waffle House officers, executives and supervisors.

### "She's our Dolly Parton"

In the summer of 1987, Waffle House held a *"Top Op "* party at Bear Creek in Dallas to honor the "Top Operators" in the Western Area. Therese Scribner was in charge of this function, and she made all the arrangements for it. When Steve Wright introduced Therese Scribner to the crowd, he made this leering reference to the size of Scribner's breasts:

> *"Therese Scribner is our 'Dolly Parton.' The girl with the big ... (pause) ... smile! "*

Lib Julian, the Waffle House Senior Executive Vice–President, Operations—from the Waffle House headquarters in Atlanta—was present at this "Top Op" banquet. He did not reprimand Steve Wright, or say anything at all to him, about this inappropriate "Dolly Parton" comment. And, Lib Julian did not report this incident to anyone.

Later that night, Mary Wright (Steve's wife) apologized to Therese Scribner for the conduct of her husband towards Therese—

---

**65.** This chronology (Exh. 166) was supported by the very credible testimony of Therese Scribner and of the persons discussed below who witnessed many of the acts of sexual harassment. Scribner's 1989 Day–Timer also records three sexual remarks by Wright (February, March and September) and four such remarks by Oswald (in October and December 1989 and February 1990).

**66.** The defendant's attacks upon the plaintiff's *1987 day-timer, the office calendar, the chronology* (Exh. 166) and *the Oswald list* (Exh. 167) are absolutely baseless. The defendant argues that these exhibits are not complete, or that they do not record *every one* of the acts of sexual harass-

ment, or that because Exhibits 166 and 167 were not "created contemporaneously with the events recorded." These Waffle House "arguments" are not just wrong, *they are ridiculous.* Indeed, since *Waffle House, a large and financially successful company, did not have a single contemporaneous document of any kind to support its claim that the plaintiff was fired because she was incompetent,* this attempt to discredit the plaintiff— because she did not keep full, complete and contemporaneous records of her harassment—is patently absurd!

**67.** The plaintiff recorded this incident in her chronology (Exh. 166).

who was very shocked and upset by this "Dolly Parton" remark. After a day or so, Therese did complain to Steve Wright, telling him that this comment about the size of her breasts offended her very much. In response, Wright only "shrugged it off, like it was no big deal." [68]

### "a weekend with Therese in a bikini"

At a working meeting in Dallas at the Sheraton Hotel in August 1987—where new recruits were being interviewed by Wright, Scribner and others—Steve Wright announced to the prospective Waffle House employees:

> "Whoever agrees to join Waffle House will get a 'sign-on bonus.' Therese will be your hostess in a hotel for a weekend ... wearing a bikini."

Again, Therese was shocked by this embarrassing, public comment. Later, she angrily confronted Steve Wright, telling him how humiliated it made her feel—and also telling Wright that one of the recruits had even asked her later, "Are you really going to be wearing a bikini?" Wright just ignored these complaints by Therese.[69]

*Joe Rogers, the President, CEO and 78% owner of Waffle House was present at this Sheraton Hotel meeting.* Although he witnessed the "sign-on bonus, weekend with Therese" statement by Steve Wright—as well as Scribner's embarrassment—he said nothing at all to Wright about his improper conduct. If Joe Rogers had taken some prompt corrective action then—as, indeed, he should have—the subsequent sexual harassment of Therese Scribner by Steve Wright and other Waffle House officers, executives and supervisors probably would have been deterred. Instead, Rogers did nothing, and the sexual harassment of Therese not only continued, *it escalated.*

Steve Wright repeated this "sign-on bonus, weekend with Therese in a bikini" remark to new recruits on many other occasions. Each time, Therese Scribner was upset and angry. Each time, she complained to Wright, telling him (for example) that "Your conduct is unprofessional." In response, Wright would just laugh and tell Therese something like, *"It's no big deal, just a clever comment."*

### other sexual comments by Wright

Steve Wright made numerous other remarks about Therese Scribner's breasts. For example, in front of other Waffle House employees (and Therese), he stated that *"Therese's big boobs help her in recruiting. It's an unfair advantage for her."* In October 1988, Steve Wright also told Therese, "That's a really nice outfit on a really nice body." And, in December 1988, Wright—in the presence of Lib Julian (Senior Vice-President, Operations), at the Marriott Courtyard hotel in Dallas—*"grabbed Thereses' blouse, pulled it out, looked down at her breasts, and smirked: 'It was driving me crazy to see what those were.'"* [70] Lib Julian did not reproach Wright about this sexually harassing conduct, nor did he report it to anyone else at Waffle House.

Therese Scribner gave other examples of the severe, pervasive acts of sexual harassment by Steve Wright. These included the following:

> ... before other Waffle House managers, Wright asked Therese, *"Are you on the rag?"* (and he repeated this numerous times).

> ... in February 1988, on a business trip to Phoenix, Wright suggested to Therese: "Let's go out and paint the town. *Your husband is far enough away.*"

> ... in June 1989, when Wright saw Therese in a black dress, he said: *"I'd like to jump your bones."*

---

**68.** The plaintiff recorded this matter in her chronology (Exh. 166). In his deposition, Steve Wright denied making this statement, but at trial, Wright admitted it.

**69.** The plaintiff recorded this incident in her chronology (Exh. 166). In his deposition, Steve Wright testified that Larry Cannon "reprimanded" Steve Oswald for making a statement like

this; at trial, however, Wright admitted that this was a lie, and that Cannon never reprimanded anyone for statements like this.

**70.** The plaintiff recorded each of the incidents listed in this paragraph in her chronology (Exh. 166). Steve Wright, of course, lied about these incidents at trial.

... in May 1989, when they learned that *one of the Waffle House Unit Managers had been charged with raping a waitress,* Wright told Therese that *"he thought it was comical"* and *"he just laughed about it."* [71]

In May of 1988, at a Waffle House meeting in the Sheraton Hotel in Dallas, Steve Wright actually told the Division Managers that they "should support" Therese Scribner and *"show more respect for her."* Later, Therese told Wright that the Division Managers "were following your example." In recording this incident, the plaintiff noted that Wright "said he was just being complimentary."

And, Wright's sexual harassment continued. For example, in March 1989, at a meeting of Division and District Managers at the Red Lobster Inn in Dallas, Wright again made the comment "that [Therese's] big boobs assist [her] in [her] recruiting efforts." [72]

*These are only examples.* Indeed, as Therese Scribner testified, they were by no means all of the perverse acts of sexual harassment by Steve Wright. On numerous occasions, Therese told Wright that she would report him if he did not stop the harassment—but Wright's conduct toward her never changed. However, in August of 1989, Steve Wright was promoted and transferred to the Waffle House headquarters in Atlanta. [73] From then on, Wright had fewer direct contacts with Therese Scribner—although, as discussed below, his control over her employment at Waffle House did not cease.

Despite the sexual remarks he made about Therese Scribner in the presence of other Waffle House supervisors, employees, and recruits—her "big smile," her "big boobs," etc.—Steve Wright even testified that he had never been present when Waffle House supervisors "were engaging in guy talk" about Therese and other female employees. *This was false, absolutely false!* In addition, in response to the Court's question about whether Wright had ever witnessed a violation of the company's Sexual Harassment Policy, *Wright lied again:*

"There are things that were said, I'm sure, among the guys in the restaurants. I feel positive about that. *But first hand information, no."* [74]

### 2. The Sexual Harassment Of The Plaintiff By Steve Oswald

The sexual harassment of Therese Scribner by Steve Wright was bad enough, but her sexual harassment by Steve Oswald—who had witnessed Wright's misconduct towards Therese on many occasions—became even worse. Steve Oswald remained as Western Area Regional Manager after Wright's promotion to Atlanta. Later, Oswald was promoted to the position of Western Area Manager and Assistant Vice–President. [75]

Steve Oswald constantly repeated Wright's "sign-on bonus, weekend with Therese in a bikini" coagent while interviewing new recruits with Scribner. [76] He made incessant remarks about her breasts, almost routinely referring to Therese as *"little Ms. Big Tits."* He literally bombarded Therese with vulgar remarks about her sex life, his sexual prow-

---

**71.** The plaintiff recorded each of these incidents in her chronology (Exh. 166). Steve Wright, lying repeatedly, denied that any of these things ever took place.

**72.** The plaintiff recorded this incident in her chronology (Exh. 166).

**73.** Wright's testimony that he "was not promoted" when he was transferred to the Waffle House headquarters in Atlanta was another of his many lies.

**74.** This and the other quotations of testimony in this opinion are based upon the Court's contem-poraneous trial notes and a rough draft of a transcript of some of the questions which this Court asked various witnesses at trial. These "quotations" are only approximations, because the official transcript has not been completed by the court reporter.

**75.** After Steve Oswald was demoted to Division Manager in June or July 1990, he left Waffle House for about three years (moving to Jackson, Mississippi), but returned to Waffle House in Dallas as Western Area Regional Manager.

**76.** The plaintiff recorded three of these incidents in her chronology (Exh. 166).

ess, etc. *Some* of Steve Oswald's harassing conduct is recorded in Exhibit 167,[77] a list prepared by Therese Scribner for her attorneys after this suit was filed. It reads:

> "Comments Made By Steve Oswald
> To Therese Scribner
>
> * Stacked well enough to be matching bookends.
> * Referred to me as 'little Ms. big tits.'
> * Lots of filthy jokes using heavy four letter words.
> * *Asked me several times if I wanted to sit on his face.*
> * Asked about size of my husband's penis—said his own was 'bigger than life,' 'a whopper,' said *if I ever fucked him I would never be happy with another man.*
> * Made references to *'Mississippi women'* being good fucks and sucks.
> * Asked me if I ever sucked chrome off a bumper or sucked a golf ball through a straw—bet I could.
> * Talked about kinky sex with rubber tubing and ropes.
> * *Asked if I had ever been eaten by a man with ice in his mouth.*
> * Constantly (every conversation) interjected filthy comments during a business conversation.
> * Told three applicants during interviews that if they came on board with Waffle House there was a 'sign-on' bonus—a weekend with Therese.
> * Asked me if I ever see my feet.
> * After meeting Bob[78] for the first time he asked *if I ever get tired of being on top*—he would be happy to oblige me.
> * *Said he would like to 'eat the lining out of my pussy.'*"

Therese Scribner was asked when each one of these things took place. Her responses placed many of them at events where other Waffle House executives, supervisors and employees were present—specifically (1) at a company banquet (*matching bookends*), (2) "said on a regular basis" (*little Ms. big tits*), (3) "happened regularly" (*lots of filthy jokes*), (4) the first time, "after an Area Meeting at the Sheraton" (*want to sit on my face?*), (5) "can't remember" (size of husband's penis), (6) "at an Area Meeting" (*Mississippi women are good fucks and sucks*), (7) at an Arlington restaurant (*ever sucked chrome off a bumper?*), (8) on a trip to Shreveport with Tim Mercer (*kinky sex talk*), (9) at a Waffle House restaurant on Jupiter Road (*ever been eaten by a man with ice in his mouth?*), (10) "constantly" (*filthy comments*), (11) "many times" (*weekend with Therese in a bikini*), (12) "on occasion" (*ever see your feet?*), (13) in a car with Larry Cannon (*do you ever get tired of being on top?*), and (14) at a restaurant where Scribner "was helping behind the counter" (*I'd like to eat the lining out of your pussy*).[79]

Steve Oswald lied repeatedly,[80] both at his deposition and in his trial testimony, about these and his other acts of sexual harassment of Therese Scribner. For example, in his deposition, this was Oswald's answer to a question by the plaintiffs' attorney:

> Q. During your tenure as an employee of Waffle House, have there ever been any allegations of a sexual harassment or sexual misconduct made against you by female Waffle House employees?
>
> A. *No.*

This was a lie. At trial, Scribner's attorney began his examination of Oswald by reading the very same question from the deposition; however, this time Oswald gave a different answer:

> Q. During your tenure as an employee of Waffle House, have there ever been any allegations of a sexual harassment or

---

**77.** Others are also recorded in the plaintiff's chronology (Exh. 166).

**78.** Bob is the plaintiff's husband.

**79.** The plaintiff testified that Oswald "whispered this in her ear and walked off." She was "so upset, so angry, so tired of it all" that she couldn't "remember what I did."

**80.** This was Joe Rogers' description at trial of Steve Oswald: "He is boastful, arrogant, and shades the truth."—and Oswald "had to grow into the executive level," where (apparently despite his demotion) "he performed very, very well."

sexual misconduct made against you by female Waffle House employees?

A. Yes.

During his deposition, Steve Oswald lied when he denied making *any* sex-based comments to Therese Scribner, including the statements listed on Exhibit 167. But at trial, Oswald admitted to the plaintiffs' attorney that he had, in fact, made the "sign-on bonus, weekend with Therese in a bikini" statement; and he, admitted to making the "matching bookend" comment.[81] However, in his deposition and initially in his trial testimony, Oswald flatly denied that any of the other entries on Exhibit 167 were true.

This, of course, was another blatant Oswald lie. During questioning by the Court, Steve Oswald finally admitted that he had actually said that the plaintiff had "big tits," that he had told "lots of filthy jokes using heavy four-letter words," and that he "could have" made some of the other remarks on the plaintiff's list "in a joking manner." But each time he was impeached, Oswald would try to minimize his admissions and his conduct, as shown by the following examples.[82]

### *"little Ms. big tits"*

Q. You never referred to her [the plaintiff]—not just to her, but to anybody else, that she had big tits?

A. You know, I didn't refer to her in person as that. You know, somebody would have asked me and, you know, describe Terez and *I would say she's got big breasts* . . .

Q. *You probably said "big tits?"*

A. *I could have, yes.*

(Later)

Q. You're positive that it (saying the plaintiff had big tits) only happened one time?

A. I wouldn't have—*if it came up, it came up one time.* I don't generally talk that way.

Q. *May not have ever happened?*

A. *I'm sure it happened. I'm not saying it didn't happen.*

Q. *But you're sure it only happened one time?*

A. *I'm sure.*

Q. *But you can't tell me why you think it only happened one time?*

A. *No, sir.*

### *The "sign-on bonus: a weekend with Therese in a bikini" lies*

Still lying, Steve Oswald swore that there were only two occasions when he made the "your sign-on bonus is a weekend in a hotel with Therese wearing a bikini" comment to recruits. Then, Oswald proceeded to tell additional lies:

Q. *You [made that remark because you] were trying to put the applicants at ease and that (sign-on bonus comment) was just a joke?*

A. *Yes, sir.*

Q. [Therese would] laugh?

A. She laughed. Everybody laughed. It was a joke.

Q. *But . . . [if] you thought that was a good interviewing technique, "just to make the person feel at ease?" . . . if it was, if it worked, why didn't you do it more than just two times?*

A. Because after a while I'd gotten so— you know, with Terez, Terez and my relationship had soured quite a bit because I didn't—I just quite frankly didn't think she was doing the job that she was hired to do. . . .

### *"filthy jokes and four-letter words"*

Another Steve Oswald lie was that, although he and Therese Scribner told "lots of filthy jokes" with "lots of four-letter words," there was no use of "real heavy" profanity.

Q. Okay. What kind of four-letter words?

---

**81.** However, later in his testimony, Oswald attempted—*quite unsuccessfully*—to minimize the meaning of this comment by lying: "I said, Therese and my girlfriend were stacked well enough to be matching bookends."

**82.** All of the questions to Oswald in these examples were asked by the Court.

A. Just a joke. *You know, I wouldn't say they were real heavy four-letter words. . . .*

. . .

Q. She [the plaintiff] would use four-letter words?

A. Yes, sir.

Q. *Hell, damn?*

A. *Yes, sir.*

Q. *Fuck, shit?*

A. *Yes, sir.*

### told filthy jokes, but never said "tits"

Ever a paragon of virtue, Steve Oswald gave this bizarre explanation for his incredible testimony that he and the plaintiff would tell jokes and use profanity, but they would never, ever joke about "her breasts."

Q. So you probably said she had 'big tits'?

A. Yes, sir.

Q. But not to her directly?

A. No, sir. No, sir.

Q. *Well, if y'all were joking around telling filthy jokes and she was brushing up against you* [with her breasts], *why wouldn't you say to her . . . if it's second nature to you to use the word "tits," why didn't you say, you know, "Therese, get those big tits off of me?"*

A. I wouldn't have said that. *I would have said, "Terez, please watch those things."* Talking to the guys I might say something like that, but I wouldn't say that to a woman. That's just not things I would say.[83]

Therese Scribner was also very credible in describing Steve Oswald's repeated, unwelcome physical contact with her—e.g., backing into her and "accidentally" bumping her breasts; tickling her under her arms; rubbing his legs against her thighs; etc.[84] Oswald lied about these physical contacts he had with Therese, too.[85]

The first two times that Steve Oswald made the "sign-on bonus/weekend with Therese in a bikini" remark to a recruit, Scribner angrily complained to him. However, Oswald just "thought it was humorous." On the third time (October 12, 1989),[86] Therese Scribner was so upset that she warned Oswald: *"If you don't stop, I will report you to Larry Cannon and to the EEOC."* Oswald was not concerned by her complaint, and he replied: *"Hey, I just think it's funny."* Therese made other angry, bitter complaints to Steve Oswald about his conduct; however, just as in the case of Steve Wright, Oswald's conduct never changed.

In summary, Therese Scribner's testimony about the incredibly severe, pervasive and demeaning sexual harassment of her by Steve Oswald was very, very credible. During her direct examination, when her attorney was asking questions about each one of the entries on Exhibit 167, *Therese began crying*—obviously because she was remembering the shame, the humiliation, and the degradation she felt because of Oswald's abuse. Seeing this, Scribner's attorney quickly asked her one general question about all the remaining statements on Exhibit 167, and moved to other topics. At this point, the Court's contemporaneous trial notes contain these remarks:

> "Pl. crying while answering. Very credible. Humiliated. Embarrassed. Angry. Upset. So tired of it. Confused. *Couldn't quit. Needed job.*"

---

**83.** Nor did Steve Oswald have *any* explanation—certainly not a believable one—as to why he and the plaintiff would cuss ("fuck, shit") and tell each other "dirty jokes"—but he would "never have said" any of the other things on Exhibit 167, like *"sit on my face," "good fucks and sucks,"* etc.

**84.** Three of these incidents are recorded in the plaintiff's chronology (Exh. 166).

**85.** During his deposition, Tim Mercer lied when he denied having sex with two different hourly employees (both of whom he later married); he lied about a sexual harassment complaint filed against him by another waitress ("foul language, unwanted touching, unwanted sexual conduct") and he lied about rape charges made against him by a waitress who had sex with Oswald so he wouldn't fire her (Oswald paid her $3400 to settle).

**86.** This is recorded in the plaintiff's chronology (Exh. 166).

**462**

### 3. *The Sexual Harassment of the Plaintiff by Tim Mercer—and the Bribery of the Mercers*

With the Western Area Manager and Assistant Vice–President (Steve Wright) and the Regional Manager (Steve Oswald) setting such sterling examples—by their open and pervasive sexual harassment of Therese Scribner *in the presence of anyone* (whether Waffle House officers,[87] executives, supervisors, employees, or recruits)—it was not surprising that Wright and Oswald were soon `joined by other Waffle House managers, including Tim Mercer.

Mercer was the only witness who told more lies at trial about Therese Scribner—and about his sexual harassment of her—as Steve Oswald did in his perjured testimony. Tim Mercer started with Waffle House as a Unit Manager (one restaurant). Within a year, Mercer was promoted, becoming a District Manager (2–4 restaurants). He was a Division Manager (12–15 restaurants) for a while, but was demoted in December 1990 and again became a District Manager.[88]

#### *"the plaintiff got so hot and wet" that her panties would "stick" against the wall*

The very beginning of Tim Mercer's testimony at trial was his admission to the plaintiff's attorney that, contrary to his deposition lies, he "may" have made a statement like this about Therese Scribner:

*"She got so hot and wet that you could throw her panties against the wall and they would stick."*

The truth, however, did not come easily to Tim Mercer. After his sworn deposition denial was followed by his sworn trial admission of this repulsive comment, Mercer "explained" that "he *may* have said this in jest, in a joking manner," *but not in the presence* of Scribner *or other Waffle House employees* ... then, Mercer admitted that, well he "could have made this remark in front of Scribner" ... and, finally, Mercer conceded that "he could have made this statement in front of other employees of Waffle House."

#### *"sex banter and vulgar language"*

Tim Mercer, of course, lied about the relationship he had with Therese Scribner. Mercer testified that Therese and I "had a great relationship"; that "we were really open with each other"; that "we enjoyed each other's company" (and only had a "few spats"), and that "we spoke all the time on the phone after the plaintiff was fired." [89]

These lies were followed by Mercer's "explanation" that he and Therese "cut up and told jokes"; that "anything went"; that "we used vulgar language" (but "not around others"); and, that it "was always a joke." With this preamble, Tim Mercer proceeded to tell one blatant lie after another, including these:

... that Therese was always joking about her breasts, calling them *"big tits."*

... that she made numerous other comments about "her tits," like, "Therese and *The Boys* are here."

... that they joked about *"a bulge in his pants"*,[90] but there was "only a look" and "nothing was said," *and* Therese *"was smiling about it."*

#### *"the sexual harassment by Steve Wright"*

Similarly, when Tim Mercer was asked this question—*"Did you ever hear Steve*

---

**87.** Including, in the case of Steve Wright, both the Waffle House President, CEO and 78% owner (Joe Rogers), and its Senior Executive Vice–President (Lib Julian).

**88.** After Tim Mercer's deposition perjury in this case, Waffle House arranged for Mercer and his wife, Sherry Mercer (who also lied at her deposition), to move to Colorado and to "purchase" and run a lucrative Waffle House "franchise store" as the owner-operator.

**89.** *At trial*, Tim Mercer testified that in recruiting, "the plaintiff just talked [to recruits] about the good points of the job," like how much money the Unit Manager could make, "but not about the bad points." However, at his deposition, Mercer testified that "he really had no complaints about how the plaintiff conducted interviews."

**90.** According to Mercer's later testimony, *"someone made this comment* about the bulge in his pants" ... that *he may have,* or *the plaintiff did,* or "it could have been *someone else"* ... or that *maybe "nothing was said."* Consistency in his lies was not one of Tim Mercer's strong points.

*Wright say that anyone who teams up with Therese Scribner has an unfair advantage because of the size of her breasts?"*—Mercer gave this "evolving" answer: first, he flatly denied ever hearing Wright make this remark; then, he admitted that Wright had "made statements to this effect, possibly"; next, he claimed, "I can't really say I heard [Wright] say that"; but then he admitted that he "had heard such comments about her large breasts"; and once again, he "didn't recall" if he heard Wright make comments "about the plaintiff's breasts"; next, he claimed he didn't "remember the exact comments" that Wright made; and . . . *finally* . . . Mercer said, *"I'm confused about the question, kind of."*

### Mercer and the sexual harassment policy

The lies that Tim Mercer told about the Waffle House sexual harassment policy, and his lies about whether others were present during the "sexual banter and vulgar language" between he and Therese Scribner, were just as conflicting as his other lies. After Mercer testified that "he did not recall" reporting "anybody for violation of the Waffle House sexual harassment policy," he gave this testimony:

"THE COURT: Then, you told . . . both of the attorneys about the sex banter [and vulgar comments] between you and the plaintiff . . . *Was that a violation of any company policy?*

MERCER: I mean, I have to answer again, I don't feel—*I mean, I don't feel like it was,* but it was just that language that was used. That language was used, whether it was on the business or, you know, out at, you know, at a lunch . . .

THE COURT: I want you to tell me any instance that you can think of where someone else was present when you and Therese were engaging in this sex banter . . . [and making] jokes or comments about "her tits" or breasts or anything like that. . . .

. . .

MERCER: When anybody else was around? . . . I mean, it's so hard to just kind of pinpoint that to a time, you know. *I want to say*—I mean, there were other people around. I don't know if it was bosses, hourly associates or what. It's hard to pinpoint that down. . . .

. . .

THE COURT: So, there were or there were not other people present?

MERCER: *I mean, I want to say there was,* but I don't know if it was hourly or

. . .

THE COURT: I mean, *it's your answer. If you want to, go ahead and say it. Either yes or no.*

MERCER: I want to say there were other people around, yes."

### the Santa's Sleigh/Polaroid "crotch shot"

Tim Mercer also lied about the disgusting incident that took place on a Winnebago being used by management employees for the annual "Santa's Sleigh" program, where Christmas gifts were delivered to the children of the restaurant hourly employees in the Dallas–Fort Worth area.

Mercer was sitting next to (or across the aisle from) Therese Scribner. He suddenly stuck his Polaroid camera between her legs, put it up under her dress, and snapped a picture of Scribner's crotch.[91] Surprisingly, Tim Mercer admitted at trial that he did *"something"* with a Polaroid camera involving Therese; but, he then proceeded to lie repeatedly about the incident: he really "didn't intend" to take a crotch picture, and he really just "put the camera down *at her leg,*" *not under her dress.* According to his next batch of lies, Mercer claimed that *"Therese didn't seem unhappy or offended or upset"*; that she just grabbed his camera and said, *"You nut"*; that "we were all taking pictures of each other"; that "it was not disrespect because it was done in a joking manner"; and that afterwards, "we had a blast, a fun time."

The Court then reminded Tim Mercer that he had "told one of the attorneys that the incident with the Polaroid camera *was not* a violation of the Waffle House Sexual Harass-

**91.** This description is based upon the very credible testimony of Therese Scribner.

ment Policy." Mercer was asked to explain this answer, and he replied:

> "MERCER: It sounds real bad, I agree with that now, but it's just at the time it was just a fun—it was just in fun. It was nothing. ... We were all crunched up on the couch of a Winnebago and there's not a lot of room in those. I just reached over and stuck it by her legs. I wouldn't even say the camera was between her legs. It would have taken the front part of her knees.

> THE COURT: I understand what you said happened. And I'm asking you ... to explain that answer, why was it not a violation of the sexual harassment policy?

> MERCER: Well, I mean, I feel like if I had heard that from somebody else, it does not sound good. But I was there and, you know, I did it. I mean, I feel like it was wrong now. *It was just—it was just a joke.* ...

> THE COURT: Now, I want you to understand what I'm asking you. I want you to tell me why that wasn't a violation of the sexual harassment policy. ... Again, do you understand the question I'm asking you?

> MERCER: *I mean, yes, do. I don't know how to answer it though.*

> THE COURT: Well, I'll tell you what I'm writing down here [in my notes] is that you think that did not violate the company sexual harassment policy because it was a joke, it wasn't serious and it was just done in a fun way and therefore, it doesn't violate the policy. Is that your answer?.

> MERCER: I'm sorry, sir. I don't know how else to answer it. I mean, it doesn't sound good."

Larry Cannon, the Area Vice–President, was on this Santa's Sleigh ride and he witnessed this repulsive, demeaning conduct by Tim Mercer—and he also saw Therese Scribner's anger and humiliation. Other Waffle House managers and supervisors were on the Winnebago, too. However, no one reprimanded Mercer or apologized to Therese Scribner, and no one reported Mercer's misconduct to any superior.

*Mercer's interview with Grandy's*

After Tim Mercer was demoted from his Division Manager position at Waffle House in December 1990, he returned to a District Manager's job in the Western Area. Sometime after this demotion, Mercer called Therese Scribner at Resource Recruiters,[92] and asked her to help him find another job. Therese arranged an interview for Mercer with Grandy's.[93] At trial, Mercer testified he did go to Grandy's and "interview for a change of position," but that he decided to stay at Waffle House. However, as was his habit, Tim Mercer told lie after lie about his interview with Grandy's, which began:

> "Q. Did you ask her (the plaintiff) to find another job for you?

> A. (No response at first, then ... *finally*) I would have to way "yes", *but she (Therese) mentioned it first.*"

Then, Tim Mercer tried to embellish his lies: he swore (falsely) that Therese Scribner supposedly told Mercer—the same Tim Mercer who had taken the Polaroid "crotch shot" of her on Santa's Sleigh that made Therese so angry and humiliated—that "We're going to clean out Waffle House and you're next. I can get you a good job." And, of course, Tim Mercer proceeded to tell another string of lies:

> ... that it wasn't really an "interview";

> ... that he was "just checking out Grandy's because we (Waffle House) had "lost so many employees to them" ";

> ... that his Grandy's interview wasn't really for a "change of position," because he "just wanted to see what Grandy's was offering" and give this information to Waffle House.

**92.** Therese Scribner was terminated by Waffle House on March 1, 1990. She started her own personnel recruiting firm, Resource Recruiters, a few months later.

**93.** Tim Mercer also contacted Scribner on another occasion and asked her to help find a job for his wife, Sherry Mercer.

*the reward for the Mercers' perjury*

Before his deposition in this case was taken on February 17, 1994, Tim Mercer was contacted by Area Manager Larry Cannon (who had been the plaintiff's supervisor for a few weeks in the fall of 1989). Cannon discussed with Tim Mercer the possibility of Mercer becoming the "Managing Partner" of a Waffle House "franchise restaurant" in Colorado. Although there "were no promises" (according to Tim Mercer), Cannon told Mercer that he would "have an opportunity for the franchise store" in Colorado *"if you continue to do a good job."*

In this same meeting, Cannon also talked with Tim Mercer about his forthcoming deposition in the Scribner case. Following this, Mercer's deposition was taken; during it, he told numerous lies and made false and derogatory statements about Therese Scribner, including his testimony that:

. . . Therese made remarks about her breasts (*"Therese and the boys are here"*);

. . . she told Mercer that *"she couldn't run because they (her breasts) would black both of her eyes"*;

. . . *she said that* "when I have sex with my husband, *I like it on top"*;

. . . she and Mercer would tell each other *"sex based jokes"*; and

. . . Therese told him that *"she was going to nail Steve Wright's balls to the wall."*

The credible trial evidence established that Tim Mercer told these lies at his deposition, just as Larry Cannon (and Waffle House) wanted. As a result, even though Mercer was—*at the very best*—a marginal employee, he and his wife were rewarded with a franchise restaurant of their own in Colorado.[94]

4. *The Others Who Witnessed The Sexual Harassment Of The Plaintiff*

Much of the sexual harassment of Therese Scribner by Steve Wright, Steve Oswald and Tim Mercer took place in the presence of other employees of Waffle House. For example, many of the Western Area managers (from Texas, Oklahoma, Colorado, Arizona and parts of Louisiana) were present at the Bear Creek banquet in the summer of 1987, when the "Top Operators" were receiving awards—and they heard Steve Wright's "Dolly Parton" introduction of Therese.[95] In addition, other credible witnesses testified either that they heard Waffle House supervisors make sexual remarks about the plaintiff out of her presence, or that they had actually seen some of the severe and pervasive sexual harassment of Therese Scribner.

One of these witnesses was MICHAEL ROBARE, a former Unit Manager for Waffle House. When asked to give some specific examples of the sexual remarks made about Therese, Robare replied: *"I mean, we can be here all day and tomorrow doing this."* Then, Robare testified about incidents like these:

. . . Wright hung up the phone after talking to Scribner and told Robare, *"I know what she really needs, she needs a man like me. Boy, I'd like to see her tits."*

. . . Wright told Robare, "I was with her (Therese) at the last restaurant and *she was looking good today. You wouldn't believe that dress she had on."*

. . . Wright said some "embarrassing" and "very graphic" things about Scribner "and her body parts," and *"it was pretty much every time [Robare] saw him . . . that things like this would transpire."*

. . . After Wright made a sexual remark to Therese in front of Robare, he later asked Wright, "Why did you say that?" Wright replied, *"Oh, I say that stuff all the time. That's just Terez."*

Robare's supervisors were Steve Wright and Larry Cannon (the Western Area Vice-President). He described how both Cannon and Wright constantly made sexual remarks about Therese Scribner and also about the

---

**94.** At trial, Joe Rogers (the Waffle House President, CEO and 78% owner) actually testified under oath that "Tim Mercer gave some very honest testimony," but this had "nothing to do with his franchise selection."

**95.** One entry in the plaintiff's chronology (Exh. 166) reflects the impact of Wright's misconduct upon other employees; the "May 1988" entry reads, "5/88 meeting at Sheraton—[Wright] told *div. mgrs. to support and show more respect* [to plaintiff]—*told him they were following his example*—he said was just being complimentary."

female hourly employees at the Waffle House restaurants. For example, whenever Robare hired "a real good-looking waitress," Wright would say something like, *"Hey, she's awful nice. Get more like her. Nice butt. The customers will like it."* Larry Cannon made similar comments about female employees, and he told Robare that Therese *"needs a real man. I could give her what she needs."* Although Michael Robare had been terminated by Waffle House "for having an affair with an Assistant Manager," [96] his testimony was *very, very credible!*

DON KELLY was another former Unit Manager. When Kelly was first interviewed for employment by Steve Wright and Therese Scribner, Wright made his "standard comment"—*"Your signing bonus will be a weekend in a hotel with Therese . . . in a bikini"*—while the plaintiff was in the rest room. Kelly gave these additional examples

> . . . *During this same interview,* Kelly said "She (Scribner) is a nice lady." Wright responded "out of the blue" with this: "Yeah, *she has nice breasts."* When Scribner returned from the rest room, Wright asked her, *"Would you like to go get in a Jacuzzi?"* Kelly testified that Scribner was "shocked," and that she quickly said, "I think this interview is concluded. I have another interview and I need to go."

> . . . On another occasion, Wright put his arm around Therese, looked down and said, *"I like the view from up here . . . oh, excuse me, I was just commenting on your cleavage."* Scribner "was shocked"; she immediately left, telling Kelly she had "to go to another interview."

> . . . During Kelly's training, Wright told him that Therese was "a nice lady. *I like the view from the back, but it's a helleuva*

*lot better from the front. Nice breasts."* To this last remark by Steve Wright, Kelly simply replied, "I'm married. I didn't notice."

When he testified at trial about this last incident, Don Kelly explained to the Court, *"How do you respond to something like that, by somebody who is a Vice–President of the company?"*

Two other ex–Waffle House Unit Managers also gave very credible testimony about the sexually demeaning remarks made either to, or about, Therese Scribner in their presence. DAVID COLEMAN heard Steve Oswald make the "signing bonus/weekend with Therese" comment when Coleman was interviewed in Shreveport by Therese and Oswald. STEVE WILLIAMS said that "whenever Scribner was at his restaurant," Steve Wright and Tim Mercer made comments about her breasts, a "weekend with her" and "the things (sexual) they would like to do with her." [97]

In her chronology of some of the acts of sexual harassment,[98] Therese listed 29 persons who were witnesses to various acts of sexual harassment. These names included Dan Kelly, Hans Spies, Kyle Coleman, Steve Bryant, Vic Neeley, Mike Robare, Roy Anderson, David Adams, David Smith, Dan Williams, Rusty Workman and Dan Gay. There was trial evidence from some of these, including:

> . . . *Dan Kelly* and *Dan Gay* (who heard the "on the rag" and "signing bonus" remarks and who were at the "Top Op" Awards banquet at Bear Creek in 1987);

> . . . *Vic Neeley* (who heard the "on the rag" remark);

---

96. In addition to his affair with an Assistant Manager, Robare also had affairs with two waitresses; when he admitted one of these to Steve Wright and Larry Cannon, Wright only told Robare, *"You could have picked someone better looking, but don't let it happen again."*

97. The attempt by Waffle House—through still more lies by Tim Mercer—to discredit the testimony of Steve Williams because he was terminated is completely rejected. Contrary to Mercer's perjury, he did not fire Williams as the Unit Manager of a Waffle House restaurant in an all-black area in Corsicana (a small town near Dallas) because Williams was incompetent. Instead, Mercer did not like Williams, who objected to the fact that there were only three blacks employed at this restaurant (Steve Williams, his wife, and his daughter). And, he abruptly terminated Williams because Mercer did not like the way Williams responded to being told in a very demeaning way, "pick up the cigarette butts in the parking lot."

98. Exh. 166.

... *Kyle Coleman* (who heard the "Jacuzzi," "nice cleavage" and other "breast" comments); and

... *Hans Spies* and *Dino Bolero* (who also heard the "signing bonus/weekend with Therese" remarks).

The testimony of these ex–Waffle House employees was supported at trial by some witnesses who knew Steve Wright and Therese Scribner, even though they had never worked for Waffle House. These included:

*Erma Cook,* a neighbor of the Scribners and the Wrights. In the spring of 1989, Therese came by Cook's house and told her that Steve Wright had made a comment "about the size of her breasts in the presence of a number of men." Cook testified that Therese Scribner was very angry, upset and frustrated by Wright's conduct.

*Margaret Dailey,* who worked for Therese Scribner at Resource Recruiters, and who met Steve Wright and Larry Cannon at the Scribner's Christmas party in 1987. Although Dailey gave no specific examples of sexual comments by Wright and Cannon, she described how both of them made "crude and crass remarks, offending people they didn't even know." Dailey also testified that these inappropriate comments "made you feel like you were tending bar," and that "when the wives of Wright and Cannon tried to stop this misbehavior, they could not."

*Fran Dubuisson,* a neighbor of both the Scribners and the Wrights, who was later in business with Therese at Resource Recruiters (after her termination by Waffle House). At a party in front of Dubuisson's home, she was talking to Therese Scribner and Steve Wright when Wright suddenly "said something about *Therese's big tits.*" Therese was "very upset" and snapped at Wright, "Get a life." Dubuisson also had discussions with Therese about how Steve Wright embarrassed her on many other occasions.

In addition, Fran Dubuisson supported Therese Scribner's credible testimony that she (Scribner) did not "participate in" or

"welcome" the "sexual banter" by Wright, Oswald and others. Specifically:

... this was Fran Dubuisson's very credible description of Steve Wright: "He was very disrespectful toward the plaintiff and all women. He was arrogant, chauvinistic, always overstepped the boundaries."

... Dubuisson also described an incident that took place when Dubuisson was working in her yard. Steve Wright came up behind her and said, *"You have a nice ass."*

... Wright also tried to have discussions with Dubuisson about "the girls he met in bars on out-of-town trips," and he told her, *"What my wife doesn't know won't hurt her."*

5. *The Waffle House Executives Who Saw The Acts of Sexual Harassment ... But Did Nothing*

There were others at Waffle House—including several of the company's top executives—who either witnessed or participated in some of the sexual harassment of Therese Scribner by Wright, Oswald and Mercer. *Not a single one of these Waffle House officers, executives and supervisors did anything about this sexual harassment.* They did not stop the harassment; they did not report it to anyone; and they certainly did not sanction any of the persons responsible for this sexual harassment of Therese Scribner.

Starting at the top, *Joe Rogers* (President, CEO and 78% owner of Waffle House) witnessed one of the very first acts of Steve Wright's sexual harassment of Therese—i.e., the incident where Wright announced to the prospective recruits at the Sheraton Hotel meeting in August 1987:

"Whoever agrees to join Waffle House will get a 'sign-on bonus.' Therese will be your hostess in a hotel for a weekend, wearing a bikini."

From the obvious deference that Rogers' employees (including Steve Wright) showed to Joe Rogers—the forceful person who owns and runs Waffle House—it was apparent to this Court that most, if not all, of the subsequent acts of sexual harassment against

Therese Scribner *would have never occurred* if Joe Rogers had not simply ignored this repugnant conduct by Steve Wright.

Next is *Lib Julian,* the Senior Vice–President, Operations, of Waffle House. Julian witnessed Wright's initial acts of sexual harassment—the "Therese is our Dolly Parton. The girl with the big . . . smile" remark—that Wright made to all of the Waffle House managers and supervisors (and others) at the "Top Op" Award banquet for the Western Area at Bear Creek in 1987. In addition, on a recruiting trip to Phoenix with Steve Wright and Therese Scribner in February 1988, Lib Julian "made a pass" at Therese in a "hotel room." [99] And, Julian was present when Wright "grabbed Therese's blouse, pulled it out, looked down at her breasts, and smirked: 'It was driving me crazy to see what those were.' " [100] In December 1988, Therese Scribner complained again to Lib Julian about Steve Wright's conduct; but all that Julian said was, "Hang in there. I'll work with him."

Following *Joe Rogers* and *Lib Julian* in the Waffle House chain of command were *Steve Wright, Steve Oswald,* and Area Vice–President *Larry Cannon.* [101] Cannon was actually on the "Santa's Sleigh" ride and he saw Tim Mercer's Polaroid "crotch shot" harassment of Therese Scribner—but Cannon did nothing about this disgusting conduct. Cannon also witnessed some of Steve Wright's sexual misconduct towards the plaintiff; and Cannon once told Mike Robare: "Therese needs a real man. *I could give her what she wants.*"

Finally, as is evident from the preceding discussions of the sexual harassment by Wright, Oswald and Mercer, their repugnant conduct took place before other executives, supervisors and hourly unit employees of Waffle House—for example, at functions such as the "Top Op" Award banquet, meetings of District and Division Managers, recruitment meetings in Dallas and elsewhere, out-of-town business trips, on "Santa's Sleigh," and even at numerous Waffle House restaurants in the Dallas–Fort Worth area.

Needless to say, not a single one of the other Waffle House officers and top executives—Senior Executive Vice–President Lib Julian, Area Vice–President (and later Senior Vice–President) Steve Wright, Area Vice–Presidents Steve Oswald and Larry Cannon, or Division Manager Tim Mercer—ever did anything about the sexual harassment of Therese Scribner that they either participated in or observed. *Neither did Joe Rogers, the President, CEO and 78% owner of Waffle House.*

### D. *Waffle House Does Not Want The Plaintiff To Quit (Dec. 1988–Jan. 1989)*

In late 1988 and early 1989, Therese Scribner began to give serious consideration to quitting her recruiting job with Waffle House. Therese had become increasingly upset about a number of things—including the fact that she had not received "a pro rata share of her second quarter bonus," and the fact that Steve Wright had assigned her some menial tasks (such as the preparation of his expense accounts). Therese was also distraught about the continuing, pervasive sexual harassment by Wright and others.

On December 8, 1988, at a meeting with Lib Julian (Senior Executive Vice–President, Operations), Therese told Julian about her concerns and about *some* of the sexual harassment of her by Steve Wright. [102] Four days later, on December 12, 1988, Therese documented part of their discussions in a

---

**99.** The plaintiff recorded this incident in her chronology (Exh. 166).

**100.** After Steve Wright called Fran Dubuisson and asked if she would have dinner with Lib Julian (who is married), Dubuisson refused. Then, she never returned Julian's call. Julian's testimony that he just "wanted her to have dinner with both Julian and Wright" was a lie.

**101.** The wives of Steve Wright and Tim Mercer, Mary Wright and Sherry Mercer, also saw some of their husbands' acts of sexual harassment of the plaintiff. The Court discounts the contrary testimony they gave at trial.

**102.** As discussed above, Julian had actually seen some of this sexual harassment, such as the time Wright grabbed Therese's blouse, pulled it out, looked down at her breasts, and said: *"It was driving me crazy to see what those were."*

memo to Lib Julian confirming that, as Julian had told her, she:

(i) was "to discontinue doing Steve Wright's expense reports,"

(ii) should "have received a pro rata portion of [her] 2nd quarter bonus," and

(iii) was to become, in Julian's words, a "defender of the people" in the Western Area.[103]

Her memo to Julian ended, "I sincerely hope that you will help me have more impact in this area *so I can do what I am best at doing—hiring and recruiting people.*"

Although this memo does not mention her sexual harassment by Steve Wright, the Court specifically credits the testimony of Therese Scribner that *she did tell Lib Julian about some (but not the specifics) of Wright's sexual misconduct towards her.* Therese also testified that "once I told Lib Julian about some of the sexual harassment on December 12, 1988, I was hoping that maybe *that part* of it would disappear." She added that, after her complaints to Lib Julian, Wright's conduct "did get better for a while," but then the sexual harassment "started again."

Therese Scribner sent Steve Wright a copy of her December 12, 1988 memo to Lib Julian, along with her handwritten note to Wright (Exh. 18)—in which she discussed a number of "areas of concern that I have made you aware of," including problems of six different Unit Managers and their need for a "training manager." This memo then listed five items which Therese had "submitted or requested," but as to which she had never received any response from Wright.[104] In this memo to Wright, Therese states:

"Steve, I disagree with your statement that 'I need to have more trust and belief in the district managers, division managers and you.' It is not a lack of trust or faith, but a lack of reaction on the part of management in this market. ... My biggest frustration is the lack of concern that is

shown when a situation occurs [with a Unit Manager], regardless of whether we feel it is important to us—it is important to that individual, and the react time to handle it. We cannot continue to ignore things and hope they go away. We cannot continue to talk about taking care of people and not show it. ... I will not bore you with what I think we should do—you've already heard it."

Steve Wright was furious when he received his copy of Therese's memo to Lib Julian. Wright was upset that she had made these complaints directly to Lib Julian (particularly her complaint "about doing Wright's expense accounts"). This resulted, in turn, with Therese Scribner's December 21, 1988 meeting with Lib Julian and with her January 18, 1989 meeting with Steve Wright and John Robertson, Vice-President, Operations Control.[105]

*At the January 18 meeting, both Wright and Robertson told Therese Scribner that they wanted her to stay with Waffle House.* She promised "to think about it," and give them an answer in two days. Therese's decision to stay with Waffle House came in her January 20, 1989 typewritten memo to Steve Wright, which begins: "As I indicated on Wednesday, January 18, I told you and John (Robertson) I would arrive at a decision today. *After a lot of thought, I have decided to stay with high expectations* of improvement" in six designated areas—including "consistent emphasis placed on retention and recruiting," "increased sensitivity to individuals and their needs," and "mutual respect and loyalty."

When she made this decision, Therese Scribner had no way of knowing that she would be terminated about one year later— *on the pretense that she had never been a satisfactory recruiter for Waffle House—* even though Julian, Wright and Robertson had persuaded her not to quit in December 1988 and January 1989.

---

**103.** Exh. 19.

**104.** The fifth item in this list begins, "I have investigated our management retention *and made*

*you aware that our highest turnover* is occurring between 4–6 periods in a unit, after training."

**105.** Exhs. 21 and 22.

E. *The Plaintiff Again Complains About The Sexual Harassment—And, As The Result, She Is Terminated*

As discussed above, Therese Scribner had repeatedly and bitterly complained to Steve Wright, Steve Oswald, Tim Mercer and others about the pervasive, demeaning sexual harassment. Indeed, some of this misconduct had been witnessed by the top officers and executives of Waffle House, including the President, CEO and 78% owner (*Joe Rogers*), the Senior Vice–President of Operations (*Lib Julian*), Area Vice–President (*Larry Cannon*), and others. In addition:

(i) in January 1989, Therese Scribner told *John Robertson*, Vice–President, Operations Control—who was her co-supervisor with Wright for a short period—about the constant sexual harassment she received from Steve Wright. Robertson never did anything about the plaintiff's complaint.

(ii) in late 1989, Therese complained to *Larry Cannon* about the sexual harassment by Steve Oswald.[106] When asked what he did about this complaint, Cannon lied—claiming that Scribner had never made such a complaint to him.[107]

However, the next complaints that Therese Scribner made about this sexual harassment—the ones to Donald "Skip" Nau in October and November 1989—were destined to be her final ones as an employee of Waffle House:

(1) *The Plaintiff's Complaints To Skip Nau*

On October 1, 1989, Skip Nau became the head of the newly created "People Department" of Waffle House. All recruiting was placed under this department, and Nau became Therese Scribner's supervisor. Skip Nau made a "fact finding" visit to Dallas from October 24–26, 1989 for meetings with Therese Scribner, Steve Oswald and others. During their meeting, Therese gave Nau a copy of her handwritten notes concerning some of the problems she had experienced during her employment at Waffle House.

In these notes (Exhibit 165), Therese first listed problems with her salary and bonuses, including the fact that her starting salary was $10,000 less than that of Rick Seal, the male recruiter she had replaced. Her notes also mentions *some* of the sexually harassing conduct of Steve Wright and Steve Oswald (and the names of some witnesses)—including (i) the "Dolly Parton/big smile" comment Wright made at the Bear Creek "Top Op" awards (Neely and Gay were there), (ii) the December 1988 blouse incident with Wright (in the presence of Lib Julian), (iii) Wright's "on the rag" comment (Neely was present, and objected), (iv) Wright's June 1989 comment about "jumping my bones" (other supervisors were there), and (v) Oswald's "signing bonus/weekend with Therese" statements to recruits (witnessed by Skip Nau, David Smith, Don Kelly, Kyle Coleman and others).

(2) *The "Bottom Line" On The Plaintiff*

Following his meetings with Therese Scribner, Skip Nau prepared a report—his handwritten memo of October 26, 1989 to Joe Rogers (President, CEO and 78% owner) and Robert Bowman (Executive Vice–President)—*in which Nau emphasized the need for Waffle House to keep Therese Scribner as a recruiter, and in which he told these two top executives about the sexual harassment by Steve Wright.* This Skip Nau memo (Exhibit 24) reads, in part:

Terez Scribner—Dallas 10/26

*The bottom line on Terez is that we need to keep her—*

She has great people skills, is well thought of by the hourly and unit mgrs. Visited enough units to verify this. Great attitude. Knowledgeable about hrly and unit training. Very assertive. Bright and articulate—She can be a player with the proper leadership and direction.

Terez has gone through a difficult time in Dallas—particularly with Steve Wright.

---

**106.** The plaintiff recorded this complaint in Exh. 157, p. 1906.

**107.** Even Steve Wright admitted that he received "something" from Larry Cannon about a sexual harassment complaint that Scribner had made against Steve Oswald. And, as discussed above, Cannon had witnessed some of this harassment, like Tim Mercer's Polaroid "crotch shot" of Therese on "Santa's Sleigh."

*(This is not news—Lib & John and prob. you two are well aware of this)* I've read the memos—in a nut shell, the problems resulted from *a lack of direction, a lack of leadership, and a lack of respect shown toward her. Frequent jesting about "Dolly Parton," Dist. & Div. Mgr. Awards for the most recruits being 'a weekend with Terez'* and statements like 'you don't understand, you're not an operator' were made at Division/Dist. Mgr. Meetings in Terez's presence. ... I realize that there are two sides here but *with the personalities being what they are logical conclusions can easily be drawn.*

This October 26, 1989 Skip Nau memo to Rogers and Bowman also contains these remarks about Steve Oswald:

*Oswald's problem was not w/Terez (I spent six hours talking and brainstorming with him—talking people and culture, et al.) He thinks she's [Therese] great w/lots of potential.* His problem—in essence—was her $40,000 salary hitting his P/L (profit & loss). He said—'I can recruit 8 people a Qtr. in Dallas—so why do I need Terez.' *I told him I thought his thinking was shortsighted in view of her potential and the kind of impact we were trying to make in Dallas. ...*[108]

Skip Nau concluded his fateful October 26, 1989 memo with his "prospective plan for Terez", including:

1. Speak by phone every week to get updated on status of trainees, terminations, new candidates, shift mgrs., etc.—update the pipeline.

. . .

2. She will provide me with her two week itinerary—which we'll update every week.

3. Need to revise her current bonus structure from $31,000 + $10,000 (2500/quarter) to 25,000 + 16,000 (up to

24,000 for [excellence] and have it more performance driven).

. . .

*Terez is motivated and capable—all she needs is leadership and direction—I can provide that.*

Let's all agree on the agenda and I will implement it—both to the operators and to Terez.

One month later, November 21–23, 1989, Skip Nau had more meetings in Dallas with Therese Scribner, Steve Wright and Larry Cannon. As recorded in her chronology,[109] there were discussions about Therese's bonus and her "work on holidays." Nau also told Therese that "he had written a memo to Joe Rogers" and that he had made "Rogers aware of the sexual misconduct against her" by Steve Wright.[110]

Accordingly, at the end of November 1989, Therese Scribner—in Skip Nau's own words—had "great people skills" and a "great attitude," she was "knowledgeable" and "very assertive," she was "bright and articulate," *she should receive an increase in earning potential of 20%* (from $41,000 to $49,000), and *"the bottom line on Terez" was that Waffle House needed to keep her as a recruiter.* However, despite Skip Nau's glowing assessments of Therese Scribner, Nau had also reported her complaints of sexual harassment to Joe Rogers—and *within four months after her complaints to Nau, Therese Scribner would be terminated from her Waffle House position by Skip Nau (at the direction of Joe Rogers).*

### (3) *The Sexual Harassment Continues*

Even after her complaints to Skip Nau, the sexual harassment of Therese Scribner by Steve Oswald continued. In her chronology,[111] Therese recorded these additional incidents:

---

**108.** Steve Oswald also told Nau that "a problem he was having with Terez" was that "his employees would go to Terez with problems and ideas" circumventing his Division Managers. Nau told Oswald this "sounded more like a leadership problem [with Oswald] than a problem with Terez," and Oswald "acknowledged that."

**109.** Exh. 166.

**110.** Scribner's only notation in the chronology (Exh. 166) of the call she received from Steve Wright about this November 21–23, 1989 trip was "11/21—talked to SW—bunch of bullshit"—a very accurate description, since Wright, again in perjured testimony at trial, claimed that the plaintiff "denied making these comments to Skip Nau."

**111.** Exh. 166.

| | |
|---|---|
| 11/89 | complained to lc (Larry Cannon) about Steve Oswald sexual harassment - per Maggie |
| 12/19/89 | Oswald ran hand up my thigh - liked my elf stockings - Santa's Sleigh |
| 1/90 | Oswald making sexual comments all the time - tickling me 'accidentally' - bumping into me - makes comments in front of everyone |
| 1/20/90 | bookends comment at banquet - his date and myself - referring to size of breasts |
| 2/1/90 | tickled me - comments about breast size |
| 3/1 | terminated |

(4) *The Waffle House President, The Executive Committee Meeting And Lib Julian's Supposed "Investigation"*

The Executive Committee of Waffle House was composed of Joe Rogers (President, CEO and 78% owner), Lib Julian (Senior Vice–President, Operations), Robert Bowman (Executive Vice–President) and J. Michael McCarthy (Executive Vice–President, Chief Financial Officer).

At an Executive Committee meeting in late October or early November of 1989, these four officers discussed Skip Nau's October 26, 1989 memo and the reported "frequent jesting" by Steve Wright about "Dolly Parton," the "weekend with Terez" comments, etc. This was Lib Julian's description of what happened at the meeting:

It started with Joe (Rogers) saying that. Skip had come back from Dallas and having a meeting with Terez and that there had been certain allegations made by Terez toward Steve Wright. *And Skip feels like Terez is really capable of performing the job functions of a recruiter now that he's in town and can provide that direction.* And that we needed to get in touch with Steve and have him to review (the) contents of Skip's message that he had written to Joe and to Bob Bowman.

Skip Nau was summoned to the Executive Committee Meeting. Joe Rogers was "very upset" at Nau, and told him, *"You have no facts. You dress up conclusions without any facts."* [112] Then, Steve Wright was brought into the meeting and his denials of any misconduct were described by Lib Julian:

"A. (Steve Wright) was given a copy of the notes that Mr. Nau had made, to read and asked to respond to the notes, and also, you know, did he agree or disagree with Mr. Nau's notes that he had made.

Q. And he denied—

A. *He denied the sexual allegations part of it.* He didn't necessarily deny the lack of leadership or lack of direction that had been given to Terez from him because he and I had discussed that on more than one occasion. This was not new news to him. ... Basically he said that's Skip's interpretation. He's new in town. He doesn't know all that has gone on ..."

Joe Rogers ended this portion of the Executive Committee meeting by designating Julian to "get with Steve Wright and find out what's going on." Julian's purported investigation consisted of a 15–20 minute discussion with Steve Wright that same afternoon. According to Julian, he told Wright that:

"A. ... these are serious allegations. I'm aware of the lack of leadership and direction, but if these allegations are true *you get in touch with Steve Oswald* and you get these fixed now. As far as the sexual innuendoes or sexual harassment allegations ...

Q. *Why did you make the comment about Steve Oswald?*

A. *Because it was Steve Oswald's name was in there in direct relation to saying that Terez would spend a weekend with a contest winner.* And Steve Oswald worked for Steve Wright." [113]

The brief discussion between Lib Julian and Steve Wright ended with Julian telling Wright "to report back to him after he had talked" with Therese Scribner.

---

112. According to Joe Rogers' trial testimony, he "chastised" Nau about the "bottom line" statement because he hadn't done the "fact finding" and "he was not even close."

113. This was not correct, since Nau's memo did not connect Steve Oswald to Wright's "Weekend with Terez" comment. However, if Lib Julian did think that Oswald was involved, then he never talked to Oswald during his supposed "investigation."

That night, Steve Wright did telephone Therese at her home. Wright was livid! He demanded to know "what she had told Skip Nau." And, he threatened Therese, *"This will not advance your career. We'll talk about it later."* Scribner testified that she "was not too worried" about this threatening call from Steve Wright because she "thought that Skip Nau was a decent guy."

In his so-called investigation, Lib Julian never contacted Therese Scribner (and neither did any other Waffle House officer). Instead, Julian called Wright after a few days, and then reported back to Joe Rogers.

"A. ... it was a few days later I asked (Steve Wright) had he talked with Terez and he said, yes, and *Terez said Skip's a damn liar.*[114]

Q. *Did you talk with the plaintiff about this?*

A. *No, sir.* In fact, I don't recall seeing much of Terez after Skip took over the People Department.

Q. Did you report back to Mr. Rogers?

A. *I told Mr. Rogers what Steve had said, that he denied the sexual harassment allegations or sexual innuendos.* ... My report to Joe was simply that Steve still denied that he had done anything wrong *and that Terez had claimed that Skip was lying about what he had put in his memo.*

Q. And that was the report?

A. That was the extent of it, yes, sir."

This, then, was the full extent of Lib Julian's purported "investigation" of the plaintiff's sexual harassment complaints against Steve Wright: a 15–20 minute discussion with Wright on the day of the Executive Committee meeting, and an even shorter conversation with Steve Wright "a few days after" Wright's call to Scribner.

### (5) *The So–Called "Investigation" By Joe Rogers*

After the Executive Committee meeting, Joe Rogers did meet privately with Steve Wright, and asked him about the "Dolly Parton" joke. Wright admitted that he did make both that remark and the "signing bonus/weekend with Therese in a bikini" statement. Wright also told Rogers that Steve Oswald had said these same two things to Therese Scribner.

However, *the only thing that Joe Rogers did after this conversation was to "counsel" Wright* [115] *"not to do things like that again."* Neither Wright nor Oswald were sanctioned in any way. Indeed, no one even talked to Oswald about the sexual harassment complaints before Therese Scribner was terminated. And, the only "explanation" ever given for the fact that Joe Rogers never contacted Therese Scribner in his supposed "investigation" was made by his attorneys in a post-trial pleading:

Based on his discussions with Wright, Julian and Cannon (among others), Rogers concluded that Scribner participated in sex-based banter, had initiated the remarks regarding Dolly Parton and that the other alleged remarks were apparently not made by Wright. *Wright was, however, counseled by Rogers and Julian that such jesting would not be condoned by the Company.*

### (6) *Skip Nau Saves His Waffle House Career By Terminating The Plaintiff*

After Skip Nau was blistered by Joe Rogers at the Executive Committee meeting—*"You have no facts"* about Wright's mistreatment of the plaintiff, *"You dress up conclusions without any facts"*—Nau began backtracking, very quickly. As described by Lib Julian:

"... Skip kept saying, *Terez said this is no problem, you know,* let's get on with the business of recruiting and retention, *this is no problem* (referring to the sexual harassment allegations), and that she was ready to go to work and he said, I can— you know, I can manage Terez."

---

**114.** Of course, if Steve Wright did tell this to Lib Julian, it was another blatant lie.

**115.** Joe Rogers did not explain why he felt it appropriate to "counsel" Steve Wright in view of

his testimony that he "did not consider Nau's memo (October 26, 1989) to be a complaint of sexual harassment" because it also stated that Scribner said, "That's all behind us."

On January 24, 1990, Skip Nau returned to Dallas. This time, as Therese Scribner testified, Nau "was not as warm, and his attitude had changed." This worried Therese and she asked Nau for a copy of his October 26, 1989 memo to Joe Rogers and Robert Bowman. Nau lied to Therese, telling her that he did not have a copy. When she later asked for a copy, Nau again lied, "I can't get my hands on it." Therese began to think that Nau really didn't want to give her a copy of the memo (and she would not see it until after this memo was finally produced by Waffle House in this litigation).

Skip Nau was not about to stand up to Joe Rogers, or even to Steve Wright. Instead, Nau quickly began to distance himself from the favorable review he gave Therese Scribner in the October 26, 1989 memo. In February 1990, "Joe Rogers, Jr. and Skip Nau met and discussed" the recruiting efforts of Therese Scribner. After they reviewed her "continuing poor results and failure to follow Nau's directions, Nau conceded [to Rogers] that Scribner was not meeting his expectations as a recruiter."[116] And, realizing what was going to happen to the plaintiff, *Skip Nau even asked Rogers if he (Nau) "could make the decision to terminate her."*

Nau returned to Dallas on March 1, 1990. Nau testified that it was "probably in mid-February" that "*he* made the decision to terminate Therese Scribner." Later, Nau "clarified" this testimony by explaining that "*Joe Rogers let me make this decision.*"[117]

At this last meeting (March 1, 1990) between the plaintiff and Skip Nau, Therese gave Nau an article about sexual harassment and also told him about another Oswald incident, the "matching bookends" comment.[118] Skip Nau told Therese "You are a good recruiter" and "you have accomplished so many things"; then, Nau "began apologizing" to her. Concerned by this, Therese

finally asked, "*Skip, are you firing me?*" Nau's only answer was something like, "I don't want to put it *that* way. We're just going to do something different." This final meeting ended with the plaintiff's termination—but *Nau did not give Therese any reasons for her abrupt discharge.*

Despite this, by letter dated March 6, 1990, Skip Nau wrote Therese Scribner claiming that he was documenting "the reasons behind your recent termination from Waffle House." That letter states these additional lies:

> You have been terminated because we have not been satisfied with the level and quality of the recruiting effort nor the recruiting results over the last 3–1/2 years, and more particularly, over the last 5 months. While your administrative skills have been adequate, your recruiting results have been unsatisfactory.

These supposed "reasons" for termination had not been discussed with Therese in Nau's final meeting with her (March 1, 1990). And, Therese Scribner replied to Nau by letter dated March 13, 1990:

> Dear Skip:
>
> I do not agree with my termination for the following reasons:
>
> 1. My performance and contributions have been excellent.
> 2. *I have never received a negative review or reprimand.*
> 3. *I consistently received an increase in salary.*
> 4. I received an award for recognition of excellence.
> 5. *No one ever indicated to me there was a problem with my performance.*
>
> I don't want to be terminated and would like to continue in my present position.

At trial, Skip Nau was given every opportunity—first by the plaintiffs' attorney, then

---

**116.** The quotations in this sentence are from a post-trial pleading filed by the Waffle House attorneys.

**117.** According to the trial testimony of Joe Rogers, "Nau probably would have fired the plaintiff within another couple of months" because Nau told him "that Scribner was not following his directions." In contrast, Rogers also testified

that Skip Nau "was brand new" and "didn't know what he was talking about some of the time" and "could not judge the competence of the plaintiff."

**118.** Nau testified, *but not credibly,* that he later gave Oswald "an oral reprimand" for making this statement to Therese Scribner.

by this Court—to state each of the reasons for "his termination" of Therese Scribner. This is an accurate summary of the only so-called "reasons" that Nau could give:

Therese was not doing a good job recruiting. The retention rate of her recruits were inadequate. She did not follow directions very well. She was not providing the leadership (we) wanted. She was not professional because she used slang. She was not part of the team.[119]

When questioned about each of the nebulous "reasons" he gave for terminating Therese Scribner, Nau admitted that he never wrote a memorandum to the plaintiff (or anyone else) "listing her defects"—and that he did not write a "termination memo" stating the reasons for her discharge. Then Skip Nau lied again, claiming that although there was nothing in writing, "he had talked to Therese about these problems" on three trips to Dallas (November 21, 1989 and January 2 and 10, 1990).[120] Nor did Skip Nau ever write a memo retracting any of the glowing statements he made about Therese Scribner in his October 26, 1989 memo to Joe Rogers and Robert Bowman:

... she has *great people skills;*

... she is *well thought of* by hourly and unit employees;

... she has *a great attitude;*

... she is *knowledgeable* about hourly and unit employees;

... she is *very assertive, bright* and *articulate;* and

... she can be a player with the proper leadership.[121]

### F. The Fabricated "Reasons" Concocted To "Justify" The Plaintiff's Termination

In their deposition and trial testimony, the Waffle House witnesses gave three supposed "reasons" for the termination of Therese Scribner. They were:

i) that the plaintiff was a poor, if not lousy employee during her entire three and one-half years with Waffle House;

ii) that she was a tramp, a "loose woman" who actually invited, initiated and participated in the gross and repugnant sexual misconduct discussed above; and

iii) that she was lying about Steve Oswald, Steve Wright, and Tim Mercer (and the others discussed above)—because no Waffle House executives, certainly not these three stellar employees, had ever violated the Waffle House sexual harassment policy with respect to Therese Scribner (or any other female employee).

Each one of the purported "justifications" for the plaintiff's discharge is false. The first, her supposed poor performance as a recruiter, was the sole reason belatedly given to Therese Scribner by Skip Nau, in his letter of March 6, 1990—which stated only, "You have been terminated because we have not been satisfied with the level and quality" of your recruiting effort nor your recruiting results. In addition, each one of the three fictitious "reasons" for the plaintiff's discharge (i) are "supported" only by lies told by Wright, Oswald, Mercer and others, and (ii) are, without question, shown to be baseless by the credible witnesses discussed below. Each of these three blatant lies will be addressed separately.

### 1. LIE NUMBER ONE: Waffle House Terminated The Plaintiff Because Of Her Poor Performance

Therese Scribner was an excellent employee for Waffle House: she never received any

---

119. Nau also criticized the plaintiff because she "didn't set up a SWAT recruiting team," and because she used personnel agencies instead of "cold calls" on competitor's restaurants. In direct contrast, Steve Wright instructed the plaintiff that she should not use personnel agencies, but that she should be making "cold calls" instead. Wright also testified that the plaintiff did set up the SWAT recruiting team.

120. The Court specifically credits the testimony of Therese Scribner that she never had any such discussions with Nau.

121. Of course, as discussed above, Lib Julian, Senior Executive Vice–President, Operations had helped Steve Wright convince Therese Scribner not to quit in December 1988 and January 1989. Nau had no explanation for why Julian and Wright would have done this if Therese was really a bad employee.

negative reviews from her supervisors.[122] Her only written performance review (that by Larry Cannon) was very favorable with Therese receiving "high marks" for her recruiting methods. She consistently received pay increases. She normally met, or came close to meeting, each hiring quota. And, she received one Waffle House award for excellence and another for outstanding achievement.

The credible witnesses who testified that Scribner "was an excellent, concerned employee" included these former Waffle House Unit Managers and employees: *David Coleman* (Therese was professional, concerned, never dressed inappropriately); *Michael Robare* (she had a very good interview style, dressed professionally); *Dave Smith* (she did a good job, very professional, dressed professionally); *Joe Thomas* (she was professional, dressed in business attire); and *Steve Williams* (she was very competent, an outstanding recruiter). In contrast, Waffle House—relying primarily upon the lies of Steve Wright, Steve Oswald, Tim Mercer, Larry Cannon, Skip Nau and Lib Julian— tried, unsuccessfully, to convince this Court that Scribner was fired because of her poor performance (and because of some other nebulous reasons which they could not explain).

### (a) *Plaintiff's recruiting and her retention rate*

Waffle House's primary attack on Therese Scribner's performance centered on two assertions: *first*, that she did not recruit viable candidates who were qualified for advancement from the Unit Manager level (1 restaurant) to the District (2–4 restaurants) and Division Manager (12–15 restaurants) positions; and *second*, that the "retention rate" of the managers she did recruit were totally

unsatisfactory during her entire 3–1/2 years as a recruiter with Waffle House.

With respect to the first assertion, the credible evidence clearly established that the only "authority" Therese Scribner had as a recruiter was to "find and screen applicants" and bring them to the attention of management. *She had no authority to hire or fire anyone.* Indeed, the hiring and firing decisions were made exclusively by her supervisors, the Division and the Area Managers [123] —who conducted their own interviews with the candidates Therese brought to them, *and who had the sole authority to hire new employees.* And, Waffle House had no satisfactory explanation as to why the plaintiff's supervisors continued to hire supposedly "inferior applicants" recruited by her—or why Therese should be fired for the hiring "mistakes" made by the Division and Area Managers.[124]

Indeed, although Skip Nau made the absurd claim that "at least one-half of Scribner's problems were recruiting," he admitted that:

... the plaintiff's authority as a recruiter was limited;

... she only had "screening" duties, and had no authority to hire or fire; and

... she had no authority to influence or improve the operations and working conditions at the Waffle House restaurants.

In addition, the overwhelming credible evidence established that the "lack of retention"—i.e., the high turnover rate for Unit Managers (1 restaurant)—was due (i) to the long existing working conditions for Unit Managers, that were beyond the plaintiff's control or authority, and (ii) not to the quality of the candidates she recruited. Specifi-

**122.** Some Waffle House witnesses lied about this, claiming that the plaintiff received "numerous reprimands." It was undisputed, however, that not a single one of these supposed reprimands was documented in Scribner's personnel files or in any other company records.

**123.** A combination of two Division Managers or a Division Manager and the Area Manager made all hiring decisions for Waffle House (subject, of course, to approval by upper management).

**124.** Robert Bowman, Executive Vice–President, Operations, estimated that 67% of the "retention problem" was due to the "management team"— i.e., Wright, Oswald, Julian, Cannon, Theobold, Adams and Mercer—and only 33% was due to Therese Scribner. In contrast, Steve Wright told more lies, claiming that the plaintiff "had more direct responsibility for the turnover" than Wright or "anyone else"; and Wright "estimated" that 80% of the problem was due to the quality of the plaintiff's recruits.

cally, this incredibly large turnover resulted from:

i) *the harsh working conditions* for Unit Managers—i.e., excessive hours, poor (if any) support from management, excessive turnover of hourly employees, mishandled pay issues, and the lack of day-to-day direction from District and Division Managers.[125]

ii) *the severe management problems* in the Dallas–Fort Worth area—i.e., three of the Division Managers during Scribner's 3-1/2 years with Waffle House were demoted for incompetence and for misconduct after Scribner's termination; and three of her other supervisors in the Western Area (Tim Mercer, Terry Dill and David Adams) were all disciplined and demoted.

iii) *the turnover rate*—even under the best of circumstances, the rate for turnover of Unit Managers was 1.6 managers per unit per year. This meant that, within 21 months from the date of hire, *there would be almost a 100% turnover of Unit Managers—irrespective of who recruited the applicant.* Indeed, of the 64 persons hired by Waffle House in the Dallas–Fort Worth area during the three year period from 1988–1990, *all but one had left Waffle House before* the trial in this case.

iv) *the lack of improvement*—if Scribner's incompetence as a recruiter did have some adverse effect on the retention rate, one would expect an improvement after her termination. However, by the time of trial the "long-term" retention rate (i.e., 21 months) had not improved to any measurable degree despite the discharge of Scribner four years earlier.

These long-existing miserable working conditions were simply the accepted way of life (by management) for Unit Managers at Waffle House. Most of the people recruited just could not continue because of the demands on them and on their families, so they quit. The very small number who did "survive" were rewarded with rapid promotion and probably more money than they could have made with any other employer.

It was clearly established that Therese Scribner had no authority to control or change these conditions that were causing the high turnover; that she was certainly less able to improve these working conditions than her supervisors (Steve Wright, Steve Oswald, etc.); but that these supervisors received promotions and substantial pay increases—while Therese Scribner was terminated shortly after she had complained about their sexual harassment of her.

Finally, not one of Therese Scribner's supervisors ever told her that they were dissatisfied with the quality of her recruits.[126] No one ever told Therese, "Your recruits are no good."[127] And, the Waffle House witnesses could not even say "what was wrong with the plaintiff's recruits." For example, David Adams, who testified that he hired "probably 5–10 of the people brought to him" by Therese Scribner, was asked, "What were the problems with them?"; and he could only respond:

"I don't recall ... I just couldn't be specific about their faults ... too many came from employment agencies ...,"

but Adams did not "recall if he told the plaintiff this," or if he told her that he was "dissatisfied with her performance."

(b) *Other supposed "reasons" for the termination*

Waffle House witnesses also lied about some other purported "reasons" for Therese Scribner's termination. Some of these bor-

---

**125.** These incredibly harsh and demanding working conditions for the Waffle House Unit Managers are discussed above in Section III ("The Facts"), under part B ("The Plaintiff's Performance").

**126.** Several Waffle House executives—Rogers, Wright, Cannon, Julian, and Nau—testified "that they talked with the plaintiff about the need to improve screening methods and retention." There were discussions generally about recruit-

ing, but none of these executives ever told Therese Scribner that they were dissatisfied with the manner in which she recruited or the quality of her recruits.

**127.** Steve Wright actually had the nerve to testify that there was nothing in writing about Scribner "not doing a good job," because "my short fall was being too close a friend with Therese."

der on the ridiculous—such as the claims that Therese Scribner was fired because she "was involved in too much *soap opera* and *nursemaiding* of unit employees," that she did not "follow instructions," and that she did not timely submit reports. Again, Therese Scribner was never warned or sanctioned about any of these things, and Skip Nau did not list any of them as the basis for "his" termination of Scribner.

The Waffle House witnesses made two other frivolous contentions: that Scribner was not willing "to get behind the counter" at the restaurants "to perform the duties of the people" she was recruiting; and that she refused to work on the Thanksgiving, Christmas and New Years holidays like other Waffle House employees. *Both of these complaints are false.* Therese did help out in the restaurants [128] as evidenced by the excellent rapport she had with the Unit Managers. And, as she documented in her calendar, Skip Nau actually gave Therese a reprieve from working on her last Thanksgiving and Christmas holidays; although she did not work on New Years Day of 1990, this was because the Unit Manager had asked her to work on New Years Eve, instead.[129]

### 2. LIE NUMBER TWO: That's Why The Lady Is A Tramp

The evidence presented by the credible witnesses established that Therese Scribner was very professional, that she always dressed appropriately in business attire at work, that she did not wear "tight or clinging" clothes, that she did not tell "sexual or dirty jokes," that she never made comments or jokes about her breasts, and that she did not "make sexual comments" or "talk freely about sex." [130]

The plaintiff and other witnesses truthfully testified that she did use slang frequently (such as "honey, baby, sweetie"); that she did cuss on occasion, that she would occasionally "hug employees or pat them on the shoulder"; and that she did engage in "girl talk" or use profanity (e.g., the word "fuck") with some of her close female friends.

Contrary to the testimony of Therese Scribner and her credible witnesses, some who testified at trial—mostly Waffle House executives or supervisors (and three of their wives)—repeatedly:

i) lied about Therese Scribner's supposed lack of professionalism—she was "vulgar and flirtatious" (Steve and Mary Wright), she discussed oral sex with Dave Smith (Rick Browning), she cut in to dance with Steve Wright (Delinda Perez);

ii) lied about the plaintiff's dress and appearance—she wore a halter-top and short shorts when we first went to dinner (Steve Wright), she wore "clinging, low-cut clothes" (Olene Mae Browning), she was showing her cleavage in the yard (Ms. Mallory); [131]

iii) lied about Therese telling dirty jokes and using profanity—she told dirty jokes (Sherry Mercer), she asked me to tell dirty jokes over and over (Steve Oswald), she used vulgar language (like "goddamn") a lot when the woman's group would go out and when we talked

---

**128.** For example, *Rodney LeBraun* testified that Therese Scribner did help at the restaurants by "getting behind the counter, answering the telephone, taking orders and washing dishes"; and *Bob Wesson* testified that she would help out by "washing dishes, pouring coffee" and giving the unit employees "a pat on the back" to encourage them.

**129.** Contrary to the seeming position of Waffle House that Therese Scribner should have worked an entire day on holidays, Skip Nau advised all recruiters that "I'm not saying you need to work an eight hour shift, but you do need to spend *a couple of hours* in the restaurants during peak time …" (Ex. 26, Nau's November 14, 1989 memo "To All Recruiters.")

**130.** This very credible testimony came from Glenda Adams, Matthew Bullock, David Coleman, Margaret Dailey, Fran Dubuisson, Tony Fish, Dan Gay, Don Kelly, Rodney LeBrun, Michael Robare, Dave Smith, Joe Thomas, Bob Wesson and Steve Williams.

**131.** In contrast, other Waffle House witnesses testified that Therese Scribner dressed inappropriately at work, wearing "tight or clinging" or "low cut" clothes—while other Waffle House witnesses claimed that Therese's clothes were "too fancy" for work. Indeed, according to Joe Rogers, who owns and controls Waffle House, she was "overdressed" and even wore high heels (which "he wouldn't even let his wife wear in our restaurants").

on the phone (Kathy Thornton), she cussed and was vulgar (Delinda Perez);

iv) lied about Scribner making jokes about her breasts—"the first time I met Therese," she said "see my tits" (Kathy Thornton), she joked with males about her breasts (David Adams, Sherry Mercer), she made jokes about how big "her tits" were (Tim Mercer, Lisa Mercer, Kathy Thornton),[132] she told and invited "the Dolly Parton" jokes (Steve Wright), she said things like "Therese and the Boys are here" and "if I jogged, I'd black both of my eyes" (Tim Mercer), she fondled her breasts in front of Steve Wright (2–3 of the same witnesses), and she intentionally brushed her breasts against Steve Wright (Delinda Perez); and

v) lied about the plaintiff talking about sex—she said my husband is so fat that I have to let him be on top all the time (David Adams),[133] she said "I like sex like anyone else, getting head, giving head (Rick Browning).

Although most of these liars were executives, supervisors or employees of Waffle House, *not a single one of them ever told Therese Scribner that her conduct was not appropriate—and not a one reported this supposed misconduct to higher management.* And, it was apparent to the Court, that some of these witnesses were lying either to protect their jobs (or those of their husbands), or—like Tim Mercer—to obtain benefits (a franchise restaurant) from Waffle House.[134] Accordingly, the Court discredits the testimony of these Waffle House witnesses.

3. *LIE NUMBER THREE: No One Has Ever Violated Our Sexual Harassment Policy*

The conduct by Steve Wright, Steve Oswald, Tim Mercer and others discussed

above—and their sexual harassment of Therese Scribner—clearly violated the Waffle House sexual harassment policy; and, so did the failure of the officers and executives who witnessed some act of harassment, but did not report this harassment or take some action to stop it.

This sexual harassment policy[135] distributed by Steve Wright to all Western Area employees in August 1989, provides:

> Management employees of Waffle House, Inc., are responsible for maintaining a work environment that is free of any form of illegal discrimination and employee harassment, including sexual harassment. Sexual harassment is a violation of Title VII of the Civil Rights Act of 1964. Waffle House complies with all Equal Employment opportunity laws and guidelines and will not tolerate violations of the law on the part of its managers.

> Sexual Harassment is defined to include unwelcomed sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when such conduct is made explicitly or implicitly for employment decisions, or has the purpose or effect of interfering with work performance or creating an otherwise hostile or offensive working enviroment (sic).

The Waffle House policy also states that an "investigation of all complaints will be undertaken immediately. Any action by a supervisor, agent, or other employee that constitutes harassment, including sexual harassment, will result in immediate disciplinary action up to and including termination."

Although this language in clear, the Waffle House witnesses could not agree about it: some testified that "sexual jokes and com-

---

**132.** Lisa Mercer never told Tim Mercer (then her husband) that she did not appreciate the plaintiff talking like this when they were both present. Similarly, Kathy Thornton never told her husband about this because it was "no big deal" and supposedly because "we don't share stuff like that."

**133.** David Adams testified that the plaintiff made two sex-based comments to him when no one else was present; however, Adams did not report

or discuss this conduct with anyone, and no one else ever told Adams that Therese had made sex-based comments to them.

**134.** In fact, several Waffle House witnesses—including Lib Julian—truthfully testified that the plaintiff "was very professional" and that she "did not make inappropriate comments."

**135.** Exh. 141.

ments" *made to female employees* (e.g., the size of Therese Scribner's breasts, the "weekend with Therese in a bikini" comment) would violate the sexual harassment policy. However, other top executives claimed that such "sexual banter" would not be in violation of the policy unless it was really unwelcome by the female employee. The Waffle House witnesses also disagreed with each other as to whether or not the sexual harassment policy condemned such on-the-job "sexual jokes and comments" made about females *out of their presence.*

Steve Wright, the first executive to harass Therese Scribner, gave this testimony in response to questions by the Court:

"Q. If you had a couple of employees, male employees, *not in the presence of a female* who were making jokes, sexual jokes, about one of the female employees, would that violate *this (sexual harassment) policy?*

A. Yes, it would."

David Smith also testified that "Oswald's comments would violate *anyone's* sexual harassment policy."

Steve Oswald, the second harasser, disagreed; he testified that there was nothing wrong with on-the-job *"guy talk"* among supervisors about the plaintiff, her breasts, her sex life, etc.:

"Q. When you were talking about Therese Scribner and referring to her breasts as "tits," with these other guys . . . in *your mind set, was that something that was okay to do?*

A. *We always talk about other people, but that was not okay to do.*

. . .

Q. What did you do it for then?

A. Like I said, *I was just talking to guys.* It wasn't around Terez, wasn't around any hourly associates. *Just guy talk.*

Q. You're . . . now telling the Judge, these are senior people you're talking to,

District and Division Managers, talking about . . . *"she's got good tits."*

A. Like I said, it was said—it was said one time and that is it.

Q. *Just one time?*

A. *I'm not sure."*

Joe Rogers, the Waffle House President, CEO and 78% owner, also disagreed with Steve Wright about the sexual harassment policy. According to his testimony, unless the conduct involves some *"unwelcomed"* conduct—whether sexual advances, requests for sexual favors, or other verbal or physical conduct—there is simply no violation.

"Q. (Court refers Rogers to Exh. 167, the Scribner list of some of the sexually demeaning conduct by Steve Oswald)

Let's assume that somebody referred to a female employee as *"Little Ms. Big Tits"* and if you would tell me, in the context of that, what you mean by "sincerely unwelcomed" and in what context that would be okay or not.

Rogers: If two people, *even if it were against our policy,* had a personal relationship with each other and that got said between them *or frankly anything else on that list,* to me that's their business.

Court: I'm sorry?

Rogers: If they had a personal relationship that was sexual or indulged in sexual jokes and they had that mutual pattern of behavior between them, *then I would not consider that sincerely unwelcomed if that spilled over and somebody else heard it . . ."*

According to this incredible testimony of the top executive of Waffle House,[136] the company's rather remarkable sexual harassment policy does not prevent a male supervisor from making sexual comments to a female subordinate—*even in the presence of others at offices or restaurants of Waffle House*—such as asking if she "wanted to sit on his face," or if she "had even been eaten

---

136. Indeed, this testimony by Joe Rogers became even more difficult to comprehend when his attorneys made this statement in a post-trial pleading: "Rogers concluded that Scribner participated in sex-based banter [and] had initiated the

remarks regarding Dolly Parton . . . *Wright, however, was counseled by Rogers* and Julian *that such jesting would not be condoned by the Company."*

by a man with ice in his mouth," of if "Mississippi women were good fucks and sucks," etc.

After this testimony, the Court asked Rogers if he realized that his "personal relationship" interpretation of the sexual harassment policy was asking "for a swearing match" between the male supervisors and a female employee just "like we're having here" in this case. Joe Rogers answered "Yes," and this was followed by:

> "Courts: I cannot believe you wouldn't be concerned that remarks like that would be made in the work place under any circumstances ... because of the danger that you might be sitting up here testifying under oath and be in court two or three weeks when I'm sure you would rather be some other place.
>
> Rogers: I certainly would. But I'm trying also to distinguish between someone having a purely personal relationship and I'm not going to condemn them for that if nobody else heard it...."

In view of this interpretation of the Waffle House sexual harassment policy by the top officer and majority owner of Waffle House, it became apparent to this Court why neither the officers, executives or supervisors who *witnessed* the sexual harassment of Therese Scribner ever reported it—and why the ones who *participated* in that harassment were never reprimanded or sanctioned for their misconduct.

### G. *After The Plaintiff's Termination*

During the period immediately following Waffle House's abrupt termination of Therese Scribner, (1) Waffle House hired a male employee to replace the plaintiff as the Western Area recruiter, (2) Scribner filed charges of sexual harassment/retaliatory discharge against Waffle House with the Texas Commission on Human Rights ("TCHR"), and (3) Scribner started her own personnel recruiting business.

#### 1. *The Higher Paid Male Replacement*

On April 3, 1990, Waffle House hired a male, Paul Smith, to replace Therese Scribner as the recruiter for the Western Area. Despite the fact that Paul Smith had no prior recruiting experience, his starting salary was $30,000 a year—i.e., $2,000 more than the plaintiff's starting base salary when she was hired on July 29, 1986.

However, after only two months, Smith's yearly compensation was increased to $49,-260—i.e., $21,000 in salary plus a potential $24,000 performance bonus and a $4,260 car allowance. This was $4,355 a year more than Therese Scribner had been making on March 1, 1990, when she was terminated—and it was $13,260 a year more than her beginning compensation on July 29, 1986.

Waffle House makes the baseless claim that Paul Smith was paid more money as a recruiter than Therese Scribner "because his responsibilities were a little different." This is not supported by any credible evidence. In fact, Smith was paid more by Waffle House than Therese Scribner had ever received for one simple reason: Paul Smith was a male recruiter—just like the plaintiff's predecessor, Rick Seal, was paid more than she received because Seal was "the bread winner" and because, according to Steve Wright, Therese just "didn't need to make as much as a man."

Paul Smith lasted less than eight months as a Waffle House recruiter, and he "resigned"—just before Waffle House could fire him for incompetence.

#### 2. *The Plaintiff's Complaints To The TCHR Result In More Lies By Waffle House*

On May 3, 1990, two months after her termination, Therese Scribner filed charges of discrimination against Waffle House with the Texas Commission On Human Rights ("TCHR"). In her complaint, Scribner swore under oath that she had been denied equal compensation by Waffle House—and that she had been "sexually harassed by two male supervisors, Mr. Steve Wright, from the fall of 1986 through the fall of 1989; and, Mr. Steve Oswald, from the summer of 1989 through February, 1990." Scribner's TCHR charges give these details concerning the sexual harassment:

> 1) I was treated differently than male Corporate Recruiters in that two individuals, Steve Wright, and Steve Oswald, made sexually suggestive statements

concerning my breasts, and sexually derogatory statements in front of potential clients. Additionally, Mr. Steve Wright made sexually unwanted touching by pulling at my blouse; and Mr. Steve Oswald made sexually unwanted touching by tickling me under my arms and near my breasts.

2) In October, 1989, I threatened to report Mr. Steve Oswald's derogatory statements to Respondent's Area Vice–President, Mr. Larry Cannon; and the Equal Employment Opportunity Commission.

3) In November, 1989, I spoke with Larry Cannon about Mr. Oswald's sexually harassing behavior.

4) Mr. Skip Nau, Vice–President of People, was made aware of the sexual harassment, even witnessing some of these individuals' comments.

5) In November, 1989, I was informed by Skip Nau that he had written a memo to Joe Rogers, Jr., about Steve Wright's sexually harassing comments. Steve Wright told me later that day that no action was taken against him.

6) I have requested a copy of Skip Nau's memo to Joe Rogers, Jr., on several occasions but the company has refused to give me one.

7) On March 1, 1990, Mr. Skip Nau terminated me.

As discussed above (in Section III C), each one of these charges—and statement concerning the plaintiff's complaints to Larry Cannon and Skip Nau—were true, and they were clearly established by the credible evidence at trial.

The Waffle House response to the plaintiff's TCHR charges was prepared by J. Michael Upton, Vice–President/Secretary and General Counsel. This response, according to Upton's statement to the TCHR, was prepared after his "consulting with" Steve Wright, Steve Oswald, Donald (Skip) Nau, Larry Cannon, John Robertson and Joe Renfro (Assistant Vice–President, Training). At trial, Upton also claimed that the response was supported by information he obtained from Mary Wright, Tim and Sherry Mercer, and Terry Deal—although he had no satis-factory explanation for his failure to include their names in the Waffle House response.

This response consisted of still more lies by Waffle House and by the officers, executives and employees (and others) who talked to Upton. It first denied any equal pay violation; next, it claimed that Therese Scribner had been terminated for not "satisfactorily performing her job"; and, then it denied that the plaintiff had ever complained about sexual harassment or that Wright or Oswald have ever "made sexually suggestive statements or sexually derogatory statements to Ms. Scribner" or that they "ever touched Ms. Scribner in a sexually suggestive way."

The Waffle House answers to Scribner's TCHR charges—*which was based upon the lies of Wright, Oswald, Nau, Cannon, Robertson* and the other discussed above (in section III C and E)—were also false. Indeed, it further demeaned Therese Scribner by reporting new lies about her:

... In fact, *Waffle House was very surprised that such complaints would be made by Ms. Scribner.* Ms. Scribner had a very "colorful" sense of humor and engaged in some off-color teasing and joking with Waffle House personnel. This was mutual "horseplay", however, and it was not directed toward Ms. Scribner in any type of sexually abusive manner. In fact, in most cases, if there were any remarks of any kind directed at Ms. Scribner by any Waffle House employee, they were invited due to the conduct and language used by Ms. Scribner. During her employment, Ms. Scribner made remarks to Waffle House personnel to the effect of:

—*I have enough to go around for everyone.*

—She made several joking remarks to a number of people about being unable to see her feet.

—She discussed with several persons *her need to obtain a breast reduction.* Again, this was done in a joking manner rather than a serious manner.

—She made remarks about her breasts getting in the way all the time [and] when someone would sit close to her or

brush against her, she would make comments about her breasts being mashed.

—On one occasion, (sic) she made the comment to Waffle House management person that *"everything they had heard about short people was true."* ...

—At one point, she was describing to the undersigned how to recognize her if she were to pick the undersigned up at the airport, and her comment was *"I am short and real top heavy."*

In keeping with the performance of other Waffle House witnesses at trial—i.e., Therese told me she was "short and real top heavy"—J. Michael Upton (Vice–President/Secretary & General Counsel) repeated this lie in his trial testimony. In fact, as the plaintiff's testimony established, Upton called Therese Scribner and asked her to meet him at the airport. When he asked what she looked like (so he would recognize her), Therese said she was about "five feet tall, with dark hair," and that she would be wearing a Waffle House name tag. Then, it was Upton who remarked, *"I hear you have another outstanding feature—that you're top heavy."* The Court discounts both Upton's testimony the response he prepared to the TCHR charge—which were, without question, proven to be false by the credible evidence.

### 3. *The Plaintiff Starts Her Own Recruiting Business*

Immediately after her termination by Waffle House, Therese Scribner began looking for a new job. She felt that the fact she had been fired by Waffle House would make this very difficult—but Therese needed a job to help support her family (particularly since her husband's employer "was laying off people"). In the next few weeks, Therese had some interviews, but no offers of employment.

This caused Therese Scribner to begin thinking about starting her own recruiting business. To Therese, this had real advantages: she would have "no need to explain her termination by Waffle House" or her pending TCHR discrimination charges; she would have more flexibility with her schedule; and she liked the idea "of working for myself." So, Therese began making contacts to see if she could generate business for her own recruiting agency. In March and April of 1990, she contacted some prior employers, some companies in the fast food business (Wendy's, Grandy's, etc.), and others.

While she was at Waffle House, Therese Scribner had become friends with Debbie Shelton (who had been a recruiter for Grandy's for several years).[137] Shelton had first called Therese in the fall of 1988 to check the references of Mike Robare, who had been terminated by Waffle House. After this, according to Debbie Shelton, she liked Therese and they "became friends." Shelton found Therese to be "very honest, upbeat, and a lot of fun."

Debbie Shelton had learned that Therese Scribner had left Waffle House and "set up her own recruiting business" shortly before she received a telephone call from Therese. They then met for the first time, at Shelton's office. Therese told Debbie Shelton that she was starting her own recruiting service. They toured Grandy's and discussed its recruiting needs. And, this meeting resulted in Shelton giving Therese Scribner her first business: a "job offer" for Grandy's on April 20, 1990.[138]

Following this, Fran Dubuisson—a friend and neighbor of the plaintiff (who witnessed some of Steve Wright's sexual harassment)— joined Therese Scribner's recruiting agency. Originally doing business as "Resource Associates," Scribner incorporated "Resource Recruiters, Inc." in September 1990. She was the President and the sole shareholder.

---

137. Shelton's employment as a Grandy's recruiter lasted six years, from 1985–1992.

138. Although Therese Scribner had been fired by Skip Nau on March 1, 1990 (confirmed by his March 6, 1990 letter to her), she received severance pay through April 30, 1990. See Exh. 261, p. 10 (defendant's July 26, 1990 response to the plaintiff's TCHR charges). Waffle House's argument that there was something wrong with Scribner opening her recruiting business during this 60-day severance pay period—and with her talking to Waffle House employees who called her, wanting her to help them find new jobs—is ridiculous, and it is rejected by this Court.

The business of Resource Recruiters quickly began to grow. On October 11, 1990, Resource entered into a written agreement with Grandy's, under which it was to be paid between $500-$750 for each new employee it placed at Grandy's. Over the next two years, Grandy's would pay approximately $9,000 to Resource Recruiters for its recruiting services. *However, Grandy's was not her sole client;* Therese and Resource Recruiters placed employees with many different companies.

Just as she had done for Waffle House, Therese Scribner did an excellent job in recruiting for Grandy's. Debbie Shelton testified that Therese "had a great way with people," that she was a good "source" for Grandy's, that "people were naturally drawn to her," that she knew how to recruit "great restaurant managers;" and that this was "confirmed by her applicants," many of whom "went on to become higher managers" at Grandy's.

Over the next two years, Therese Scribner brought a number of recruits to Debbie Shelton, who hired them for Grandy's. Of these recruits, only a relatively small number—between 15 and 20—had been Waffle House employees or were still employed there. The credible evidence established that, contrary to the assertions of Waffle House, Therese Scribner *did not "raid" Waffle House to get recruits for Grandy's.* Indeed, as a matter of policy, Scribner and Resource Recruiters did not make the initial contact with *any* Waffle House employee. However, they did receive calls from some Waffle House employees who asked Therese (and Resource Recruiters) to help them find jobs with another employer.

Debbie Shelton testified that she saw nothing unusual in the relatively small number of the Resource recruits who were employees of Waffle House.[139] According to Shelton, it is common for restaurants in the "fast food industry" to have "a higher turnover" than other businesses. Indeed, during her employment at Grandy's—and before she began using Therese Scribner and Resource Recruiters—Shelton had, in fact, interviewed a number of Waffle House employees herself. Shelton found that the Waffle House restaurant managers were disgruntled with "the working conditions," with the long hours and poor management, and with "abusive supervisors" (who had called some of these managers "stupid", etc. in front of other employees). Indeed, *Debbie Shelton said she "never heard stories like this from the employees of any other company."*

These complaints about Waffle House were some of the same reasons that, as discussed above, other credible witnesses gave for the very high turnover of unit employees and managers at Waffle House.[140]

### 4. The Fictitious "Raid" Upon Waffle House

Waffle House makes the baseless claim that Therese Scribner and Resource Recruiters "raided" its restaurants, from May 1990 through May 1992, to find new recruits for Grandy's. This fictitious "raid" supposedly occurred in this manner:

i) "Within a month of plaintiff's termination, seven Waffle House managers . . . had been scheduled by plaintiff and interviewed by Grandy's";

ii) "Between May 1990 and the early spring of 1992, plaintiff and her company placed approximately 5 more Waffle House employees with Grandy's"; and

iii) "Then, in May 1992, an avalanche of recruiting and placement of Waffle House employees to Grandy's occurred during a short period of time."

It was solely because of this, Waffle House pretends, that a decision was made "to inform Grandy's of the situation in an attempt to halt the apparent pirating of their employees."[141]

---

**139.** The credible trial evidence established that from 95–100 employees were placed at Grandy's by Resource Recruiters.

**140.** These witnesses included Glenda Adams, Matthew Bullock, Lisa Chamblis, David Coleman, Tony Fish, Rodney LeBrun, Dave Smith and Bob Wesson.

**141.** The quotations in this paragraph are from the Waffle House response to the plaintiff's TCHR complaint (Exh. 261).

This Waffle House scenario—that Scribner "raided" its restaurants to find recruits for Grandy's—is false. It was not supported by any credible evidence at trial. Indeed, the evidence clearly established that neither the plaintiff nor her two recruiters, Fran Dubuisson and Margaret Dailey, had any contacts with Waffle House employees *unless those employees had first called Resource Recruiters to ask for help in finding another job.* The Court credits this testimony by Therese Scribner, Fran Dubuisson.[142] and Margaret Dailey,[143]—which was supported by other credible witnesses at trial, including:

... Matthew Bullock, Rodney LeBrun and David Adams, who testified that they "had contacted the plaintiff first" to get her help "in finding a new job," and that *the plaintiff "did not call first."*

... Glenda Adams and James Douglas, who testified that Tony Fish had told them to call the plaintiff and they did.

... Tony Fish, who first testified that he "called the plaintiff in early 1992 or *she called me,*" but then testified that "*it was his idea to call the plaintiff*" and that "she never tried to recruit (him) away from Waffle House".

... Dave Smith, who testified that Waffle House employees "were upset when the plaintiff got fired and they were calling her"[144] and that he knew that Unit Managers Matt Bullock, Tony Fish and James Akins had all made the first contact with the plaintiff.

In contrast, the Waffle House witnesses lied once again, this time about the supposed "raiding" by Therese Scribner and Resource Recruiters. For example, Doug Eckhoff—who did not know that James Williams had already testified about how "he had put Eckhoff in touch with the plaintiff"—said that Margaret Dailey had first contacted him and arranged an interview with both Dailey and Scribner.[145] And, of course, both of the Mercers lied repeatedly: Sherry Mercer said the plaintiff "made a job offer" to her; Tim Mercer, adding his usual touch of class, said that in recruiting him, Therese said, "*I'm going to nail Steve Wright's balls to the wall.*"

However, this fabrication of "raiding"—the supposed "avalanche of recruiting and placement of Waffle House employees to Grandy's" in May of 1992—laid the stage for Waffle House to retaliate once again against Therese Scribner.

5. *Waffle House Threats Causes Grandy's To Terminate Its Contract With Resource Recruiters*

It took only two threatening telephone calls for Waffle House executives, using the fabricated "raiding" story, to cause the loss of the written agreement that Resource Recruiters had with Grandy's.

(i) *the first call: by Skip Nau*

The first call was on May 8, 1992. Skip Nau, still Vice–President–People of Waffle House, contacted Robert McGregor, the Director of Human Resources, at the Grandy's offices in Dallas. According to McGregor's testimony, Nau called from the Waffle House offices in Atlanta; he told McGregor that Waffle House was very concerned that Grandy's "was singling out Waffle House in recruiting"; that "some" or "several"—Nau did not give any specific numbers—of the Waffle House restaurant managers "had been coming to work for Grandy's." McGregor re-

142. Fran Dubuisson remembered only "one person calling from" Waffle House, a "manager of some sorts," who asked to speak to Therese Scribner. When Therese ended this call, she said to Dubuisson, *"I guess I wasn't the only one who was unhappy at Waffle House."*

143. Margaret Dailey testified, very credibly, that James Williams, a Waffle House Unit Manager, just called "out of the blue" and told Dailey that "he would like to refer others" at Waffle House to Resource Recruiters. Dailey also testified truthfully that she (Dailey) interviewed the persons who were still employees of Waffle House and that Therese Scribner did not participate in any of these interviews.

144. When Larry Cannon told Dave Smith that Therese Scribner "was calling to recruit Waffle House employees," *Smith said to Cannon: "This is not correct. It's not in her nature to do that."*

145. In fact, as Dailey testified, the plaintiff did not participate in her interview of Doug Eckhoff. Instead, she simply made a few "feed back" notes later in Eckhoff's file, including his call to the plaintiff to say that "he had decided to stay at Waffle House."

sponded to these complaints by telling Skip Nau that he would "investigate to see if Waffle House was being targeted" by anyone connected with Grandy's. Then, Nau said:

> "*Do you guys use Therese Scribner?* Waffle House terminated her because of performance problems. Now, she's vindictive and is targeting our managers to get them to leave Waffle House and go to Grandy's."

Skip Nau reported to Joe Rogers, the Waffle House President, CEO and 78% owner, that he had made this call to Robert McGregor of Grandy's, and he told Rogers about the conversation. At trial, however, Nau lied about his call to McGregor; specifically, Nau denied telling McGregor that Therese Scribner "had been terminated for poor performance" or that she "was vindictive towards Waffle House." When he told these lies, Skip Nau did not realize that McGregor had actually recorded Nau's comments on a note pad dated May 8, 1992, which read:

> 5/8/92
>
> Skip Now (sic)—Waffle House 404–729–5700
>
> Terez hiring their mgrs. & referring them to Grandy's
>
> _____
>
> Larry Cannon—Area Mgr. H 817–481–4130
>
> Dave Theobold—Reg. Mgr. H 817–837–6817
>
> _____
>
> She was recruiter for them for 3 ½ yrs, term'd for perf. Problems. She's now vindictive & trying to get Waffle House mgrs.

McGregor also thought that Nau's "performance comments" were to "dissuade Grandy's from using" Therese Scribner as a recruiter.

Robert McGregor, who was Debbie Shelton's supervisor at Grandy's, called her shortly after he had talked with Skip Nau.

According to Shelton, McGregor was "very disturbed," and told her that he had just received Skip Nau's call; that Nau said that Scribner "was going into Waffle House restaurants" and was "calling Waffle House employees" to attempt to "hire them away from Waffle House"; and that Nau also told him that Scribner "is vindictive" because Waffle House had "fired her for poor performance."

Debbie Shelton responded to the Skip Nau accusations by telling McGregor that "this was not true" and that "people at Waffle House had been contacting Scribner first." McGregor then instructed Shelton to make sure that Scribner "was not singling out one company"—and, "if she was, he wanted it stopped."

Debbie Shelton promptly contacted Therese Scribner. Therese denied Nau's accusations; she told Shelton that she "was not targeting Waffle House employees"; that the Waffle House employees knew her (and liked her); and that the employees had "made the first contacts with her." Shelton was "satisfied" and felt that Therese's "explanation was fine." Shelton then reported to McGregor that "his recruiting standards had not been violated" by Therese Scribner. Therese also called McGregor to assure him personally that she had not done anything wrong with respect to the Waffle House employees she had presented to Grandy's.

### (ii) the second call: Dave Theobold

The second Waffle House call was on May 18, 1992, less than two weeks later.[146] This time, it was Dave Theobold, Assistant Vice-President and Regional Manager, who called Robert McGregor. Theobold's call was much stronger than Nau's. He told McGregor that "two more Waffle House managers had moved to Grandy's" since Skip Nau had talked to him.[147] Theobold also made the same remark as Nau, that Therese Scribner "had been discharged" and this was "why she

---

**146.** During the spring of 1992, Larry Cannon also told a "multi-unit manager" at a Grandy's restaurant that "you've got a lot of Waffle House people working for you," but this is "a two-way street," and if it continues "we will do it to Grandy's."

**147.** The only two Waffle House employees who *interviewed* with Resource Recruiters between the May 8 and May 12, 1992 calls by Nau and Cannon were Tony Fish and Ann Tate. Neither Fish nor Tate went to work for Grandy's. Fish was told by James Douglas to call Scribner after he (Douglas) had contacted her earlier; as discussed above, Fish lied about this at trial.

had a vendetta against Waffle House and was targeting Waffle House."

*Then, Dave Theobold threatened McGregor:* "If you don't stop hiring Waffle House employees" through Therese Scribner, "we're going to set a bounty" and "pay a signing bonus" for "hiring away Grandy's employees." McGregor replied that he was going to check with Debbie Shelton, Therese Scribner, and the "Waffle House people they had hired."

McGregor did talk to both Debbie Shelton and Therese Scribner about these renewed Waffle House accusations of "raiding." Therese told McGregor—*truthfully*—that she "didn't single anyone out" and that all of the ex–Waffle House employees she brought to Grandy's had first contacted Resource Recruiters. Debbie Shelton also told McGregor that these Waffle House allegations were false. At the direction of McGregor, Shelton checked with "the new managers" at Grandy's who had been with Waffle House; each of these new managers "confirmed that they had contacted Therese first." [148]

However, although Shelton was satisfied that "there was nothing wrong" with the recruiting that the plaintiffs were doing for Grandy's, McGregor was still extremely concerned by the threats of Cannon and Nau. Shelton, in particular, felt like Grandy's had to avoid a "recruiting war" with Waffle House, that "would escalate." And, although Debbie Shelton was "very angry" about what "she had to do," Shelton called Therese Scribner and "reluctantly" canceled the Grandy's contract with Resource Recruiters. The plaintiffs never did any more work for Grandy's.

Of course, neither Skip Nau nor Dave Theobold told Robert McGregor, or anyone else at Grandy's, that by May 1992, *Therese Scribner had not worked for Waffle House for over two years*—since her termination by Nau on March 1, 1990. If McGregor had known this, then the "raiding story" fabricat-

ed by Waffle House would not have worked because McGregor testified:

> If I'd known that she [Scribner] had been gone for two years and there was still a concern on their part, it seems to me it would have lessened the impact in my eyes a little bit because if she had been gone for two years and they were just now calling to say we feel like there's a problem here, I don't know that I would have given it as much weight as I did.

### H. The Attempt To Suborn Perjury

Shortly before trial, Waffle House made an egregious attempt to suborn perjury by David Smith, a part-time Waffle House employee. At one time, Smith had been the Unit Manager of a Waffle House restaurant. However, Smith stopped when he started college classes again, but then later returned to work part-time as a cook. Eventually, David Smith decided that he wanted to return full-time, as a Unit Manager again. Smith met with Larry Cannon, Area Manager and Assistant Vice–President,[149] who told Smith that he should talk to Steve Oswald, the Regional Manager and Assistant Vice–President.

The following week, David Smith met with Steve Oswald, who told Smith that there was "no problem" with him coming back as a Unit Manager. Oswald also told Smith that he could be the Unit Manager at a new Waffle House restaurant being opened in Mansfield. Oswald also said he would "confirm this" with Larry Cannon.

However, the next person David Smith heard from was Dave Adams, who called and said that Larry Cannon wanted to meet with Smith. *This meeting with Cannon took place exactly one week before David Smith took the stand at trial and testified on behalf of Therese Scribner.* Smith gave very credible testimony about this meeting. *Cannon, of course, lied about it.*

---

**148.** Robert McGregor explained that it was common in the fast food industry—particularly with the incredibly difficult working conditions—for other employees "to follow a disgruntled employee who leaves," and for these employees "to turn into recruiters for their new company."

**149.** This was the same Larry Cannon, of course, whose threats had caused Grandy's to terminate its recruiting agreement with Resource Recruiters some two years before trial.

The Cannon–Smith meeting took place at another new Waffle House restaurant, which was being completed in Arlington. Inside, Larry Cannon told David Smith that the new restaurant in Mansfield was "not available" for Smith. When David Smith protested that "Steve Oswald had said Smith could have the Mansfield store," Larry Cannon said "Steve had no right to tell you that." And, Cannon told Smith "it's not going to happen" because the new Mansfield restaurant was "right on the line" between Oswald's territory and that of another Regional Manager.

Larry Cannon then asked David Smith to go outside with him to look at the parking lot "that needed to be repaired." After they left the restaurant and were alone, *Cannon said to Smith, "I saw your name on a list of witnesses for the plaintiff" in the Scribner case. "What is you name doing on her witness list?"*

David Smith, who had not been subpoenaed for trial—and who was surprised to learn he had been listed as a witness—honestly told Cannon, "I don't know." Cannon persisted, *"I want to know what you know" and why "you are to be a witness" for the plaintiff.* David Smith replied, "Larry, you should know me. My business is my business. You should know I don't stick my nose in other people's business." And, this was Larry Cannon's response to this statement by David Smith:

I wouldn't (if I were you). I couldn't think why you would be a witness. *Let's not do anything to jeopardize our situation here. I'd really hate to see you jeopardize your opportunities with Waffle House* and if there was something you knew, then I wanted to know.[150]

On the way home, David Smith kept thinking about Larry Cannon's remarks. The more Smith thought about them, "the madder he got." Smith realized—correctly so—that Cannon was threatening Smith if he did testify at trial on behalf of Therese Scribner. And, early the next morning, David Smith drove to Fort Worth to confront Larry Cannon. When Smith found Cannon at another Waffle House restaurant, he angrily told Cannon:

Larry, I'm just amazed. The conversation we had yesterday really bothers me. I want to talk to you about this. *I can't believe that you would ask me to jeopardize my ethics or my morals to do anything different or say anything different than the truth.* And it's just bothered me all day.

Larry Cannon did not deny making any of those comments to David Smith. Instead, Cannon just told some more lies: "It wasn't meant like that. It was meant that *I didn't want to be sitting in court across from Joe (Rogers), Jr. and have egg on my face by something that you might say or know."*

Larry Cannon told David Smith that he would "talk to Steve Oswald and they would contact him (about the restaurant)." Throughout that day, Smith kept worrying about Larry Cannon's threats to keep him from testifying. Finally, David Smith decided to contact Therese Scribner and her lawyers. He soon did that—and, of course, Smith never heard from Cannon or Oswald about the new Waffle House restaurant in Mansfield—that was miraculously located right on the dividing line between two Regional Managers.

In view of the numerous other acts of misconduct discussed above—by the top officers, executives and supervisors of Waffle House—this attempt by Larry Cannon to eliminate David Smith as a trial witness for Therese Scribner was really not surprising at all, certainly not to this Court (since it witnessed Cannon's lies at trial).

## IV. *LIABILITY AND ACTUAL DAMAGES*

The law applicable to each of the *liability* claims of Therese Scribner and Resource Recruiters, and the *actual damages* they are entitled to recover under each theory, are both discussed in this section. The law concerning the plaintiffs' *punitive damage*

---

**150.** As stated above, the quotes in this opinion are based upon the Court's contemporaneous trial notes.

claims, and the amounts of their punitive damages recovery, are discussed next, in Section V.

### A. *Willful Discrimination In Pay*

#### 1. *Liability*

■ To recover damages under the Equal Pay Act, Therese Scribner was required to prove that Waffle House paid her less compensation than it paid to male employees for work that required equal skill, effort and responsibility and that was performed under the same or similar circumstances.[151] Under Title VII, Scribner was also required to prove that Waffle House intended to discriminate on the basis of sex.[152] And, if the evidence established that Waffle House's wrongful conduct in this pay discrimination was willful, then the plaintiff is entitled to recover double the back pay award as liquidated damages.[153]

#### 2. *Actual Damages*

■ From the credible evidence discussed above (sections III A 3–5, B and D), it is clear that Waffle House acted willfully, with the intent to discriminate against Therese Scribner, in paying her substantially less than these male recruiters who performed the same work under the same or similar conditions: Rick Seal, Paul Smith, John Brazelton and Rusty Whaley.

#### *Therese Scribner*

These are the four different levels of compensation that the plaintiff received [154] during her employment as a recruiter for Waffle House:

| | Salary | Bonus | Car Allowance | Total |
|---|---|---|---|---|
| 7/29/86 | 28,000 | 2,000–8,000 | -0- | 30,000–36,000 |
| 6/29/87 | 30,040 | 2,500–8,000 | -0- | 32,540–38,040 |
| 6/3/88 | 31,090 | 2,500–8,000 | 4,260 | 37,850–43,350 |
| 6/1/89 | 32,405 | 2,500–8,000 | 4,260 | 39,165–44,665 |
| 3/1/90 | *termination of the plaintiff* | | | |

As shown by the following comparison, during each of these periods, Therese Scribner was being paid substantially less than Waffle House paid the four male recruiters—including the one that Therese replaced (Rick Seal) and the one who replaced her (Paul Smith). This pay discrimination was intentional and willful: Initially, Steve Wright lied to Therese Scribner, telling her that she was receiving the same compensation as Rick Seal, her predecessor. Then, when Therese discovered that this was false—after she reviewed Seal's files—and angrily confronted Wright about it, Wright just "laughed" and told Therese that "her's was second income" since she was married and "was not the family bread winner." Wright added: *"I hired you because I saw you in a halter top and shorts."*

The compensation figures in the following compensation comparison are Therese Scribner's salary and maximum bonus during each period of her Waffle House employment; this is because of these reasons: the plaintiff's credible testimony that she regularly earned the highest performance bonus; the evidence establishing that, if she did not reach the top level, her performance—unlike that of the male recruiters—was certainly affected by the severe, pervasive sexual harassment of her,[155] and by the addition non-recruiting jobs (e.g., preparation of Steve Wright's expense accounts) Scribner was required to perform; and the proven facts that Waffle House often miscalculated the amount of, or delayed payment of, the bonus which Scribner had earned.

**151.** *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974).

**152.** *Peters v. City of Shreveport*, 818 F.2d 1148, 1154 n. 3 (5th Cir.1987), *cert. dismissed*, 485 U.S. 930, 108 S.Ct. 1101, 99 L.Ed.2d 264 (1988).

**153.** *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

**154.** This is based upon the credible testimony and exhibits, as summarized in *Exh. 267*, a comparison of Scribner's compensation during these four periods (and others) to comparable male recruiters, including Seal, Smith, Brazelton and Whaley.

**155.** See, e.g., Skip Nau's 10/26/89 memo (Exh. 24): *"Terez has gone through a difficult time in Dallas—Particularly with Steve Wright* (This is not news ...)."

This comparison is also based upon this Court's total rejection of the claims by Waffle House that Rick Seal and the other male recruiters were paid more compensation than Scribner because they *supposedly* had "some additional duties and responsibilities." These claims—for example, the frivolous assertion that Rick Seal also recruited hourly employees for the Waffle House restaurants—were clearly pretextual. Indeed, during Steve Wright's deposition, he could not describe a single difference between Seal's job description and that of Therese Scribner.[156]

*First Period: Rick Seal (7/29/86–6/29/87)*

On July 29, 1986, Therese Scribner was hired to replace Rick Seal as the recruiter for the Waffle House Western Area. Her starting salary was $28,000 a year with a potential performance bonus of $2,000 to $8,000 (*total: $30–36,000* ). In contrast, Rick Seal's yearly compensation had been $38,000 in salary, a minimum $2,000 bonus, plus an additional $10,000 performance bonus (*total: $40–50,000* ).[157] However, the evidence established that Rick Seal, despite his poor performance,[158] actually made $6,250 of his potential bonus during the year before Scribner replaced him (*total: $46,250 of the potential $50,000* ).[159]

Since the plaintiff regularly earned her maximum performance bonus, the annual discrimination in pay between Seal's maximum ($50,000) and Scribner's maximum ($36,000) was *$14,000* during this first comparison period—*which lasted 11 months*, until June 29, 1987, when the plaintiff received her first

raise. Accordingly, during this 11–month period, the discriminatory unequal pay of Therese Scribner was $1167 per month, for *a total of $12,833.*

*Second Period: Rick Seal (6/29/87—6/3/88)*

On June 29, 1987, Therese Scribner's compensation was increased to a yearly salary of $30,040, with a performance bonus of $2,500 to $8,000 (*total: $32,540–38,040* ). Therefore, after a year of employment as the Waffle House Western Area recruiter, Scribner was—despite this raise—still making less than Rick Seal actually made in the same position in 1985 (*total: $44,250* ) and less than Seal's maximum ($50,000).[160] Because the plaintiff regularly earned her maximum performance bonus, the discrimination in pay between Seal ($50,000 maximum) and Scribner ($38,040) was $11,960 a year.

However, since a male recruiter in Seal's position would no doubt have received at least the same $2,540 a year pay raise that the plaintiff did on June 29, 1987 (*total: $52,540* ),[161] the adjusted discrimination in pay for this period would be $14,500 a year. This unequal compensation lasted for 11 months (6/29/87–6/3/88). Accordingly, during this second 11–month period, the discriminatory unequal pay of Therese Scribner was $1318 per month, for *a total of $14,450.*

*First and Second Periods: John Brazelton (8/22/86–6/3/88)*

On August 22, 1986—*less than one month* after Therese Scribner started as the recruiter in the Western Area—John Brazelton became the recruiter for the Waffle House

---

**156.** There was only one reason why Steve Wright did not lie about this: *Wright*, as he testified in his deposition, *"did not know that [the plaintiff's] pay was an issue in this case."*

**157.** See Exh. 267, p. 1.

**158.** In fact, Rick Seal's performance as a recruiter was so unsatisfactory that he "resigned" just shortly before he was going to be terminated by Waffle House. Seal started his employment on July 8, 1985 (Exh. 56), and he "resigned" several months before the plaintiff was hired. Again, Steve Wright lied about Seal; after he testified that Seal left "to pursue another career opportunity," he was asked, "You fired him?" and he answered "yes."

**159.** This is recorded in Steve Wright's handwritten notes in the "Comments" section of Exh. 56 (the Waffle House "Employee Status" form of Rick Seal).

**160.** That is, Seal's base salary of $38,000 plus his earned performance bonus of $6,250.

**161.** Just as Therese Scribner would have received this $2,540 raise on June 29, 1987, if she had started as a recruiter at the same salary and bonus that Rick Seal received when he was hired on July 8, 1985.

Metro East Area in Atlanta.[162] Brazelton had absolutely no prior recruiting experience; previously, *he had been operating a Colorado ranch owned by Waffle House.* Nevertheless, his starting compensation was $37,500, a fixed performance bonus of $6,000,[163] and a $4,260 car allowance (*total: $47,760*). Brazelton continued at this level until June 3, 1988, where his performance bonus was increased to $8,455 a year (*total: $50,215*).

From July 29, 1986 to June 29, 1987 (12 months), Therese Scribner's compensation was (as discussed above) only $36,000—that is, $11,760 less than Brazelton was paid during this period (*an average of $980 per month*). The total pay discrimination during these 12 months was $11,760.

On June 29, 1987, Scribner's maximum compensation was increased to $38,040; she continued at this level until June 3, 1988—that is, $9,720 less than Brazelton (*an average of $810 per month*). The total pay discrimination during these 12 months was $9,720.

### Third Period: John Brazelton (6/3/88–3/10/89)

On June 3, 1988, both John Brazelton and Therese Scribner received raises. Brazelton was increased to $50,215 (salary $37,500 plus $8,455 bonus plus $4,260 car allowance). Scribner, who had continually complained about not receiving a car allowance like the other recruiters, was finally given one[164]— and this increased her compensation to $43,-350 ($31,090 salary plus $8,000 bonus plus $4,260 car allowance).[165] This discrimination

in pay (an average of $572 per month) continued until March 10, 1989, a period of 9 months; accordingly, it totaled *$5,148 for this third period.*

The credible evidence established, without question, that Therese Scribner's duties and responsibilities as the recruiter in the Western Area were the same as those of John Brazelton as a recruiter in the Metro East Area in Atlanta. The claim by Waffle House that Brazelton had responsibilities "for more restaurants"—supposedly he had some 100 restaurants, while Waffle House claims that Scribner only had 27 in Dallas and Fort Worth—is misleading, and it is rejected. The plaintiff's recruiting responsibilities were for the entire Western Area, not just Dallas–Fort Worth.[166] Similarly, the Waffle House contention that Brazelton's compensation also included $7,500 a year for providing certain "administrative services" to executives in the Atlanta office is also misleading; Therese Scribner performed other duties besides recruiting in the Western Area—e.g., the preparation of Steve Wright's expense accounts, the "Top Op" awards banquet, "Santa's Sleigh", etc.—but she never received additional compensation for these non-recruiting responsibilities.

### Fourth Period: Rusty Whaler (3/10/89–3/1/90)

When John Brazelton left Atlanta to begin running a new ranch for Waffle House, he was replaced on March 10, 1989 by Rusty

---

**162.** Rusty Whaley, who became the recruiter of the Metro West Area in Atlanta on March 10, 1989, was also located at the Waffle House headquarters. His starting salary as a recruiter was $52,640 (salary, bonus and car allowance).

**163.** Unlike Rick Seal, Brazelton regularly earned his maximum performance bonus.

**164.** Brazelton had received his allowance since he began as a Waffle House recruiter in 1986.

**165.** The recruiter's car allowance, of course, was for reimbursement of expenses incurred in the use of their personal cars on company business. Obviously, the amount of actual car expenses varied between recruiters. However, these calculations include the maximum car allowances

without expense offsets, and this treats each recruiter's total compensation in an equal manner. This is a fair comparison, particularly since it *does not include* the periods when the plaintiff, the sole female recruiter, was not being paid the car allowance which the male recruiters were receiving.

**166.** The evidence showed that Scribner made trips to other cities and states in the Western Area. In addition, Skip Nau addressed memos to "All Recruiters," not just to those in Atlanta (e.g., Exhs. 25, 26, 27 and 28). And, despite the spurious contention that Brazelton handled four times as many restaurants as Scribner, each received the same car allowance of $4,260 when the plaintiff finally received her's beginning June 3, 1988.

Whaley.[167] *Whaley*, a former District Manager, *had no prior experience as a recruiter.* Despite this, Whaley's compensation was, of course, substantially more than that of Therese Scribner. Whaley received $24,388 a year in salary, plus a performance bonus of $24,000, plus a car allowance of $4,260 (*total: $52,648* ).[168]

Scribner's compensation on March 10, 1989 was the same that it had been on June 3, 1988—that is, *$43,350* ($31,090 salary plus $8,000 bonus plus $4,260 car allowance). After three months, on June 1, 1989, she received an *increase to $44,665* (salary of $32,405, an $8,000 maximum bonus, and the $4,260 car allowance). This remained Scribner's compensation until she was terminated after seven months, on March 1, 1990.

For the three month period (3/10/89–6/1/89), the discrimination in pay between Whaley ($52,648 annually) and Therese Scribner ($43,350 a year) was $9,298—*that is, $775 a month.* For the next nine months (6/1/89–3/1/90), the discrimination between Brazelton ($52,648) and Scribner ($44,665) was $7,983 per year—*that is, $665 a month.* Accordingly, the illegal unequal pay of Scribner was $2,325 (3 months) and $5,965 (9 months)—that is, *a total of $8,310.*

### Summary Of Pay Discrimination

In summary, this is the total amount of money lost by Therese Scribner because of the pay discrimination against her during these four separate periods of time just discussed:

| | | |
|---|---|---|
| 7/29/86–8/22/86 | Seal (1 month) [169] | $ 1,167 |
| 8/22/86–6/3/88 | Brazelton (23 months) [170] | $20,500 |
| 6/3/88–3/10/89 | Brazelton (9 months) | $ 5,148 |
| 3/10/89–3/1/90 | Whaley (12 months) | $ 8,310 |
| | Total Discrimination: | $35,125 |

**167.** On March 10, 1989, *Bob Burke* became the second recruiter in Atlanta. He *was also a former District Manager who had no prior recruiting experience.*

**168.** Although Whaley was terminated by Waffle House on July 28, 1989, he would have received at least $52,648 through March 1, 1990, the date of the plaintiff's termination.

### 3. *Liquidated Damages*

As discussed above, the conduct of Waffle House in discriminating in pay against Therese Scribner, the only female recruiter, was willful. Therese was not "entitled" to receive compensation equal to the male recruiters because "her's was second income" and because she was not the family "bread winner."

Indeed, this blatant misconduct is also demonstrated by the compensation paid to the male recruiter who replaced Scribner. On April 3, 1990, Paul Smith was hired to take over the Western Area recruiting job vacated by the plaintiff's discharge. Although Smith's compensation was initially $30,000 a year, after only two months—*despite the fact that he had no prior recruiting experience*—it was increased to $21,000 a year, with a potential bonus of $24,000, and a $4,260 car allowance (*total: $49,260* ). *This was $13,260 a year more than Therese Scribner's beginning compensation on July 29, 1986, and even $4,595 a year more than Scribner was being paid when she was terminated* on March 1, 1990.

Because she was a woman, Therese Scribner was paid less during her entire employment at Waffle House. This discrimination in pay was willful. The plaintiff is, therefore, entitled to liquidated damages of double her actual damages—that is, *a total award of $70,250.*

### B. *Sexual Harassment*

#### 1. *Liability*

■ Under *Farpella–Crosby v. Horizon Health Care,* Therese Scribner was required to prove (i) that she belonged to a protected class, (ii) that she was subjected to *unwelcome sexual harassment* based upon her sex, (iii) that this harassment "affected a term, condition, or privilege of employment" (i.e.,

**169.** Because John Brazelton's compensation was higher than that of Rick Seal after he began as a novice recruiter on August 22, 1986, Seal's extra pay is used only for the preceding one month of the plaintiff's employment.

**170.** That is, the total of the $10,780 unequal pay for one period (8/22/86–6/29/87) and the $9,720 unequal pay for the next period (6/29/87–6/3/88).

that the sexual harassment was so pervasive or so severe as to alter her conditions of employment and create an *"abusive working environment"*) and (iv) that Waffle House *"knew or should have known* of the harassment and failed to take prompt remedial action."

Waffle House concedes the first element, that Therese Scribner was female, a member of a protected class. However, it denies that she proved any of the other elements of sexual harassment. Contrary to this assertion—as is evident from the lengthy discussion of the facts established by the credible evidence—Therese Scribner certainly did establish each of the other *Farpella–Crosby* requirements concerning the sexual harassment of her by Waffle House officers, executives and supervisors. Indeed, this is shown clearly by a comparison of Scribner's evidence to that of the successful plaintiff in *Farpella–Crosby.*

### The Unwelcome, Severe and Pervasive Sexual Harassment of Therese Scribner

■ The *Farpella–Crosby* plaintiff proved that one supervisor, Jose Blanco, made frequent statements about (i) her "sexual proclivity," (ii) his "knowing what she liked to do," (iii) her "taking men home" and his wondering "if they got any," (iv) her "sexual activity" because "he knew what she liked to do," and (v) her supposed lack of knowledge about "how to use a condom" because of the number of children she had.

This conduct by the supervisor in *Farpella–Crosby, while disgusting enough,* pales by comparison to the gross and continual acts of sexual harassment committed against Therese Scribner by several different supervisors, executives and top officers of Waffle House. *For example,* these are just a few of their repulsive acts of sexual harassment of Scribner:

(i) by *Steve Wright* ("*she's our Dolly Parton* with a big ... smile"; a *weekend with Terez in a bikini* is your "signing bonus"; "*are you on the rag?*"; *pulling out her blouse,* leering at her breasts, and

smirking, "*It was driving me crazy to see what those were.*"; etc.)

(ii) by *Steve Oswald* ("*how big is your husband's penis?*"; "have you ever been eaten by a man with ice in his mouth?"; "*if you ever fucked me, you would never be happy with another man*"; etc.)

(iii) by *Tim Mercer* (the "Santa's Sleigh *crotch shot*" with a Polaroid camera stuck under the plaintiff's dress; "*Therese and the boys* are here"; "*she got so hot and wet that you could throw her panties against the wall and they'd stick,*" ad nauseam.) [171]

These, of course, are only nine examples picked from the 36–page discussion (pp. 34–69, 78) of the severe, perverse and repugnant sexual harassment of Therese Scribner.

### Waffle House Knew Or Should Have Known Of This Sexual Harassment

■ The plaintiff in *Farpella–Crosby* "frequently talked" with the employer's first "human resource director," telling her that Jose Blanco was making "personal comments" about her "personal life," but giving no specifics. Farpella–Crosby also told the second "human resource director" that Blanco was making "offensive or unwelcome" comments about her personal life, but again without giving any details. And, Farpella–Crosby also testified that *"on several occasions,* Blanco made offensive comments" to her in the presence of two people, a co-worker and an assistant director of nursing.

In stark contrast, *the sexual harassment of Therese Scribner was actually committed or witnessed by the top officers, executives and supervisors of Waffle House*—including *Joe Rogers* (President, CEO and 78% owner); *Lib Julian* (Senior Vice–President); *Larry Cannon* (Area Vice–President); *Steve Wright* (First Assistant Vice–President and Western Area Manager, *later promoted to* Senior Vice–President, who witnessed some of the harassment by Steve Oswald); *Steve Oswald* (who observed acts of sexual harassment by both Wright and Tim Mercer); and *Tim Mercer* (first District Manager, then promot-

---

**171.** The Waffle House contention that any "sex-based conduct or language" was really based on the plaintiff's "personality rather than her sex" is disingenuous, to say the very least.

ed to Division Manager, then demoted to District Manager again), who witnessed some of the Wright and Oswald sexual harassment of the plaintiff. In addition, the sexual harassment of Therese Scribner was done openly, at company functions and at the Waffle House restaurants, before numerous supervisors[172] and hourly employees,[173] and even some of the Waffle House wives were present.[174]

Therese Scribner complained to her harassers—Wright, Oswald, Cannon, Julian, Mercer—but to no avail. Finally she complained to Skip Nau, shortly after he assumed responsibility in the Western Area, and gave him a *few specific examples* of the conduct of Wright and Oswald. Skip Nau, in turn, actually reported some of Scribner's specific complaints to the President, CEO and 78% owner of Waffle House, Joe Rogers. However, this resulted only in Scribner's abrupt termination (and in the blatant lies told first by Steve Wright, and later by Skip Nau, to save their careers at Waffle House).

### Waffle House Failed To Take Any Proper Remedial Action

■ In *Farpella–Crosby*, the two "human resource directors" would only tell the plaintiff things like, "Hang in there. Something's got to be done." Nothing was, and she "endured nearly six months of Blanco's abusive behavior" before the employer *finally* took some action to stop the sexual harassment.

Again, the contrast with this case is obvious. Therese Scribner endured almost three and one-half (*3–1/2*) *years* of severe, pervasive sexual harassment by Steve Wright, Steve Oswald, Tim Mercer and others. However, the only "prompt action" taken by Waffle House after Scribner's complaints was this: *it ended the severe, pervasive sexual harassment by terminating Scribner shortly after her complaints were reported to the*

*company's top management* (including Nau, Rogers and the so-called "executive committee"); it concocted false "reasons" to justify this retaliatory discharge; and its officers, executives and supervisors successfully bribed two witnesses (Tim Mercer and his wife, Sherry) and unsuccessfully attempted to suborn perjury by another witness (Dave Smith) just before trial; and it promoted one of the sexual harassers, Steve Wright, to become a Senior Vice–President, one of the top executives of Waffle House.

### 2. Actual Damages

■ Therese Scribner is entitled to the recovery of the actual damages she sustained as the result of the sexual harassment and the retaliatory discharge. Her actual damages include recovery (i) for the income Scribner would have made as a Waffle House recruiter but for the retaliatory discharge, and (ii) for the mental anguish she suffered during the three and one-half years of almost constant sexual harassment, and (iii) for the mental anguish she sustained because of the wrongful termination. (As discussed below, Therese Scribner is also entitled to the recovery of punitive damages because of the egregious conduct by Waffle House.)

### (i) Lost Income

If Therese Scribner had not been illegally terminated on May 1, 1990, she would have continued to receive compensation at a rate equal to that of the Waffle House male recruiters—specifically, the $50,215 per year being paid to John Brazelton beginning June 3, 1988.[175] And, this annual income of $50,215 would have continued until the point at which Scribner began to make more money from Resource Recruiters than she would have received from Waffle House.

Under the credible evidence in this case, the income that Therese Scribner was mak-

---

172. Including (i) Unit Managers Michael Robare, David Coleman, Steve Williams, Vic Neely, Kyle Coleman, Hans Spies, and Dino Bolero, and (ii) the plaintiff's friends and neighbors Erma Cook, Margaret Dailey and Fran Dubuisson (Dailey and Dubuisson also worked for Resource Recruiters).

173. Including hourly employees in the various Waffle House restaurants and those who attend-

ed company special events, like the "Top Operator" Awards Banquet, etc.

174. E.g., Mary Wright, Sherry Mercer and Kathy Thornton.

175. That is, the highest income that was paid to any of the male recruiters at Waffle House.

ing from Resource Recruiters did not exceed $50,215 per year prior to 1993, when the gross income of Resource Recruiters reached $100,925.[176] Therefore, Scribner is entitled to recover $50,215 per year for 2 years 10 months (May 1, 1990 to December 31, 1992)—that is, $4,185 per month, for a total of $142,290. Deducting the $26,500 compensation that the plaintiff actually received from Resource Recruiters during 1993,[177] her net lost income is $115,790.

### (ii) *Recovery Of Mental Anguish Damages For Emotional Harm That Manifests Itself As Humiliation And Stress*

■ In this case, as in *Farpella–Crosby,* the recovery of compensatory damages "in a Title VII hostile work environment case is governed by 42 U.S.C. § 1981a," *which authorizes damages for mental anguish.* The Supreme Court held, in *Harris v. Forklift Systems, Inc.,*[178] that an award of mental anguish damages is proper "irrespective of whether the plaintiff suffers psychological injury."

"... Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. ..."

The Fifth Circuit's standard for "the specificity of proof required to support an award of mental anguish damages" in the context of a constructive or retaliatory discharge is set forth in *Patterson v. P.H.P. Healthcare Corp.:*[179]

... The court set the bar high. The court held that to recover mental anguish damages, the claimant must satisfy the specificity requirement set out in *Carey v. Piphus,* 435 U.S. 247, 255–56, 98 S.Ct. 1042, 1048, 55 L.Ed.2d 252 (1978). ... To meet this requirement, the claimant must show that the harassment '*manifests some specific discernable injury to the claimant's emotional state.*' *Id.* at 940.

The *Patterson* court ... vacated the mental anguish award (of $150,000) and enunciated the defects in Patterson's proof, *including a lack of evidence that she was humiliated or subjected to a hostile working environment* ...*Id.* at 941 (emphasis added).[180]

Unlike *Patterson,* the evidence presented in *Farpella–Crosby* established that the plaintiff's emotional harm "went *far beyond hurt, anger, and frustration* to manifest itself in the form of humiliation and stress."

Farpella–Crosby testified that she felt '*very embarrassed, very belittled,*' '*very disgusted,*' '*hopeless,*' '*about two inches high*' and '*started to feel pretty stupid*' as a result of Blanco's harassment. ... Significantly, Farpella–Crosby testified that her work environment was '*very stressful*' and that she was 'embarrassed *every time* [she] went in there.' ... [181]

Accordingly, the Fifth Circuit affirmed the $7500.00 jury award to Farpella–Crosby for her mental anguish damages over the "nearly six months of Blanco's abusive behavior," because Farpella–Crosby's testimony and that of one co-worker was sufficient to support the jury's award of mental anguish damages.

In this case, the emotional harm suffered by Therese Scribner because of the severe,

---

**176.** The gross income of Resource Recruiters in prior years was $40,364 (1990), $57,044 (1991), and $72,663 (1992). Exhs. 204–207. Its net income in 1992 was less than $50,215 because of business expenses. Exh. 206.

**177.** Exh. 207, p. 2.

**178.** 510 U.S. at 22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993).

**179.** 90 F.3d 927, 937–41 (5th Cir.1996).

**180.** *Farpella–Crosby,* 97 F.3d at 808 (In *Patterson,* the court looked to a discussion of the 'manifestation: of emotion harm found in an EEOC policy statement.' *Id.* at 939 (citing EEOC POLICY GUIDANCE NO. 915.002 II(A)(2) (July 14, 1992)). The Commission lists numerous ways in which emotional harm may manifest itself, *including physical manifestations as well as other types of manifestations, such as stress and humiliation* ).

**181.** *Id.* at 809.

pervasive sexual harassment also "went far beyond hurt, anger and frustration" to manifest itself in the "humiliation and stress" that continued almost unbroken during her entire Waffle House employment (July 29, 1986 to March 1, 1990). Moreover, the harassment of Scribner for this three years and seven month period was far more abusive and unrelenting than the sexual harassment in *Farpella–Crosby:*

> ... instead of being sexually harassed by only one person (the director of nursing), Therese was harassed by several officers, executives and supervisors of Waffle House (including the Senior Vice–President, a Regional Manager and Assistant Vice–President, a District and Division Manager, and others);

> ... instead of being witnessed by only one or two co-workers, Therese's harassment was observed by numerous others at Waffle House, including the President, CEO and 78% owner, the Senior Executive Vice–President operations, the Western Area Manager and Assistant Vice–President, the Area Vice–President, and other supervisors and unit employees, and wives of some of the harassers;

> ... instead of the harassment finally being addressed after six months (as in *Farpella–Crosby* ), the harassment of Therese Scribner continued for over 3–1/2 years (and was never addressed by Waffle House), until she was terminated because of her complaints to Skip Nau about the sexual harassment.

Considering all of these circumstances, and having observed the plaintiff's demeanor in testifying about the severe humiliation, disgust, and despair she endured—which went far, far beyond hurt and anger, and which manifested itself in the form of abject stress and humiliation—the Court finds that Therese Scribner is entitled to recover $358,000 as mental anguish damages.

---

**182.** *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 664 (Tex.1990); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 661 (Tex.Civ. App.—Corpus Christi 1991, writ denied); *Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 215 (Tex.Civ.App.—Houston 1991, no writ).

**183.** 797 F.2d 227 (5th Cir.1986).

## C. Intentional Interference With The Contract Between Resource Recruiters and Grandy's

### 1. Liability

Under Texas law, which applies to Resource Recruiters' claim that Waffle House intentionally interfered with the contractual relations it had with Grandy's, Resource Recruiters was required to prove: (i) the existence of a contract that was subject to interference, (ii) intentional and willful conduct that interfered with that contract, and (iii) the economic loss caused by this intentional interference.[182] The Fifth Circuit applied this Texas law in *Marcus, Stowell & Beye Govt. Securities, Inc. v. Jefferson Investment Corp.*[183]

> Under Texas law, in an action for tortious interference with contract *a party seeking punitive damages must establish either "actual malice" or that the defendant's acts were accompanied by fraud or other aggravating circumstances.* Actual malice, as distinguished from "legal malice," requires a showing of "ill-will, spite, evil motive or purposing the injury of another." *Clements v. Withers,* 437 S.W.2d 818, 822 (Tex.1969) ... As in other instances which require proof of the wrongdoer's state of mind, the requisite state of mind can properly be inferred from the acts and conduct of the wrongdoer. See *Chandler State Bank v. Dorsey,* 618 S.W.2d, 113, 116 (Tex.Civ.App.—Tyler 1981, no writ). (797 F.2d at 237)(emphasis added).

Each of these elements was established by the credible evidence in this case. First, Grandy's entered into a written agreement with Resource Recruiters on October 11, 1990 (Exhibit 249). Under this contract, Resource was to be paid from $500 to $750 for each new employee it recruited and placed with Grandy's.[184] Although this contract was

---

**184.** This was less than Resource Recruiters' standard fee of 1% per each $1,000 of the employees' pay in the jobs obtained for them by Resource (e.g., with a $20,000 salary, the recruiting fee was $4,000). However, because Resource and Scribner had an "ongoing relationship" with

terminable at will, it certainly would have continued for some time—and this was established by the testimony of Debbie Shelton of Grandy's, who not only liked and respected Scribner, but who also thought "she was a good source who knew how to recruit great restaurant managers." Contrary to the Waffle House argument, the Grandy's contract was not a mere "expectancy" of future business.

Secondly, the conduct of the two Waffle House executives who caused the termination of the Grandy's contract was intentional, willful and malicious. Skip Nau's May 8, 1992 call to Grandy's and his lies to Robert McGregor about Therese Scribner ("she's singling out Waffle House")—and Dave Theobold's May 18, 1992 call to Grandy's, his lies to McGregor about Therese (she "has a vendetta against Waffle House" because we "fired her for poor performance") and his threats to raid Grandy's by "setting a bounty" and hiring away its employees—were both intentional, and they were both committed with actual malice towards Scribner and Resource Recruiters.[185] This malicious conduct and the lies by two top Waffle House executives, Skip Nau and Dave Theobold, were certainly not "privileged," as the defendant claims.

### 2. *Damages*

The third element of Resource Recruiters' intentional interference claim—economic loss—was also established by the credible evidence. Indeed, it was clear that *the only reason* that Grandy's terminated its contract with Resource Recruiters was the malicious conduct and lies of Waffle House's Skip Nau and Dave Theobold. Resource Recruiters,

therefore, is entitled to the recovery of both actual and punitive damages.[186]

### *Actual Damages*

As described above,[187] from the date of the Grandy's–Resource Recruiters contract to its termination (some two years), Grandy's paid approximately $9,000—that is, $4,500 per year. From the credible evidence, the Court finds that this income from Grandy's not only would have continued, *it would have continued to increase*, at least until the date of trial. Contrary to the defendant's arguments, this continuing business *would not* have been targeted at Waffle House; indeed, Resource Recruiters placed employees from other companies with Grandy's,[188] and this would have continued.[189]

■ Resource Recruiters, therefore, is entitled to the recovery of from $4,500 per year to $8,200 per year[190] for the income it would have made over a period of over 4 years and 3 months.[191] This actual damage award would total $24,188. This amount should not be offset by any expenses because Resource Recruiters has continued to operate, incurring the costs of rent, salaries, supplies, utilities, etc., and because any additional expenses if the Grandy's business had continued (and increased) would be minimal.

### D. *Defamation*

#### 1. *Liability*

Texas law applies to the claims of Therese Scribner and Resource Recruiters that they were defamed and damaged by the slanderous lies that two Waffle House executives, Vice–President Skip Nau and Area Vice–President and Regional Manager Dave Theo-

---

Grandy's, their normal fee was discounted under their contract.

**185.** *Id.* at 237.

**186.** *Id.* at 237 (recovery of $150,000 in punitive damages, as well as actual damages, for malicious interference with an exclusive brokerage agreement).

**187.** Section III G 3–5 of this opinion.

**188.** Just as Grandy's would have continued to find employees through other sources besides Resource Recruiters.

**189.** Therese Scribner testified that "my firm represents Domino's, Cici's Pizza, El Chico, Western Sizzler, Cracker Barrel," and others.

**190.** This is based upon a modest 20% yearly increase in the Grandy's business, which is certainly reasonable in view of the relationship and respect between Debbie Shelton and Therese Scribner.

**191.** This is from the date of the Grandy's–Resource Recruiters agreement (October 11, 1990) to the trial (December 1994).

bold told to Robert McGregor, Grandy's Director of Human Resources on May 8 and 18, 1992, causing the termination of the recruiting contract between Resource Recruiters and Grandy's.

■ In order to recover on their defamation claims, the two plaintiffs were required to prove that the statements made about them to Grandy's by these two Waffle House executives were defamatory and were made with malice. In making this determination, the statements of Nau and Theobold must be constructed in light of all surrounding circumstances, based upon how a reasonable person would perceive these statements.[192]

■ Under the credible evidence, the plaintiffs clearly established that the statements made about them[193] were false, slanderous and malicious.[194] With respect to Skip Nau's call on May 8, 1992, the only true statement he made to Robert McGregor of Grandy's was that "some" or "several" of the Waffle House restaurant managers "had been coming to work for Grandy's." In contrast, he told a number of lies, including these: that Grandy's (through Scribner and Resource Recruiters) "was singling out Waffle House in recruiting"; that Waffle House had "terminated Scribner because of performance problems"; and that she was "vindictive and was targeting" Waffle House managers "to get them to leave and go to Grandy's."

Just as Waffle House had terminated Therese Scribner without any investigation of her complaints of sexual harassment by (Steve Wright and Steve Oswald), it was now Skip Nau, Vice–President of People, who—without contacting Scribner or doing any investigation—either told these malicious lies about the plaintiff Scribner or made them with a reckless disregard for their truth. Indeed, this was apparent from the trial testimony of Skip Nau; apparently sensing that these accusations might be harmful to the positions being advanced by Waffle House, *Nau told more lies—denying that he ever made the statements to Robert McGregor (Grandy's) that Therese Scribner "had been terminated for poor performance" and that made her "vindictive towards Waffle House."*

The second call to Grandy's was made on May 18, 1992 by another Waffle House executive, Area Vice–President Dave Theobold, was even stronger than Skip Nau's call two weeks earlier. Theobold made these false statements about Therese Scribner, either with malice or with reckless disregard for their truth: First, Theobold lied that "she had a vendetta against Waffle House and was targeting Waffle House" because she had been fired for poor performance. Then he added the impact by threats that Waffle House would retaliate by setting "a bounty" and paying a "signing bonus" for "hiring away Grandy's employees." For the same reasons just stated with respect to the false statements of Skip Nau, Theobold's blatant lies about Therese Scribner also defamed and damaged Resource Recruiters.

■ Finally, the Court rejects the Waffle House argument that it had a "qualified privilege" for the lies of Skip Nau and Dave Theobold because of the *"potential* improper methods utilized" by the plaintiffs to attract new managers for Grandy's. Again, Waffle House conducted no investigation; if it had, it would certainly have learned that Scribner and Resource Recruiters were not "raiding" Waffle House; that the Grandy's contract represented only a small portion of the plaintiffs' recruiting business; and that it was the Waffle House employees who were initiating the contacts with the plaintiffs because of their mistreatment by and dislike for Waffle House.

---

**192.** *Musser v. Smith Protective Services, Inc.,* 723 S.W.2d 653 (Tex.1987); *Fitzjarrald v. Panhandle Publishing Co.,* 149 Tex. 87, 228 S.W.2d 499 (1950).

**193.** Grandy's first did business with Therese Scribner individually and then, after she formed her corporation in September 1990, Grandy's entered into the written agreement with Resource Recruiters. It is apparent, therefore, that the Waffle House defamation of Scribner necessarily defamed and damaged Resource Recruiters, the corporate plaintiff.

**194.** The slanderous statements made by Skip Nau and by Dave Theobold to Robert McGregor are discussed above in Section III, G 4 (*"The Fictitious 'Raid' Upon Waffle House."*)

## 2. Actual Damages

■ A plaintiff injured by defamation is entitled to recover (i) actual damages, including lost income and mental anguish, and (ii) punitive damages (which are discussed below with the other punitive damages claims).[195]  Like Therese Scribner, Resource Recruiters is also entitled to the recovery of defamation damages for "loss of reputation and business . . . and its need to advertise to restore its reputation." [196]

### lost income

■ However, the evidence did not establish any loss of income or business, or any damage to reputation, sustained by Therese Scribner.  Both of the Grandy's witnesses, Robert McGregor and Debbie Shelton testified that *they did not believe the lies told to them by Nau and Theobold about Scribner, and they*—particularly Shelton—*continued to hold Therese in high esteem.*  Of course, Scribner sustained no loss of business loss other than the compensation she would have received from Resource Recruiters under the terminated Grandy's contract.  However, this loss by Scribner would be included in the actual damages already awarded to Resource Recruiters for Waffle House's interference with the Grandy's agreement.

Of course, Resource Recruiters did sustain an economic loss: the termination of its written recruiting agreement with Grandy's.  However, there was no evidence concerning actual defamation damages sustained by Resource Recruiters other than the loss of the Grandy's contract (e.g., no proof of any expenses it incurred to "repair its reputation.") [197]  And, the actual damages on the defamation claim for the loss of the Grandy's contract would be exactly the same as the damages awarded to Resource Recruiters for Waffle House's tortious interference with the Grandy's agreement.

### mental anguish

■ Therese Scribner, however, is entitled to the recovery for mental anguish as actual damages under her defamation claim. *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803 (5th Cir.1996).

Over two years had passed since Therese had been wrongfully terminated by Waffle House.  Then suddenly, without warning, Waffle House began to attack Scribner with the Skip Nau and Dave Theobold lies about her supposed, but non-existent "raids on Waffle House" to find recruits for Grandy's.  The mental anguish that Scribner suffered (like that caused by the sexual harassment two years earlier) "went far beyond hurt, anger, and frustration to manifest itself in the form of humiliation and stress."

Fearful of losing a valuable client,[198] Therese immediately assured both Debbie Shelton and Robert McGregor (of Grandy's) that Skip Nau had lied about her.  However, this was successful for only ten days, when Dave Theobold told additional lies about Scribner and threatened Grandy's with a "recruiting war."  And, shortly after Theobold's call, the recruiting agreement that Resource Recruiters had with Grandy's was terminated.

Considering all of the surrounding circumstances, and having observed the plaintiff's humiliation and stress at this second Waffle House attack upon her—which renewed the embarrassment, disgust and despair caused by her abrupt termination—the Court finds that Therese Scribner is entitled to recover $119,500 as mental anguish damages.

### E. Intentional Infliction Of Emotional Distress

■ Texas law also recognizes the tort of intentional infliction of emotional distress,

195. *Brown v. Petrolite Corp.,* 965 F.2d 38 (5th Cir.1992); *City of Brownsville v. Pena,* 716 S.W.2d 677, 681 (Tex.Civ.App.–Corpus Christi 1968, no writ); *Vista Chevrolet, Inc. v. Barron,* 698 S.W.2d 435, 441 (Tex.Civ.App.–Corpus Christi 1985, no writ).

196. *Brown,* 965 F.2d at 45–46.

197. Nor was there any proof of any separate "mental anguish" damages that Resource Recruiters suffered because of the defamation of Therese Scribner.

198. At a time when Therese Scribner's husband had been laid off by his employer, McDonald Douglas.  See Exhs. 196–198 (containing a record of his unemployment compensation).

adopting the elements set forth in the Restatement (Second) of Torts § 46 (1965). To recover under this claim, Therese Scribner was required to prove (i) that Waffle House acted intentionally or recklessly; (ii) that its conduct was extreme and outrageous; (iii) that its actions caused her emotional distress; and (iv) that this emotional distress was severe.[199]

Although Scribner established each of these four elements, it is not necessary to discuss the facts concerning the severe emotional distress inflicted upon her by Waffle House. This is because any damage award under this emotional distress claim would be identical to the mental anguish damage award made for her sexual harassment claim plus the mental anguish damage award made in her defamation claim (that is, a total of $119,500).

### F. Breach Of Contract

As discussed above,[200] there was no agreement between Waffle House (through Steve Wright) and Therese Scribner that her employment could only be terminated for cause.

### G. Summary Of Actual Damages

In summary, the actual damages sustained by the plaintiffs Therese Scribner and Resource Recruiters under each theory of recovery discussed above are:

| | | |
|---|---|---|
| Willful Pay Discrimination (Scribner) | | $ 70,250 |
| Sexual Harassment (Scribner) | | |
| lost income | 115,775 | |
| mental anguish | 358,000 | |
| | | 473,775 |
| Intentional Interference (Resource) | | |
| lost income | | 24,188 |
| Defamation (Scribner) | | |
| actual damages | -nominal- | |
| mental anguish | 119,500 | |
| | | 119,500 |
| Defamation (Resource) | | -0- |
| Emotional Distress (both plaintiffs) | | -0- |
| Breach of Contract (Scribner) | | -0- |
| Total: | | $687,713 [201] |

**199.** *Twyman v. Twyman*, 855 S.W.2d 619 (Tex. 1993); *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).

**200.** See Section III A 3 (The Plaintiff's Hiring By Waffle House), at fn. 44 (finding that Wright did not tell Scribner that she could only be terminat-

### V. PUNITIVE DAMAGES

### A. The Applicable Law

The general principles for recovery of punitive damages by a plaintiff who prevails on federal claims or on state law claims are governed by *BMW of North America v. Gore*, —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); and *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

In *BMW of North America*, the Supreme Court derived these principles from its earlier decisions in *Haslip* and *TXO*:

> Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. ... *Haslip*, 499 U.S., at 22, 111 S.Ct., at 1045–1046. In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. ... See *TXO*, 509 U.S., at 456, 113 S.Ct., at 2719–2720; *Haslip*, 499 U.S., at 21, 22, 111 S.Ct., at 1045, 1045–1046. Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment. Cf. *TXO*, 509 U.S., at 456, 113 S.Ct., at 2719–2720.

In applying these principles to the jury verdict in *BMW of North America*, which awarded $4,000 in actual damages and $2 million in punitive damages to the purchaser of a BMW that had been repainted after being damaged before delivery, the Court required an analysis of these three factors:

> ... the degree of reprehensibility of the wrongful conduct (i.e., the nondisclosure of the damage and repainting);

ed for cause, i.e., for "violating the employee conduct policy").

**201.** For the reasons explained, the plaintiff is not awarded damages under her state law claims for breach of contract and intentional infliction of emotional distress.

... the disparity between the actual or potential harm suffered by the plaintiff and his punitive damage award; and

... the difference between this remedy and the civil penalties authorized or imposed under comparable cases.

(i) *the degree of reprehensibility:* With respect to the first factor, the Court considered "the degree of reprehensibility" of the defendant's conduct to be "the most important indicium of the reasonableness of the defendant's conduct." In explaining this factor, the Court stated:

... Certainly, *evidence that a defendant has repeatedly engaged in prohibited conduct* while knowing or suspecting that it was unlawful would provide relevant support for an argument that *strong medicine is required to cure the defendant's disrespect for the law.* ... *Haslip,* 499 U.S., at 5, 111 S.Ct., at 1036, *TXO,* 509 U.S., at 453, 113 S.Ct., at 2717–2718 (—— U.S. at ——, 116 S.Ct. at 1599).

(ii) *the ratio of punitive to actual damages:* With respect to the second factor ("reasonable relationship"), the Court emphasized that we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, or "ratio," comparing "actual and potential damages to the punitive award." Here, the Court noted that:

... low awards of compensatory damages may properly support a higher ratio ... if, for example, *a particularly egregious act has resulted in only a small amount of economic damages.* A higher ratio may also be justified in cases in which *the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.* ... *TXO,* 509 U.S., at 482, 113 S.Ct., at 2732 (O'CONNOR, J., dissenting).

(iii) *sanctions for comparable misconduct:* With respect to the third factor, the Supreme Court felt that "a third indicium of excessiveness" is provided by a comparison of the punitive damages award to the penalties imposed in similar cases for the same type of misconduct.

The first Fifth Circuit punitive damages case following *Pacific Mutual Life Ins. Co. v. Haslip,* (the first of the three Supreme Court punitive damages trilogy) was *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th Cir. July 1991)—*Eichenseer* had been pending on writ or certiorari at the time of the *Haslip* decision in 1991. After *Haslip,* the Supreme Court simply vacated the prior Fifth Circuit decision in *Eichenseer,* 881 F.2d 1355, and remanded the case "for reconsideration in light of *Pacific Mutual Life Insurance Co. v. Haslip.*" Accordingly, in the *Eichenseer* remand, the Fifth Circuit revisited a "controversial issue" of whether or not a large punitive damages award is unconstitutional.

Until recently, however, the Supreme Court had offered little more than vague suggestions that large punitive damages awards might offend constitutional requirements. In *Pacific Mutual Life Insurance Co. v. Haslip,* the Court finally converted these suggestions into substance: the Court recognized that, under certain circumstances, an award of punitive damages may "cross the line into the area of constitutional impropriety." [499 U.S. at 24] 111 S.Ct. at 1046. Significantly, the Court concluded that the specific circumstances in *Haslip* did not raise constitutional concerns. *Id.*

Like *Haslip, Eichenseer* involved a dispute concerning coverage under health and medical insurance policies.[202] In *Eichenseer,* the insurance company (Reserve Life) denied liability, claiming that the plaintiff's "acute pelvic inflammatory disease was a preexisting illness which the policy did not cover"—a claim based *only* upon this single notation made by the doctor in the hospital records: that the plaintiff had experienced pain in the lower abdomen *"for the last 2–3 years."* Although the plaintiff submitted this doctor's affidavit swearing that the statement should have read, "for the last 2–3 *days,*" Reserve Life first lost this affidavit—just as it had

---

**202.** In *Haslip,* the insurance agent collected premiums from the plaintiffs, but failed to remit them to the insurance company or to send "notices of lapsed coverage" to the plaintiffs; the company denied coverage for hospitalization expenses incurred before the "plaintiffs learned their insurance had lapsed."

previously lost the plaintiff's medical records submitted—and then again denied the claim, supposedly because of *the doctor's "failure to correct the hospital records."* After three years and three months of litigation, and after receiving still another copy of the lost affidavit, Reserve Life finally paid Eichenseer the benefits under the hospitalization policy. However:

> Despite the payment of the benefits under the insurance policy ... Eichenseer continued to pursue the instant action for extracontractual damages and punitive damages. After a bench trial, the district court awarded Eichenseer $1000 in compensatory damages and $500,000 in punitive damages. Reserve Life appealed.[203] (934 F.2d at 1380.)

The Fifth Circuit, of course, noted the similarity between this trial court award of punitive damages in *Eichenseer* to the jury award in *Haslip* ("$200,000 in compensatory damages, including $4,000 in out-of-pocket expenses, and $840,000 in punitive damages"). Then, the Fifth Circuit held that under *Haslip* the constitutionality of an award of punitive damages is a function of two practical considerations:

> We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. ... *Id.* at 18, 111 S.Ct. at 1043. In essence, the Court in *Haslip* reasoned that the constitutionality of an award of punitive damages is a function of two practical considerations: (1) *whether the circumstances of the case indicate that the award is reasonable,* and (2) *whether the procedure used in assessing and reviewing the award imposes a sufficiently definite and meaningful constraint on the discretion of the factfinder.*[204]

With regard to the first consideration, "the Supreme Court (in *Haslip* ) identified a couple of facts that supported the amount of the punitive damage award in *Haslip:* (1) the conduct in question was reprehensible, and

(2) society has a significant interest in discouraging insurers from similar conduct." (934 F.2d at 1381). And, with regard to the second consideration, the Fifth Circuit stated:

> ... The Supreme Court acknowledged several procedural devices that controlled the discretion of the jury in *Haslip.* First, the trial court properly explained to the jurors the deterrent and retributive purposes of punitive damages. Second, the trial court and the Alabama Supreme Court applied a series of tests to ensure that the punitive damages were reasonable in their amount and rational in light of their purpose to punish and deter wrongful conduct.[205]

*Circumstances Indicating Reasonableness of Award:* In applying this *Haslip* factor, *Eichenseer* first recognized that "the calculation of an appropriate amount of punitive damages" is traditionally left to the unique discretion of the fact finder ... that the "degree of punishment to be inflicted" necessarily must depend "on the peculiar circumstances of each case" ... and that if "there are *any* circumstances of probative force that support the amount" of punitive damages awarded, "then the award meets the 'reasonableness' prong of the due process test in *Haslip.*" Then in applying these principles, the Fifth Circuit concluded that the $500,000 award of punitive damages to Eichenseer "did not lack support in the record." Specifically:

> (i) *particularly egregious conduct:* Reserve Life's conduct was particularly egregious because, although not malicious, "it nonetheless acted with reckless disregard—if not intentional disregard" and its conduct was "far more offensive than mere incompetent recordkeeping or clerical error."

> (ii) *failure to investigate:* Reserve Life did not give the claim "even the most cursory investigation" and in fact, "*declined even to interview Eichenseer or her*

---

**203.** 934 F.2d at 1380.

**204.** *Id.* at 1381.

**205.** *Id.*

*doctor.*" [206]

(iii) *ignoring the facts:* Reserve Life simply ignored documents submitted by Eichenseer that "indicated her claim was valid" and even lost these documents "under suspicious circumstances."

(iv) *reasons for the egregious conduct:* Reserve Life's "cavalier handling of Eichenseer's claim" was an unfortunate example of an insurer's "desire to save money at the expense of its insureds"—so "a mere slap on the wrist" was inadequate to punish this "egregious" conduct.

(v) *the corporate size of defendant:* Reserve Life's net worth was $157,000,000, and the $500,000 punitive damages award "was necessary to deter the insurer from future misconduct" [207]—because *"a small award of punitive damages would have had little deterrent effect against a corporation of Reserve Life's magnitude."*

(vi) *similar conduct by the defendant:* "In addition, *and perhaps most importantly,*" Reserve Life had been "assessed a $150,000 punitive damages award" several years earlier on "the basis of conduct remarkably similar to the egregious" conduct towards Eichenseer; and that smaller award of $150,000 appears "to have had little effect on the manner in which Reserve Life handled claims."

After this analysis,[208] the Fifth Circuit concluded that the "first of the two practical considerations in *Haslip,* therefore, does not suggest that the ($500,000) award against Reserve Life offended the requirements of due process."

*Procedural Protection:* In applying the second *Haslip* factor, the Fifth Circuit concluded in *Eichenseer* that "the procedure used in assessing and reviewing" the $500,000 award of punitive damages did impose "a sufficiently definite and meaningful constraint on the discretion of the fact finder." Specifically:

... Examples of effective procedural safeguards include, but are not limited to the following: comprehensive instructions that explain the nature of punitive damages, state laws that limit the amount or applicability of punitive damages ... and rigorous systems of appellant review of punitive damages. ...

...

... In the instant case, however, other procedural safeguards have controlled the discretion of the fact finder. *The district court completed a rigorous examination of the appropriateness of the punitive damages it imposed* against Reserve Life ... (including) the reprehensibility of the defendant's conduct, the "financial position" of the defendant, the costs of litigation, etc.[209]

Applying the *Haslip* factors to the district court's assessment of punitive damages, the Fifth Circuit found that "the peculiar circumstances" of Reserve Life's egregious conduct toward its insured, Eichenseer (it's failure to investigate, its disregard of the facts, the reasons for its "cavalier treatment" of her claim, its corporate size, etc.)—and the rigorous procedures used by the district court in assessing and determining the amount of the award—supported the $500,000 punitive damage award despite the small amount of actual damages ($1,000).

Other Fifth Circuit cases applying the *Haslip* analysis to punitive damage awards include *Brown v. Petrolite Corp.,* 965 F.2d 38 (5th Cir.1992) (defamation case: sustaining jury award of $60,000 in actual damages and $700,000 in exemplary damages,[210] because

---

**206.** Similarly, the employee who reviewed Eichenseer's claim did not even consult with the in-house doctor at Reserve Life before denying the claim.

**207.** The $500,000 punitive damages awarded in *Eichenseer* was *"less than one third of one percent of Reserve Life's net worth."*

**208.** Of course, the first factor applied by the Fifth Circuit in *Eichenseer* "circumstances indicating the reasonableness of the punitive dam-

ages award" encompasses all three of the factors later set by the Supreme Court in *BMW of North America:* i.e., the degree of reprehensibility, the ratio of punitive to actual damages, and sanctions for comparable misconduct.

**209.** *Id.* at 1385–86.

**210.** In *Brown v. Petrolite Corp.,* the jury award of $300,000 in punitive damages to the individual plaintiff was reversed because the jury also found

the defendant acted with "actual malice" toward the corporate plaintiff); *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085 (5th Cir. 1991) (asbestos case: punitive damage award of $6,100,000 was not excessive, although this was 20 times the amount of actual damages); *Nichols v. Shelter Life Ins. Co.*, 923 F.2d 1158 (5th Cir.1991) (suit for misrepresentation of insurance coverage: rejecting attack on jury's award of $50,247 for actual damages, $75,000 for "emotional distress and mental anxiety damages," and $200,000 in punitive damages); and *Marcus, Stowell & Beye Govt. Securities, Inc. v. Jefferson Investment Corp.*, 797 F.2d 227 (5th Cir.1986) (tortious interference with contract: Fifth Circuit affirmed jury award of $119,000 in actual damages and $150,000 in punitive damages).[211]

### B. *Punitive Damages: Sexual Harassment*

#### 1. *The Circumstances Of This Case*

█ Applying the *BMW* and *Eichenseer* punitive damage factors to the circumstances of Waffle House's severe and pervasive sexual harassment of Therese Scribner, it is clear that a significant award of punitive damages is required to punish Waffle House for its egregious conduct and to deter it from engaging in such reprehensible wrongdoing in the future. The rationale for this substantial award of punitive damages is explained in the following explanation of the deterrent and retributive purposes of this award.

#### *(i) particularly egregious conduct*

The reprehensible conduct of Waffle House towards Therese Scribner was far more offensive than the sexual harassment of the plaintiff in any other case that this Court has seen, or tried or read.

There was not just one Waffle House supervisor that sexually harassed Therese: there were several officers, executives and supervisors, including Steve Wright, Steve Oswald, Tim Mercer, and others. These were not lower level Waffle House supervisors: when the harassment took place, Wright was a Vice–President and Oswald was an Assistant Vice–President and Regional Manager, Tim Mercer was a Division Manager. Despite their harassment of the plaintiff, Steve Wright was promoted and is now a Senior Vice–President in Atlanta, Steve Oswald also received promotions, and Tim Mercer (instead of being fired for incompetency) received the reward of a Waffle House franchise restaurant in Colorado.

Moreover, the sexual harassment of Therese Scribner did not take place in private without witnesses. Instead, acts of harassment were observed by the top executives of Waffle House—including the President, CEO and 78% owner (Joe Rogers), a Senior Vice–President (Lib Julian), an Area Vice–President (Larry Cannon)—as well as by other supervisors,[212] the wives of some of these executives and supervisors,[213] by numerous hourly employees at the Waffle House restaurants, and even by Therese's neighbors and friends.[214]

Although the conduct of Wright, Oswald, Mercer and others was in violation of the Waffle House sexual harassment policy, they were never reprimanded and they were never sanctioned in any way. Instead, the Waffle House witnesses at trial—including Joe Rogers (President, CEO and 78% owner)—distorted the company's sexual harassment policy *and lied about it*, claiming that none of the repugnant acts of sexual harassment by Wright, Oswald and Mercer were wrong be-

that he "had suffered only nominal damages." (965 F.2d at 48).

**211.** See also *Hiltgen v. Sumrall*, 47 F.3d 695 (5th Cir.1995) (auto-truck accident: $1.5 million in actual damages and $1.5 million in punitive damages); *Texas Tanks, Inc. v. Owens–Corning Fiberglas Corp.*, 99 F.3d 734 (5th Cir.1996) (trade secrets case affirming jury award of $2 million in actual damages and $3 million in punitive damages because defendant "acted with malice" in

beginning development of its design only one week after it received the plaintiff's prototype).

**212.** E.g., Unit Managers Michael Robare, Don Kelly, David Coleman, Steve Williams, Dan Gay, Vic Neely, Kyle Coleman, David Adams and others.

**213.** E.g., Mary Wright and Sherry Mercer.

**214.** E.g., Erma Cook and Fran Dubuisson.

cause they were supposedly "welcomed" and "participated in" by Therese Scribner.

Waffle House also lied to the Texas Commission on Human Rights in responding to the plaintiff's charges of discrimination. And, its top officers and executives and its other witnesses—including Rogers, Nau, Julian, Wright, Cannon, Oswald, Dave Theobold, Robert Bowman, John Robertson, J. Michael Upton, Tim and Sherry Mercer, etc.—lied to Scribner's attorney at depositions and trial and they repeatedly *lied to this Court during trial.* Indeed, this case is unique in that the top executive of Waffle House—President, CEO and 78% owner, Joe Rogers—told numerous egregious lies during his testimony.[215]

### (ii) *failure to investigate*

Therese Scribner complained to Vice–President John Robertson in January 1989 about the constant sexual harassment by Steve Wright. In November 1989, she complained to Area Vice–President Larry Cannon about the incessant sexual harassment by Steve Oswald. Neither Waffle House executive, Robertson or Cannon, did anything about the plaintiff's complaints and pleas for help, much less investigate them.

In October 1990, Therese complained to her new supervisor from the Atlanta headquarters, Skip Nau, Vice–President of the People. She gave Nau a few specific examples of the sexual misconduct against her by Steve Wright and Steve Oswald and the names of other Waffle House supervisors who had witnessed some of the harassment—including Lib Julian, Senior Executive Vice–President, five District Managers, and Skip Nau himself (Oswald's "signing bonus/weekend with Therese" statements to new recruits). Nau did not investigate these incidents by talking to Lib Julian or anyone else, but he did report them to *Joe Rogers, the top executive and majority owner of Waffle*

*House*—in Nau's "the bottom line" is "we need to keep Therese as a recruiter" memorandum (Exhibit 24).

Joe Rogers conducted no meaningful investigation of Scribner's complaints of sexual harassment. *He never contacted Therese,* or had anyone else do so, about the complaints reported by Nau. Instead, at the Executive Committee meeting—in the presence of committee members Lib Julian, Robert Bowman (Executive Vice–President) and J. Michael McCarthy (Executive Vice–President and Chief Financial Officer)—Joe Rogers berated Nau, telling him that *"You have no facts. You dress up conclusions without any facts."* The only person that Rogers "questioned" about Scribner's sexual harassment complaints was Steve Wright, who was brought into the Executive Committee—where he flatly denied any improper conduct (contrary to Wright's admissions of some of the improper conduct toward the plaintiff at Wright's deposition and at trial).[216]

The Executive Committee meeting ended with Wright's designation of Lib Julian to "get with Steve Wright and find out what's going on." Julian's so-called investigation consisted of a 15–20 minute discussion that afternoon with Wright, in which Julian told Wright to "get in touch with Steve Oswald," and get this "fixed now." Instead, Wright made an angry call to Therese Scribner, threatening her that "this will not advance your career."

*Indeed, it did not!* Joe Rogers decided that Scribner would be terminated, and "he let Skip Nau do this," some four months after the Executive Committee meeting.

### (iii) *ignoring the facts*

As just discussed, Waffle House simply ignored the information that Therese Scribner gave to Skip Nau, i.e. the *few examples* of her sexual harassment by Wright and

---

**215.** For example, in addition to those noted above, Joe Rogers told these lies to the Court at trial: that Seal "had twice the job duties and challenges that Therese Scribner did"; that he had repeatedly instructed Steve Wright and others "that he wanted the plaintiff fired"; that two years after Scribner was terminated "there was a sudden fire storm of people leaving" because she recruited them for Grandy's; and that Scribner

"was not a recruiter," but only "a placement secretary."

**216.** Following the meeting, Steve Wright did admit to Joe Rogers that he (and Oswald) had made the "Dolly Parton" and "signing bonus" comments; Rogers merely said, *"Do not do things like that again."*

Oswald. Indeed, Nau's report was not merely "ignored"; it lead directly to Therese's rapid termination. In addition, as discussed above, other Waffle House officers and executives simply ignored the acts of sexual harassment of the plaintiff—by Wright, Oswald and Tim Mercer—never reporting any of this repugnant conduct or sanctioning the offenders for their actions. Finally, Waffle House not only ignored the facts, it also totally ignored its own written sexual harassment policy.

### (iv) *reasons for the egregious conduct*

The main reason was this: *Therese Scribner was merely a woman!*

As the plaintiff's attorney argued, Waffle House is a "long entrenched private family dynasty" that "time and the law have passed by." It is run by the son of a Waffle House founder, and its operations are directed exclusively by white males. Top corporate management has never included any females or minorities.

Indeed, women employees at Waffle House are treated with disrespect and contempt, as demonstrated by the sexual harassment of Therese Scribner (the Polaroid "crotch shot," her "big boobs," eating "the lining out of her pussy," *ad nauseam* and other female employees (e.g., Wright telling Therese that the charges of rape of a waitress by a Unit Manager "was comical")).

Nor, from the credible evidence, do minorities fare any better at Waffle House. For example, Steve Wright—now a member of the top echelon of company management in Atlanta—told Scribner that he *"pretty much wanted white males,"* and that she should not recruit *"any more damn niggers."* [217]

### (v) *the size of Waffle House*

Although there was no evidence concerning the net worth of Waffle House, it had total revenues of $283 million from its company-operated restaurants in the last fiscal year before trial, and the total revenue of its additional 465 "franchise restaurants" was $187 million during this same period. Also, the net income of Waffle House for the last fiscal year before trial was approximately $12 million.[218]

### (vi) *similar conduct by Waffle House*

Although there was no evidence of any sanctions being imposed against Waffle House for similar conduct before trial, the evidence did contain some examples of the sexual harassment of other females who worked as hourly employees at the restaurants in the Dallas–Fort Worth area. The most egregious of these incidents was the criminal charges filed against a Unit Manager for raping a waitress; when Therese Scribner told Steve Wright about this, *"he thought it was comical"* and *"he laughed about it."*

In addition, the Waffle House attitude towards its written sexual harassment policy was cavalier, to say the very least. Although top officers and executives witnessed violations of this policy, no offender was ever reported or sanctioned. Indeed, the attitude of the Waffle House witnesses during trial—including Joe Rogers (President, CEO and 78% owner)—would simply render the policy meaningless by their ridiculous interpretation: that it did not prohibit on-the-job "sexual jokes and comments" and "guy talk," and that the policy was not violated by an executive asking Therese Scribner *"if she wanted to sit on his face"* or if she *"had ever been eaten by a man with ice in his mouth"* unless this conduct was "unwelcome."

■ Finally, there is one other case in which punitive damages were assessed against Waffle House for the sexually harassment of a waitress by a "shift manager"—who, among other things, repeatedly made comments about the size of his penis and his sexual prowess, requesting sexual favors from her and groping her, and making numerous other obscene and lewd comments to this waitress. When she reported this be-

---

**217.** This treatment of women and minorities had been tempered only slightly in the years before trial, when perhaps "several" of Waffle House's 140 District Managers and 45 Division Managers were female—since there were no female Regional Managers or Area Managers and since the corporate management in Atlanta has never included any females, African–American, Hispanics, or other minorities.

**218.** According to the testimony of Joe Rogers.

havior to her Unit Manager, he laughed off the incident and took no action. After the shift manager assaulted the waitress again, she quit her job, and only then did Waffle House terminate him. The jury awarded $50,000 in actual damages and $500,000 in punitive damages, and the defendant's post-trial motions to set aside the verdict were denied. However, this case—*Adkins v. Waffle House*, No. 3:95–CV–54OWS (S.D.Miss. September 16, 1996)—took place after the trial in this case, and it is pending on appeal. Accordingly, it is given no weight in the determination of the award of punitive damages in this case.

(vii) *ratio of actual to punitive damages*

Although both *BMW* and *Eichenseer* reject the notion that the amount (and constitutionality) of punitive damages "is marked by a simple mathematical formula," it is instructive for this Court—as it was for the Supreme Court and for the Fifth Circuit—to consider the ratio of actual damages to punitive damages awarded in other cases. This ratio in the Fifth Circuit cases cited above are:

|  | Actual | Punitive | Ratio |
|---|---|---|---|
| *Eichenseer* | 1,000 | 500,000 | 500–1 |
| *Glasscock* | 317,625 | 6.1 million | 20–1 |
| *Brown* | 60,000 | 700,000 | 10–1 |
| *Haslip* | 200,000 | 840,000 | 4–1 |
| *Nichols* | 125,000 | 200,000 | 2–1 [219] |

If these same ratios were applied to the actual damage award in this case for the plaintiff's sexual harassment claim—i.e., $473,775 [220]—then the punitive damage award would range from $887,550 in *Nichols* (2–1) to $1,895,100 in *Haslip* (4–1) to $4,737,750 in *Brown* (10–1), and to $9,475,500 in *Glasscock* (20–1). [221]

(viii) *the punitive damage award*

In both *Haslip* and *Nichols,* the reprehensible conduct involved the defendant's denial of liability and misrepresentations of coverage under an insurance policy. In *Brown*,

the wrongful conduct was the defamation of the prevailing plaintiff.

In this case, the reprehensible conduct of Waffle House lasted over 3–1/2 years, the severe and pervasive sexual harassment of Therese Scribner was either done or condoned by the top officers and executives of Waffle House (including the President, six Vice–Presidents and Executive Vice–Presidents, and several Area and Regional Managers and Assistant Vice–Presidents). In addition, Waffle House executives successfully bribed two witnesses to give perjured testimony and attempted to suborn perjury by another witness shortly before trial.

A small amount of punitive damages would not adequately punish the particularly egregious conduct in this case and serve as an adequate deterrent to Waffle House. A nominal award of punitive damages would have "little deterrent effect against a corporation" of Waffle House's size and success. And, as the plaintiffs' attorney correctly argued:

"Waffle House needs a wake-up call. . . . The call needs to go out that it is not right to lie; it's not right to allow sexual harassment of its employees; it's not right to discriminate against women in pay; it's not right to Rambo your way through to destroy a person's business by unjustified paranoia; it's not right to suborn perjury; it's not right to maliciously defame someone; and it's not right to sign false affidavits. The Court is dealing with a long entrenched private family dynasty. It is a dynasty that time and the law has passed by. This company will not change unless and until the Court makes it financially unpalatable for this company to continue to do business as they have in the past."

Accordingly, under the egregious facts of this case, this Court finds that a reasonable amount of punitive damages for the severe,

**219.** The *Nichols* figures include the $75,000 award for emotional distress; if that is excluded, the actual damages would be $50,247, and the *Nichols* ratio would be about 4–1.

**220.** As discussed above, this consists of $133,920 in lost income due to the retaliatory discharge and mental anguish damages of $358,000.

**221.** Because *Eichenseer* involved only minimal actual damages ($1,000), this is not comparable to the actual sexual harassment damages of $473,775 in this case.

pervasive and relentless sexual harassment of Therese Scribner would be an award of $6.3 million against Waffle House.

### 2. *The Constraints And Procedural Protections*

Obviously, this $6.3 million of punitive damages to Therese Scribner is very large. It is 13 times the award of actual damages for the severe, pervasive sexual harassment. Accordingly, this Court—like the appellate judges who will review this punitive damage award—has taken pains to conduct a rigorous examination to assure that "the procedure used in assessing and reviewing" this punitive damage award impose the required "definite and meaningful constraint on the discretion" of this Court. In fact, the primary reason for the length of this opinion was to detail the depth and depravity of the wrongful conduct and the involvement of the executives and supervisors who run (and own) Waffle House—from the top, the President, CEO and 78% owner and the Executive Committee, to the lowest level of management, the District and Division Managers, like the perjurer Tim Mercer.

In addition, this Court has conducted a rigorous examination of the appropriateness and the size of the punitive damages award. And, because of the circumstances surrounding the egregious conduct of Waffle House described in this opinion, this Court concludes that "the strong medicine" of $6.3 million in punitive damages is "required to cure the defendant's disrespect for the law." *BMW*, —— U.S. at ——, 116 S.Ct. at 1601.

### C. *Punitive Damages: Defamation And Tortious Interference*

■ As discussed above, Therese Scribner is entitled to the recovery of punitive damages on her claim for defamation based on the malicious lies told by the two Waffle House executives (Skip Nau and Dave Theobold) to Robert McGregor of Grandy's. Similarly, Resource Recruiters is entitled to a punitive damage award on its claim that Waffle House tortiously interfered with the Grandy's contract by the egregious acts of Nau and Theobold—which were certainly condoned, if not authorized in advance, by the defendant's top officers and executives.

Obviously, the circumstances surrounding the defamation and the tortious interference are identical. Also, the punishment of Waffle House for its defamation of Therese Scribner would have the same purpose as the punishment of the defendant for its tortious interference with the Grandy's–Resource Recruiters agreement. Therefore, a joint award of punitive damages to Scribner and Resource is appropriate.

### 1. *The Circumstances of the Defamation And The Tortious Interference*

Applying the *BMW* and *Eichenseer* punitive damage factors to the circumstances of Waffle House defamation of Therese Scribner and its tortious interference with the Resource–Grandy's recruiting contract, it is clear that a large award of punitive damages is required for punishment and deterrence.

#### (i) *particularly egregious conduct*

The evidence did establish even more reprehensible conduct by Waffle House, this time the lies and threats of two executives, Vice–President Skip Nau and Area Vice–President Dave Theobold—egregious conduct that was condoned, if not approved in advance, by the corporate heads of Waffle House (including President, CEO and 78% stockholder, Joe Rogers). Indeed, the malice with which the defamation of Scribner and the tortious interference with Resource Recruiters' contract was accomplished, was the same type of "ill-will, spite and evil motive" that Waffle House displayed when it abruptly terminated the plaintiff for false reasons after she had complained in late 1989—to the same Skip Nau—about the sexual harassment of her by Steve Wright and Steve Oswald.

In addition, both Skip Nau and Dave Theobold lied about their misconduct; and Nau's lies were clearly established by the notes that Robert McGregor made following their telephone conversation.

#### (ii) *failure to investigate*

There was no "investigation" of the supposed "raid" of Waffle House employees by Therese Scribner and Resource Recruiters. If there had been even a minimal investigation—i.e., if Waffle House had just contacted

the plaintiffs or some of the departing Unit Managers—it would have learned that, as these witnesses testified at trial, it was the understandably dissatisfied Waffle House employees who contacted the plaintiffs in attempts to find better jobs.

### (iii) *ignoring the facts*

Because of Waffle House's failure to investigate the purported "raiding," it did not learn any facts to ignore.

### (iv) *reasons for the egregious conduct*

Here, there is little doubt: Waffle House wanted to punish the plaintiffs because they had the audacity and tenacity to file and pursue this case against Waffle House—and to withstand the bitter and unrelenting retaliation by Waffle House. This is clearly shown by the Waffle House attempt to suborn perjury by one trial witness (Dave Smith) and its successful bribery of two other witnesses (the Mercers).

### *the other BMW–Eichenseer factors: (v)–(vii)*

Each of the remaining punitive damage factors—(v) the corporate size of Waffle House, (vi) similar conduct by Waffle House, and (vii) the ratio of actual to punishment damages—are the same as those discussed above with respect to the punitive damages award for the sexual harassment of Therese Scribner.

With respect to the actual/punitive damage ratio, if the same ratios applied in the cases discussed above in (Section V.B1) were applied to the actual damage award to Resource Recruiters on the tortious interference claim (i.e., $24,188), then the punitive damage award would range from $48,376 in *Nichols* (2–1), to $96,752 in *Haslip* (4–1), to $241,880 in *Brown* (10–1), and to $483,760 in *Glasscock* (20–1).

And, with respect to the defamation claim of Therese Scribner, applying these same ratios to the $119,500 actual damage award for her mental anguish, the punitive damage award would range from $239,000 in *Nichols* (2–1), to $478,000 in *Haslip* (4–1), to $1,195,- 000 in *Brown* (10–1), and to $2,390,000 in *Glasscock* (20–1).

### (viii) *the punitive damage awards*

The reprehensible conduct of Waffle House in defaming Therese Scribner and in tortiously interfering with Resource Recruiters' contract with Grandy's took place in less than a month. However, its effects were devastating to both plaintiffs.

For Therese, it was *"deja vu"* all over again! Two years after being shocked by the lies of Waffle House and by her unjust and unwarranted termination, she was suddenly confronted with the new and equally false attacks, again by top Waffle House executives. Therese was afraid that she might lose a valuable client, and her stress was aggravated by the fact that her husband had just been laid off by his employer. And, these new baseless attacks by Waffle House forced Therese to relive the embarrassment and despair that she suffered when she was abruptly and wrongfully terminated in March 1990.

With respect to Resource Recruiters, it too was severely affected by the loss of the Grandy's recruiting business caused by the threats and lies of Skip Nau and Dave Theobold. Although Resource Recruiters certainly had other clients, and although it continued to place recruits with a number of companies, the Grandy's contract had furnished a stable line of business for Resource—business that would, as discussed above, certainly have continued and increased.

Again, a small punitive damage award would not be adequate punishment for the egregious and malicious conduct of Waffle House in defaming Therese Scribner and causing the termination of the Resource Recruiters–Grandy's contract. This Court would award $575,752 in punitive damages for the defamation and tortious interference if only two executives, Skip Nau and Dave Theobold, had been involved.

However, it was obvious that the highest level of Waffle House management—including *Joe Rogers*, the President, CEO and 78% owner (and the person who dominated the Executive Committee) and the other Waffle House executives who lied so repeatedly and blatantly at trial—either condoned the

wrongful conduct of Nau and Theobold or sanctioned it in advance. Accordingly, this Court finds that a reasonable amount of punitive damages for the defamation of Therese Scribner and the tortious interference with Resource Recruiters' contract would be an award of $1,149,504 against Waffle House.

### 2. *The Constraints And Procedural Protections*

Finally, after conducting the same rigorous examination of the appropriateness and the size of this punitive damage award that was applied above to the Scribner's sexual harassment claim, this Court concludes that "the strong medicine" of $6,300,000 in punitive damages is "required to cure" the disrespect and contempt that Waffle House obviously has "for the law." [222]

## VI. SUMMARY OF ACTUAL AND PUNITIVE DAMAGES

In summary, these are the actual and punitive damages awarded to Therese Scribner and Resource Recruiters under each of their liability claim:

| | | |
|---|---:|---:|
| Willful Pay Discrimination (Scribner) | | $ 70,250 |
| **Sexual Harassment (Scribner)** | | |
| lost income | 115,775 | |
| mental anguish | 358,000 | |
| punitive damages | 6,300,000 | |
| | | 6,773,775 |
| **Intentional Interference (Resource)** | | |
| lost income | | 24,188 |
| **Defamation (Scribner)** | | |
| lost income | -nominal- | |
| mental anguish | 119,500 | |
| | | 119,500 |
| **Punitive Damages For Tortious Interference And Defamation** (Both Scribner & Resource, Jointly) | | 1,149,504 |
| | **TOTAL:** | **$8,137,217** |

## VII. CONCLUSION

Therese Scribner was hired by Waffle House because its current Senior Vice–President saw Therese "in a revealing halter-top and short-shorts." She was paid less than male recruiters simply because she was a woman and did not "need to make as much as a man." After three and one-half years, Waffle House discharged Therese Scribner, supposedly because she was such a poor recruiter—but two years later, Waffle House maliciously caused the loss of the Resource Recruiters–Grandy's contract, supposedly because Therese was so good at recruiting.

Of course, Waffle House really discharged Therese Scribner because she complained, one too many times, about the severe, pervasive and disgusting sexual harassment she constantly received—repulsive conduct that was committed, witnessed and condoned by the company's top executives, by its other supervisors and employees, and indeed by the Waffle House President, CEO and 78% owner. When Scribner had the nerve to confront Waffle House in court because of its egregious misconduct, the Waffle House executives not only lied about their shameful actions, but they also bribed at least two witnesses and attempted to suborn perjury by another.

Of course, the actual and punitive damages assessed against Waffle House—because of the inexcusable conduct of its owner, its officers, its supervisors and others discussed at length in this opinion—are large: $663,525 in actual and $6,300,00 and $1,149,000 in punitive damages. However, this Court is convinced that, under the unique circumstances of this case, these damage awards are the least amounts that are needed to compensate the plaintiffs for their actual damages and to serve as adequate punishment of Waffle House for its egregious misconduct. Any smaller amounts would, this Court firmly believes, simply tell Waffle House:

> ... that it is alright to discriminate against females by paying them less than men;

> ... that there is nothing wrong with abusing its female (and minority) employees;

> ... that there is nothing wrong with terminating a female because she has complained of severe and pervasive sexual harassment by her supervisors and by officers and executives of Waffle House; and

> ... that it is perfectly acceptable to lie repeatedly under oath, to bribe witnesses, and to attempt to suborn perjury.

Accordingly, the plaintiffs are entitled to recover $687,713 in actual damages and

---

**222.** *BMW,* — U.S. at —, 116 S.Ct. at 1601.

$7,449,504 in punitive damages against Waffle House.